# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| CARLOS EDUARDO LOREFICE LYNCH and GRUPO BELLEVILLE HOLDINGS, LLC, a Delaware Limited Liability Company, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | C.A. No. 2019-0356-MTZ |
| R. ANGEL GONZALEZ GONZALEZ, TELEVIDEO SERVICES, INC., a Florida Corporation, JUAN PABLO ALVIZ and FERNANDO GUIDO CONTRERAS LOPEZ, | ) ) ) ) ) ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION
Date Submitted: April 23, 2020
Date Decided: July 31, 2020

Theodore A. Kittila and James G. McMillan, III, HALLORAN FARKAS & KITTILA, LLP, Wilmington, Delaware; Jeffrey M. Greilsheimer and Shaelyn Gambino-Morrison, FOX HORAN & CAMERINI LLP, New York, New York, *Attorneys for Plaintiffs Carlos Eduardo Lorefice Lynch and Grupo Belleville Holdings, LLC.*

William E. Gamgort and Jennifer M. Kinkus, YOUNG CONAWAY STARGATT & TAYLOR, LLP, Wilmington, Delaware; Omar Ortega, Rey Dorta, Valerie M. Hassan, and Evelyn Ferriol, DORTA & ORTEGA, P.A., Coral Gables, Florida, *Attorneys for Defendants R. Angel Gonzalez Gonzalez, Televideo Services, Inc., Juan Pablo Alviz, and Fernando Guido Contreras Lopez.*

**ZURN, Vice Chancellor.**

Trust is an asset that is often misappropriated. The risk of such misappropriation is higher when the trust one instills in another is so great that the trusted agent has the freedom to run rampant. In this case, the Court addresses such a misappropriation of trust after a successful media businessman expanded his operations to Argentina. To do so, he created a Delaware limited liability company to hold valuable media assets, including numerous subsidiaries created and operating in Argentina. A young attorney at the firm advising on the initial expansion efforts developed a rapport with the businessman and eventually became his right-hand man in Argentina. The attorney advised the businessman on Argentine law and served as the holding company's formal legal representative in Argentina, quickly gaining the businessman's unwavering trust.

To the businessman, the attorney was loyal and dedicated to doing right by the businessman and his company. But appearances can be deceiving. In the early days of their working relationship, the attorney identified and seized the opportunity to misappropriate the businessman's trust for his own gain. The attorney knew that the businessman trusted that the attorney's representations were accurate and, therefore, that the businessman would sign documents the attorney presented to him. Using his position of confidence, the attorney induced the businessman to sign documents stating that the attorney, not the businessman or his affiliate, was the company's majority member.

1

Shortly after those documents were signed, a new Argentine law required that an Argentine hold the majority interest in media companies operating in Argentina. This inspired the attorney to make his paper trail more elaborate. He informed the businessman that it was necessary to ensconce the attorney as the holding company's majority member to satisfy the new law. The attorney assured the businessman that the businessman would remain the company's true majority member and that the attorney was simply a placeholder in a larger scheme to facially satisfy Argentine holding regulations. The businessman agreed, subject to a secret agreement memorialized in a "counterdocument," which stated that the attorney would hold the majority interest in name only and for the businessman's benefit, and that he would return the majority interest to its true owner upon request. The attorney assured the businessman that he would execute the counterdocument and that it would be effective. The businessman took the attorney's word and believed the attorney would honor their agreement. The attorney did not.

After establishing himself as the company's majority member, the attorney deserted his placeholder role to seize actual control over the company. Now, the attorney seeks this Court's blessing, pointing to the paper trail that he carefully created to corroborate his control over the Company. But again, appearances can be deceiving. In this post-trial opinion determining the company's ownership and management structure, I find that the documents in the paper trail are not binding

2

contracts, and that if they were, the attorney fraudulently induced the businessman to execute those documents and has proceeded with unclean hands and in bad faith. I hold that the businessman and his deputy are the company's managers and that the businessman's affiliate is the company's majority member.

## I.    BACKGROUND

This opinion determines the ownership and management of Plaintiff Grupo Belleville Holdings ("GBH," "Belleville," or the "Company"), a Delaware limited liability company.[1]   On May 14, 2019, Plaintiff Carlos Eduardo Lorefice Lynch ("CLL," "Lorefice," or "Lynch," and together with Belleville, "Plaintiffs") filed this action against defendants Remigio Angel Gonzalez Gonzalez, the businessman, ("RAGG" or "Gonzalez"), Televideo Services, Inc. ("Televideo"), Juan Pablo Alviz ("Alviz"), and Fernando Guido Contreras Lopez ("Lopez") (collectively, "Defendants").[2]   The Complaint seeks injunctive and declaratory relief arising from Defendants' allegedly fraudulent attempt to strip Lynch, the attorney, of his ownership interest in Belleville.

---

[1] Citations in the form of "[Name] Tr. —" refer to witness testimony from the trial transcripts.  Citations in the form of "[Name] Dep. —" refer to deposition transcripts in the record.  Citations in the form of "PTO ¶ —" refer to stipulated facts in the pre-trial order.  *See* Docket Item ("D.I.") 179 [hereinafter "PTO"].  Citations in the form of "JX — at —" refer to a trial exhibit.

[2] D.I. 1 [hereinafter "Compl."].  Witnesses and documents in the record refer to the parties by various monikers and surnames.  I intend no disrespect to the parties by referring to them as "Lynch" and "Gonzalez" throughout.

Count I seeks declaratory relief pursuant to 6 *Del. C.* § 18-110.[3]  Count II

seeks declaratory relief pursuant to 10 *Del. C.* § 6501.[4]  Count III seeks injunctive

relief.[5]  Pursuant to those Counts, Plaintiffs sought a declaratory judgment that (1)

Lynch holds 65% of Belleville, (2) Gonzalez holds 5% of Belleville, (3) Televideo

holds 30% of Belleville, (4) Lynch is Belleville's sole manager, and (5) all contrary

actions taken by Gonzalez and Televideo are null and void.[6]  Count IV asserts a

---

[3] Compl. ¶¶ 92–102.

[4] *Id.* ¶¶ 103–13.

[5] *Id.* ¶¶ 114–27.

[6] PTO at 2.  In addition, Plaintiffs seek a declaratory judgment that (1) Lynch is Belleville's legal representative in Argentina; (2) Alviz is not Belleville's manager, president, or legal representative; (3) Lopez is not Belleville's manager or legal representative; (4) any and all acts taken by Alviz in connection with Belleville are null and void; (5) any and all taken by Lopez in connection with Belleville are null and void; (6) the Certificate of Amendment of Grupo Belleville Holdings, LLC filed with the Delaware Secretary of State on April 12, 2019 is null and void; and (7) the Certificate of Correction of Grupo Belleville Holdings, LLC filed with the Delaware Secretary of State on May 9, 2019 is null and void.  Plaintiffs also seek an order directing the Delaware Secretary of State to strike from the record (1) the Certificate of Amendment of Grupo Belleville Holdings, LLC filed with the Delaware Secretary of State on April 12, 2019; and (2) the Certificate of Correction of Grupo Belleville Holdings, LLC filed with the Delaware Secretary of State on May 9, 2019. Finally, Plaintiffs seek injunctive relief barring Defendants from (1) interfering with Lynch's ownership interest in Belleville and Lynch's status as Belleville's sole manager and legal representative; (2) making any statement to any governmental agency that is contrary to Lynch's status as Belleville's 65% owner, sole manager, and legal representative; (3) taking action, direct or indirect, without the express consent of Lynch, on behalf of Belleville, including, without limitation, with respect to Belleville's ownership, management, business operations, or assets. *Id.* at 2–3.  To the extent Plaintiffs request relief pertaining to any litigant's status as Belleville's legal representative in Argentina, I decline to address the issue.  That is a matter for Argentine authorities.

4

claim for conversion.[7]  Lynch also seeks damages for Defendants' alleged

conversion.[8]

On May 24, I granted expedition, to which the parties agreed.[9]  On June 5, I

entered a status quo order, mandating that the parties maintain the status quo

concerning Belleville's operations and management during the pendency of the

litigation.[10]

On June 14, Defendants filed an Answer and Affirmative Defenses to the

Complaint.[11]  Defendants raised as affirmative defenses unclean hands, fraudulent

inducement, misrepresentation, failure of valuable consideration, equitable estoppel,

and promissory estoppel.[12]  Defendants Televideo and Gonzalez—Televideo's

owner and president[13]—also asserted counterclaims against Lynch.[14]  In respect to

the counterclaims, I refer to Gonzalez and Televideo collectively as the "Televideo

---

[7] Compl. ¶¶ 128–37.

[8] PTO at 3.  Plaintiffs also seek an order awarding such other and further relief to Lynch as the Court deems just and proper.  *Id.*

[9] *See* D.I. 37.

[10] D.I. 33.

[11] D.I. 39.

[12] *Id.* at 32–34.

[13] At all times, Televideo acted through Gonzalez.  To the extent that Gonzalez took any action with respect to the disputed 65% membership interest in Belleville, discussed *infra*, he did so on Televideo's behalf.

[14] *See* D.I. 39 at 34–57 [hereinafter "Countercl."].

Defendants." Count I of the counterclaim seeks declaratory relief pursuant to 6 *Del. C.* § 18-110.[15] Counts II and III seek declaratory relief pursuant to 10 *Del. C.* § 6501.[16] With respect to Counts I, II, and II, Defendants sought a declaratory judgment and order that (1) Gonzalez holds 5% of Belleville, (2) Televideo holds 95% of Belleville, (3) Gonzalez is Belleville's sole manager, (4) any actions Lynch has taken on Belleville's behalf are null and void.[17] In addition, Count IV asserts a claim for conversion.[18] Count V asserts a claim for fraud in the inducement.[19] Finally, Count VI asserts a claim for fraudulent misrepresentation.[20] Defendants also sought damages for Lynch's fraudulent conduct.[21] On July 5, Lynch answered the counterclaims and asserted several affirmative defenses, including unclean hands and judicial estoppel.[22]

The case proceeded through expedited and contentious discovery, spats over the breadth of the status quo order, and a motion to dismiss Lopez for lack of

---

[15] Countercl. ¶¶ 53–63.

[16] *Id.* ¶¶ 64–82.

[17] *See id.* at 55–56; D.I. 189 at 51.

[18] *Id.* ¶¶ 83–91.

[19] *Id.* ¶¶ 92–107.

[20] *Id.* ¶¶ 108–17.

[21] *See id.* at 56; D.I. 189 at 51. Defendants also seek an order granting Defendants such other relief that the Court deems equitable.

[22] *See* D.I. 49 at 28–29.

personal jurisdiction.[23]  I held trial from January 27 through January 29, 2020.[24]  At trial, ten witnesses testified primarily in Spanish:  Lynch, Gonzalez, Ariel Dario Lambert, Morelia Gonzalez, Marcos Landaburu, Jose Ramon Gomez, Herber Damian Martinez,[25] Silvia Susana Curutchet, Guillermo Jorge Candeo White, and Liliana Silvia Casaleggio.[26]  The parties also designated for the record the deposition testimony of two witnesses:  Adriana Maleplate and Fernando Contreras Lopez.[27]  In addition to witness testimony, the parties submitted 163 joint exhibits, most of which were translated from Spanish.[28]

---

[23] *See, e.g.*, D.I. 30, 34, 37, 40, 69, 74, 92, 107, 111, 121, 125, 146, 150, 162, 166, 168, 169, 182, 205, 213, 231, 237, 239, 240, 241.  The parties agreed that I would defer ruling on Lopez's motion to dismiss for lack of personal jurisdiction, D.I. 40, until after trial so that I could assess the motion with the benefit of a fully developed record.  Accordingly, the parties addressed the motion in post-trial briefing and at post-trial argument.  On June 8, 2020, I issued my decision dismissing Lopez, without prejudice, for lack of *in personam* jurisdiction with respect to all counts of the Complaint except Count I pursuant to Section 18-110.  Because this Court has *in rem* jurisdiction over Belleville, I retain the authority to determine whether Lopez is a member or manager of Belleville under Section 18-110.  *See* D.I. 237, 239.

[24] *See* D.I. 193, 194, 195.

[25] Plaintiffs called Martinez as a rebuttal witness.  For reasons explained at trial, I struck Martinez's testimony.  *See* Martinez Tr. 581–82.

[26] *See* D.I. 193, 194, 195.  The Court is grateful for the expertise and proficiency of Sebastian Beale, who translated from English to Spanish and vice versa, and the Chancery court reporters, whose remarkable RealTime skills were invaluable.

[27] *See* D.I. 196, 197, 198, 199.

[28] *See* JX 1–163; D.I. 218, Ex. 3 [hereinafter "Schedule of Evidence"].

The parties completed post-trial briefing as of March 26.[29] I held post-trial argument on April 8.[30] In post-trial briefing and at argument, the parties addressed (1) their competing declaratory judgment claims pursuant to Section 18-110 and Section 6501; (2) their competing conversion claims; (3) their competing unclean hands defenses; (4) the Televideo Defendants' fraudulent misrepresentation and fraudulent inducement Counterclaims and Defendants' corresponding affirmative defenses; (5) Defendants' failure of consideration and promissory estoppel defenses; and (6) Lynch's judicial estoppel defense. Accordingly, this opinion is cabined to those claims and defenses, and all others are deemed waived.[31]

The factual findings in this case are outcome-determinative. My duty is to make findings of fact based on the preponderance of the evidence the parties present. "The side on which the greater weight of the evidence is found is the side on which the preponderance of the evidence exists."[32]

---

[29] D.I. 189, 190, 204, 206.

[30] D.I. 212, 219.

[31] *See Oxbow Carbon & Minerals Hldgs., Inc. v. Crestview-Oxbow Acq., LLC*, 202 A.3d 482, 502 n.77 (Del. 2019) ("The practice in the Court of Chancery is to find that an issue not raised in post-trial briefing has been waived, even if it was properly raised pre-trial.").

[32] *Reynolds v. Reynolds*, 237 A.2d 708, 711 (Del. 1967); *accord Taylor v. State*, 748 A.2d 914 (Del. 2000) (TABLE) ("The phrase 'preponderance of the evidence' has been defined to mean the side on which 'the greater weight of the evidence' is found.").

Here, this task has proven onerous. This case presents a he said-he said dichotomy of the starkest form. According to Lynch, he and Gonzalez agreed Lynch would purchase 65% of Belleville, and iteratively documented that purchase and adjusted its terms. The documentary evidence—namely a series of documents and public filings identifying Lynch as 65% owner and signed by Gonzalez—facially supports Lynch's account. If one accepts Lynch's story as true and discredits the testimony of numerous witnesses, then those documents speak for themselves and this ownership dispute is easily resolved.

According to Defendants, these documents should not be taken at face value. Instead, Defendants contend that Lynch induced Gonzalez to execute a series of documents to create a paper trail presenting Lynch as Belleville's 65% majority owner, in name only, for the purported purpose of satisfying Argentine regulations; and after Lynch completed that paper trail, he wrongfully claimed control of the Company. If one accepts Defendants' theory of the case as true, then the volume of documentary evidence in Lynch's favor is predictable and meaningless: the point of the sham was to create a paper trail naming Lynch as Belleville's majority owner to satisfy Argentine regulators.

Testimony and other corroborating evidence support Gonzalez's account. In 2007, Lynch began working as Belleville's attorney and Gonzalez's personal

9

advisor.[33] Gonzalez trusted Lynch and his advice regarding Belleville's Argentine operations, and he signed documents Lynch presented as solving Belleville's legal and regulatory issues.[34] Between September 2007 and January 2008, Lynch papered the foundation for his long-term plan to appropriate 65% of Televideo's interest in Belleville. To do so, he advised Gonzalez to execute a series of documents to facilitate the final steps of Gonzalez's foray into Argentina; those included public filings that fabricated Lynch's ownership stake in Belleville. Gonzalez complied, relying on Lynch's representations about their contents and necessity; admittedly, Gonzalez did not meaningfully read or review those documents on his own.[35] Facially, those documents gave Lynch what he wanted: a majority 65% position in Belleville, and Gonzalez's ignorance. At that time, the parties had not discussed, negotiated, or agreed to transfer Televideo's 65% interest to Lynch.

Eventually, however, a serendipitous change in Argentine law gave Lynch a foothold to induce Gonzalez to execute more documents naming Lynch as Belleville's 65% member, and legitimized the documents Gonzalez signed and Lynch filed in September 2007 and January 2008. In late 2008, Lynch advised

---

[33] *See, e.g.*, Lynch Tr. 103, 121–122, 132–33, 143; M. Gonzalez Tr. 271, 279; A. Gonzalez Tr. 459, 462–63, 464, 468, 471, 476, 478, 480, 481, 482, 483, 485, 488, 490, 499, 501, 507, 508.

[34] *See, e.g.*, A. Gonzalez Tr. 459, 462–63, 464, 468, 471, 476, 478, 480, 481.

[35] *See, e.g.*, *id.* at 490, 507.

Gonzalez of the new law requiring Televideo to transfer Belleville's majority position to an Argentine citizen. Lynch, as an Argentine citizen, proposed that he fill this role. To ensure Gonzalez would agree to the "transfer," Lynch proposed that they create a paper trail fabricating Lynch's 65% ownership to satisfy Argentine holding laws, but also sign a secret contract providing that Lynch would hold the interest in name only, and Televideo would remain Belleville's true owner. Lynch assured Gonzalez that he would prepare a "counterdocument" that memorialized the secret terms.[36]

Accordingly, in 2009, Lynch and his team drafted backdated purchase agreements to fabricate a 5% transfer in September 2007 and a 60% transfer in January 2008, among other documents. And as promised, Lynch prepared and presented to Gonzalez the counterdocument providing that Televideo beneficially owned the 65% interest, and that Lynch would return the interest to Televideo upon Gonzalez's request. Lynch assured Gonzalez that he would execute it. The

---

[36] The parties refer to the counterdocument using multiple terms, including "contradocumento," "declaracion jurada," "DDJJ," "sworn statement," "sworn declaration," and "control document," and sometimes referred to Gonzalez as the "ultimate beneficial owner," or "UBO," in the context of this ownership structure. *See, e.g.*, D.I. 190 at 3 (identifying alternative names for the counterdocument); Lynch Tr. 197 (referring to Gonzalez as the "UBO" in the context of a counterdocument), 214 (same), 218 (noting that the "sworn declaration," or counterdocument, was referred to as a "control document[]"); M. Landaburu Tr. 433 (acknowledging that the counterdocument is also referred to as a "contradocumento"); JX 102 (clarifying that "DDJJ" refers to a counterdocument, like that attached at JX 103).

11

counterdocument was the only document in the entire suite that the parties objectively intended to have any binding effect or otherwise evidence a legitimate agreement. They intended the rest to be a sham.

Trusting Lynch's representation that he would execute the counterdocument and return the interest, Gonzalez agreed to transfer 65% of Belleville to Lynch, in name only, to satisfy Argentine law. But Lynch never intended to sign the counterdocument or return the interest. Lynch did not sign the Counterdocument, and ultimately concealed or destroyed the copy Gonzalez signed, leaving only those crumbs in the trail that named him as Belleville's 65% owner. Lynch then came to this Court, relying on that paper trail, in an attempt to obtain final control over Belleville.

In view of the conflicting testimony and theories of the case, my credibility assessments of the witnesses tip the scales here. "[T]he relative weight given to any particular piece of evidence, and particularly witness testimony, is a matter for the court to determine as the trier of fact."[37] "In my role as the trier of fact, I must assess the credibility of the witnesses, supported by the record. My credibility determinations are based on the testimony and evidence submitted to make up the

---

[37] *Hockessin Cmty. Ctr., Inc. v. Swift*, 59 A.3d 437, 453 (Del. Ch. 2012) (quoting *In re IAC/InterActive Corp.*, 948 A.2d 471, 493 (Del. Ch. 2008)).

12

record."[38]  Accordingly, I may "'determine the weight and credibility to be accorded any witness,' and [am] responsible for resolving conflicts in the evidence."[39]  "The rule is that in determining the weight and the credibility of the testimony, the apparent fairness, interest or bias of the witnesses, their opportunity to see and know of the circumstances, their recollections connected therewith, and all other facts and circumstances that go to test the accuracy of their testimony, are to be considered."[40]

At trial, I had ample opportunity to observe Lynch and Gonzalez and to assess their credibility.  After listening to Gonzalez's testimony, and that of multiple corroborating witnesses, I find him to be credible concerning the regulatory scheme and private agreement.[41]  I place more weight on Gonzalez's testimony when it conflicts with Lynch's.  Consequently, I view the record, including the paper trail,

---

[38] *Eagle Force Hldgs., LLC v. Campbell*, 2019 WL 4072124, at *13 (Del. Ch. Aug. 29, 2019) (citing *Gatz Props., LLC v. Auriga Capital Corp.*, 59 A.3d 1206, 1221 (Del. 2012) ("The law requires the trial judge to weigh the evidence, including the credibility of live witness testimony.")), *aff'd in part, rev'd in part*, 2020 WL 3866620 (Del. July 8, 2020).

[39] *Johnson v. Wagner*, 2003 WL 1870365, at *4 (quoting *Jones v. Lang*, 591 A.2d 185, 188 (Del. 1990)).

[40] *Matter of Langmeier*, 466 A.2d 386, 405 (Del. Ch. 1983) (citing *Benson v. Wilm. City Ry. Co.*, 75 A. 793 (Del. Super. Ct. 1910)).

[41] I particularly find his testimony credible with respect to the parties' intentions when executing each document in the paper trail.  *See Johnson*, 2003 WL 1870365, at *4 ("Where 'state of mind' or 'consciousness and conscious' is involved, credibility–a [fact-finder] determination–is often central to the case." (alteration in original) (quoting *Scott v. Bosari*, 1994 WL 682615, at *8 (Del. Super. Oct. 26, 1994)).

through the prism of the parties' scheme: the documents Lynch presents identify him as Belleville's 65% member only because the parties agreed to create a paper trail evidencing that ownership structure in order to satisfy regulators, and agreed Lynch did not actually purchase or beneficially hold that interest. The nature of the scheme explains the scant documentary evidence supporting Defendants' position. Having weighed the evidence and evaluated the credibility of the witnesses, I find that the following facts were proven by the preponderance of the evidence.[42]

### A. Gonzalez Acquires The Argentine Media Assets.

Gonzalez is an experienced acquirer and owner of media assets throughout Latin America.[43] He owns and controls "Albavision," the name for an informal conglomerate of Latin American media companies, including Televideo.[44] Over nearly forty years in the industry, Gonzalez amassed over thirty radio and television stations in at least twelve countries.[45] He solely owned all of these assets, except for

---

[42] The parties did not brief any evidentiary objections in post-trial briefing. Any objections are waived.

[43] *See* A. Gonzalez Tr. 453, 457.

[44] *See* D.I. 218, Ex. 1 at 1 [hereinafter "Glossary of Stipulated Terms"]; M. Gonzalez Tr. 261–62.

[45] *See* A. Gonzalez Tr. 453, 457, 468.

one station he owned with a partner.[46]  Once Gonzalez acquired those assets, he did

not sell them.[47]

In 2006, Gonzalez sought to expand the Albavision brand into Argentina by

acquiring an Argentine media conglomerate, Inversora de Medios y Comunicaciones

Sociedad Anónima ("IMC"), owned by Gerardo Daniel Hadad.[48]  The IMC

acquisition would expand Gonzalez's asset portfolio to include a number of

associated and subsidiary companies operating in Argentina, including IMC,

Sebrumax Sociedad Anónima ("Sebrumax") and Telearte Sociedad Anónima

("Telearte").[49]  At the time, IMC operated Canal 9, a well-known television station

in Argentina.  Canal 9 was the primary motivation for the purchase.[50]

Gonzalez contacted Hadad about potentially acquiring IMC.[51]  With

discussions underway, Gonzalez retained an Argentine law firm, Santiago Lynch, to

assist with negotiation and due diligence.[52]  Lynch's uncle, a partner at the firm, was

---

[46] *See id.* at 456–57.

[47] *See id.*  Gonzalez has only ever sold one media asset:  a Puerto Rican radio station, sold twenty-one years ago.  *See id.* at 459.

[48] *See* JX 2; Lynch Tr. 17–18, 100; M. Gonzalez Tr. 262–63; A. Gonzalez Tr. 452–53; Casaleggio Tr. 544.

[49] *See* Glossary of Stipulated Terms at 1.

[50] *See id.*; PTO ¶¶ 7–8; *see also* White Tr. 528.

[51] *See* M. Gonzalez Tr. 262.

[52] *See* Lynch Tr. 17, 100; M. Gonzalez Tr. 262–63; Landaburu Tr. 415; A. Gonzalez Tr. 452–53.  Lopez first retained the firm on Gonzalez's behalf.  *See* M. Gonzalez Tr. 263.

in charge of the firm's relationship with Gonzalez.[53]  Lynch was a junior attorney at the firm.[54]  His primary role was to hand deliver documents to Gonzalez that required his signature.[55]  He did not have a meaningful role in the IMC acquisition.[56]  Hadad assigned Liliana Casaleggio, then head of Telearte's legal department, to "take charge in Telearte with regards to the purchase and sale."[57]

---

[53] *See* Lynch Tr. 101.

[54] *See* M. Gonzalez Tr. 263; A. Gonzalez Tr. 452–53; Casaleggio Tr. 545; White Tr. 528.

[55] *See* A. Gonzalez Tr. 452–53.  Lynch testified that he was lead counsel who negotiated the IMC purchase on Gonzalez's behalf.  *See* Lynch Tr. 100–01, 109.  Lynch's testimony is not credible on this point.  Although negotiations began in 2006, Lynch did not meet Gonzalez until January 2007, when he took Gonzalez paperwork that needed to be signed.  *See id.* at 101–02.  Gonzalez and Casaleggio credibly testified that Lynch was not involved in negotiating the terms of the sale or responsible for drafting any of the documents involved in the transaction.  *See* A. Gonzalez Tr. 452–53; Casaleggio Tr. 544–45; *see also* White Tr. 528.  I find that, at the time of the IMC purchase, Lynch's role was limited to delivering documents to Gonzalez for his signature.  *See* Lynch Tr. 101; A. Gonzalez Tr. 452–53; Casaleggio Tr. 544–45.

[56] *See* Lynch Tr. 101; A. Gonzalez Tr. 452–53; Casaleggio Tr. 544–45.

[57] Casaleggio Tr. 544.  Alejandro Massot, counsel for Gonzalez and Televideo, asked Casaleggio to testify on Defendants' behalf.  *See id.* at 550–51, 552.  She worked as an attorney for Telearte and Canal 9 for seventeen years:  from 2000, under Hadad's ownership, through 2017, under Gonzalez's control.  *See id.* at 543.  She worked as a senior attorney, chief legal consultant, and manager of the Telearte's judicial apartment.  *See id.* Eventually, Casaleggio began reporting to Lynch.  Gonzalez terminated her employment in 2017.  *See id.* at 559–60, 561.  At that time, Lynch was her immediate superior.  *See id.* 550.  Plaintiffs tried to impeach her credibility, suggesting that she was improperly coerced and coached to testify.  *See id.* at 558–59.  Plaintiffs' attempt was unsuccessful.  *See id.* at 562.  Casaleggio was not coached before taking the stand, and she was not offered anything in exchange for her testimony.  *See id.* at 558–59, 562.  She is familiar with the transactions in dispute in this litigation, including the parties' intent with respect to the Counterdocument.  *See id.* at 543–49.  She testified, and I believe, that she testified to share facts she personally knows and because "the justice system require[d] [her] to" with respect to "a conflict between the ownership."  *Id.* at 552.  I find Casaleggio's testimony credible.

16

To facilitate the IMC acquisition, on December 12, 2006, Gonzalez formed Belleville as a Delaware limited liability company to hold Canal 9 and IMC's other Argentine assets.[58] At that time, 95% of Belleville was owned by Televideo, a Florida corporation owned and controlled by Gonzalez and his two daughters, Jani Gonzalez and Morelia Gonzalez.[59] Gonzalez personally owned the remaining 5% of Belleville.[60]

In January 2007, Gonzalez purchased 84.21% of IMC from Hadad for $24.2 million.[61] He did so "on commission" for Belleville, the ultimate purchaser, and was required to timely identify Belleville as IMC's acquirer to the Argentine media regulators.[62] To do so, Belleville needed a representative to appear on its behalf before the Argentine government.[63] So in April 2007, Gonzalez granted Lynch a special power of attorney and designated him as Belleville's legal representative in

---

[58] *See* JX 1; PTO ¶6.

[59] *See* M. Gonzalez Tr. 261:5–8; A. Gonzalez Tr. 477–78; PTO ¶ 11.

[60] It is undisputed that today, Televideo still owns 30% and Gonzalez personally holds at least 5% of Belleville. *See* PTO ¶¶ 10, 38, 44.

[61] *See* JX 2; Lynch Tr. 17–18, 100; M. Gonzalez Tr. 262–63; Casaleggio Tr. 544.

[62] Lynch Tr. 18. Lynch's firm advised Gonzalez that the IMC acquisition needed to be structured in compliance with Argentine law and documented with Argentine regulators. *See* Casaleggio Tr. 545–46.

[63] *See* Lynch Tr. 18; A. Gonzalez Tr. 453; JX 3 at 10, 19, 29, 42, 51, 61, 63.

17

Argentina.[64] Belleville also adopted a resolution to hold equity in Argentine companies, which Lynch filed on Belleville's behalf with the Argentine regulatory body Argentina Inspección General del Justicia ("IGJ").[65]

After the initial 84.21% sale to Belleville, Hadad still held an interest in IMC.[66] Belleville eventually acquired Hadad's remaining interest to own 100% of the company by causing IMC to make a capital call.[67] Through Gonzalez, Belleville injected the requested capital; Hadad did not participate, and his interest was diluted to 4.1%.[68] Thereafter, Lynch negotiated for Belleville's purchase of Hadad's

---

[64] *See* JX 3 at 10, 19, 29, 42, 51, 61, 63. When Belleville designated Lynch as its legal representative in April 2007, he was still employed at his uncle's law firm. *See* Lynch Tr. 103. The resolution also identifies other individuals with authority to act on Belleville's behalf in Argentina. *See* JX 3 at 9, 19, 29, 41, 51, 63.

[65] *See* JX 3. The filed paperwork certified that Lynch was Belleville's legal representative and formally assigned to Belleville Gonzalez's 84.21% ownership interest in IMC. *See* Lynch Tr. 18; JX 3 at 10, 19, 29, 52, 61, 63.

[66] *See* Lynch Tr. 18, 20.

[67] *See id.* at 20, 116–17; A. Gonzalez Tr. 456.

[68] *See* Lynch Tr. 20, 116–17. At the time of the capital call, Lynch held 5% of IMC, which he received from Belleville through Gonzalez. Lynch acquired this interest in connection with the efforts to squeeze out Hadad. He claims that he purchased 5% of IMC on the "same conditions" as his claimed purchase of 65% of Belleville. Lynch Tr. 117. Although Lynch held himself out as the genuine holder of 5% of IMC, he did not inject any funds through the capital call. According to Lynch, this is because his shares had not been "completely integrated" or "completely paid off" at the time of the call. *Id.* at 116–17. I do not find Lynch's testimony credible as to his genuine purchase and ownership of 5% of IMC. Rather, I find that Gonzalez permitted Lynch to hold 5% of IMC in name only, that Lynch never paid valuable consideration for that interest, and that the parties never intended for Lynch to be the true owner of that interest. I find that Lynch held 5% of IMC for Gonzalez's benefit and pursuant to a similar agreement under which he held 65% of

18

remaining interest.[69] Belleville acquired it for $1 million in December 2007.[70] In total, Gonzalez, through Belleville, paid a total of $27.345 million for the IMC acquisition.[71] By completing the acquisition, Belleville expanded the Albavision portfolio to include ownership interests in Argentine media companies, such as Canal 9 and FM Aspen 102.3, and Argentine real estate holdings.[72]

## B. Gonzalez Hires Lynch As An Employee And Advisor.

At all times, Gonzalez controlled and financed Belleville's operations.[73] Gonzalez made Belleville's decisions.[74] Consequently, Lynch was required to, and did, consult with Gonzalez and seek his approval before making decisions.[75] Gonzalez did not, and would never, allow Lynch to dictate what Gonzalez did with Belleville's business.[76] He had the final say over the operations of Belleville and its

---

Belleville, discussed at length *infra*. *See, e.g.*, JX 117 at 161 (noting that Lynch held shares in IMC subject to a counterdocument).

[69] *See* Lynch Tr. 20.

[70] *See id.* at 20, 111.

[71] *See id.* at 20.

[72] *See, e.g.*, PTO ¶¶ 7, 8; JX 161. Telearte operates Canal 9. Telearte is financed by Producciones Dragon, which was formed for this purpose in 2007. *See* Lynch Tr. 65; Curutchet Tr. 514.

[73] *See, e.g.*, A. Gonzalez Tr. 456–57, 459–60; Gomez Tr. 448–49; Curutchet Tr. 514–15; Casaleggio Tr. 548–49; Maleplate Dep. 30, 31.

[74] The parties have presented no formal document naming Gonzalez as Belleville's sole manager prior to 2009, but they do not meaningfully dispute this point.

[75] *See, e.g.*, A. Gonzalez Tr. 457; Curutchet Tr. 514–15.

[76] *See, e.g.*, A. Gonzalez Tr. 457, 460.

subsidiaries, and could not be overridden by Lynch.[77]  As late as February 2018, other advisors and employees of Belleville and its subsidiaries—including Lynch's subordinates—understood the same:  Gonzalez, as Belleville's owner, controlled, directed, and financed the Belleville family's operations.[78]

Gonzalez delegated many tasks to Lynch and his other employees and advisors, and relied on their advice when making decisions for Belleville.[79] Gonzalez's reliance on and trust in Lynch grew as Lynch became more involved in the Company.  From February 2007 through July 2007, Lynch provided legal advice to Gonzalez and Telearte as an outside attorney.[80]  In August 2007, Gonzalez hired Lynch as a Telearte employee.[81]  Initially, he had no formal title.[82]  Lynch advised IMC and Belleville's other subsidiaries, served in-house as local Argentine counsel with respect to Belleville's Argentine assets, and worked closely with Canal 9.[83]

---

[77] *See, e.g.*, *id.*

[78] *See* Landaburu Tr. 428–29; Gomez Tr. 441; A. Gonzalez Tr. 457, 459–60; Curutchet Tr. 514–157; Casaleggio Tr. 547–49.

[79] *See, e.g.*, A. Gonzalez Tr. 486, 490, 492, 493.

[80] *See* Lynch Tr. 103.  Prior to that time, Lynch had not worked in television or radio.  *See* A. Gonzalez Tr. 453.

[81] *See* Lynch Tr. at 102; A. Gonzalez Tr. 453.

[82] *See* Lynch Tr. 102.

[83] *See id.* at 18; M. Gonzalez Tr. 263; A. Gonzalez Tr. 453.  Occasionally, Lynch assisted with Gonzalez's companies in other countries.  *See* Lynch Tr. 18.

Lynch initially worked alongside Casaleggio, but quickly rose to be the primary lawyer advising Gonzalez as to Belleville's operations in Argentina.[84] Because Gonzalez ran Belleville's operations from afar, he relied on Lynch to advise on Argentine law and compliance, to act on Belleville's behalf before the IGJ and other regulators, and to assist with Belleville's subsidiaries and other operations.[85] Eventually, Lynch directed the local operations of Belleville and its subsidiaries and was designated as Gonzalez's co-manager.[86] And by mid-2009, he developed significant influence in the Belleville family and had "tak[en] charge of the legal aspect at [Canal 9]."[87] He was eventually named as Canal 9's President, and he was named Telearte's President in 2011.[88] In these positions, Lynch cultivated trust and influence over others in the Belleville family—including Ariel Lambert, Marcos Landaburu, Hernan Birencwajg, and Fernando Banus—who would later assist in or derive benefit from Lynch's scheme to divest Televideo of its interest in Belleville.[89]

---

[84] *See* A. Gonzalez Tr. 454, 462–63; White Tr. 528; Casaleggio Tr. 545.

[85] *See, e.g.*, A. Gonzalez Tr. 454, 459, 461, 462–63, 464, 468, 471, 476, 478, 480, 481, 482, 483, 485, 488, 490, 499, 501, 507, 508. Gonzalez's primary residence is in Miami. *See, e.g.*, JX 25.

[86] *See, e.g.*, PTO ¶ 28; JX 16; M. Gonzalez Tr. 263; A. Gonzalez Tr. 454; Casaleggio Tr. 545.

[87] A. Gonzalez Tr. 454; *see also* M. Gonzalez Tr. 263; Casaleggio Tr. 545.

[88] *See* Casaleggio Tr. 545.

[89] *See, e.g.*, White Tr. 531 (noting that Lynch demanded golden parachutes for these individuals when he held the Company for ransom).

Lynch became Gonzalez's "right-hand man" in Argentina.[90] Gonzalez trusted Lynch and relied on him as his employee and attorney for both Belleville and Gonzalez's interest in the Company.[91] Accordingly, Gonzalez tasked Lynch with conveying information and documents regarding Belleville's Argentine operations for Gonzalez's final approval.[92] Morelia, Gonzalez's daughter, facilitated Lynch's written and email communications with Gonzalez; she received Lynch's messages on her father's behalf, then relayed the information to him.[93] When working with Lynch, Gonzalez expected and assumed that Lynch had prepared all necessary documents, that they were complete, and that Lynch had properly handled all legal issues.[94] When Lynch brought Gonzalez legal documents to sign, Lynch would summarize them briefly and offer legal and business explanations as to why

---

[90] White Tr. 528.

[91] *See, e.g.*, A. Gonzalez Tr. 508 ("Mr. Lynch was the attorney for the company and also personal."); M. Gonzalez Tr. 263 ("Q. And from 2007 and onward, did Mr. Lorefice Lynch provide legal advice to you and your father with regards to the company? A. Yes, he did."); *see also* A. Gonzalez Tr. 454–56, 459, 468, 471, 478, 480–81, 482, 485, 486, 490, 508. Plaintiffs attempted to impeach Gonzalez on this point in an effort to establish that Lynch was not, in fact, Gonzalez's personal counsel. *See* A. Gonzalez Tr. at 508–10. At his deposition, Gonzalez testified that Lynch was not his personal attorney, but only the attorney for the Company. *See id.* at 509–10. The preponderance of the evidence presented at trial demonstrates that Gonzalez understood Lynch to advise him on an array of Belleville issues, as well as with respect to his own personal stake in the Company. *See, e.g.*, Lynch Tr. 122.

[92] *See, e.g.*, A. Gonzalez Tr. 454–56, 459, 468, 471, 478, 480–81, 482, 485, 486, 490, 508.

[93] *See* Lynch Tr. 133; M. Gonzalez Tr. 263–64.

[94] *See, e.g.*, A. Gonzalez Tr. 454–56, 459, 468, 471, 478, 480–81, 482, 485, 486, 490, 508.

22

Gonzalez's signature was required.[95]  Lynch often assured Gonzalez that "he had already taken care of everything and not to worry about it."[96]  Gonzalez trusted Lynch's representations that the documents were necessary to further a Belleville business objective and were complete, and then signed upon Lynch's advice.[97]

### C.  In September 2007, Lynch Strategizes To Seize Belleville.

After Lynch established himself as Gonzalez's right-hand man in Argentina, Gonzalez transferred 65% of Televideo's interest in Belleville to Lynch in name only, believing that Televideo would remain the actual beneficial owner of that interest.[98]  The parties offer competing stories as to how Lynch came to hold the interest.

According to Lynch, he negotiated for and purchased the interest outright between September 2007 and January 2008 pursuant to two "verbal agreement[s]."[99] Lynch contends that in exchange for his efforts to negotiate Hadad's exit from IMC, and consideration that evidently took the form of a debt assumption, Gonzalez agreed to transfer most of Televideo's interest in Belleville to Lynch in two blocks:

---

[95] *See, e.g.*, *id.* at 455–56, 507.

[96] *Id.* at 456.

[97] *See, e.g.*, *id.* at 454–56, 459, 468, 471, 478, 480–81, 482, 485, 486, 490, 507, 508.

[98] *See, e.g.*, *id.* at 455, 459, 463, 483, 485.

[99] *E.g.*, Lynch Tr. 112, 125, 173.

5% in September 2007, and 60% in January 2008.[100] Collectively, these two alleged "purchases" would have resulted in a 65% transfer of Belleville. No contemporaneous documents support Lynch's testimony; instead, Lynch points to a series of either inconsistently timed or backdated documents. I do not find Lynch's account credible.[101]

---

[100] *See, e.g.*, *id.* at 18–19, 110–11.

[101] *See id.* at 18–19. Lynch testified that Gonzalez initially agreed to transfer 5% of Belleville to Lynch for roughly $1.2 million, and that transfer was completed in September 2007. *See id.* at 107, 123. Lynch contends Gonzalez "willingly just gave [him] 5 percent of his company . . . under a verbal agreement" just after Gonzalez had purchased IMC for over $27 million. *Id.* at 112, 115. Lynch further testified that, during the same month, he began negotiating with Gonzalez to purchase an additional 60% of Televideo's interest in Belleville. *See id.* at 18–19. According to Lynch, if he was able to squeeze out Hadad "in an economical way or a more affordable way," Gonzalez agreed to "transfer his 60 percent to [Lynch] with the same terms and conditions that were negotiated with the acquisition of the 5 percent." *Id.* at 111. Belleville purchased Hadad's remaining IMC interest in December 2007, and Lynch contends his 60% acquisition finalized in January 2008. *See id.* Together, the September 2007 and January 2008 "sales" would have established Lynch as Belleville's majority holder as of January 2008. Lynch admits that he did not pay for the interests at the time of purchase. *See id.* at 108.

Lynch has presented no contemporaneous contract, communication, or other document evidencing the alleged agreement or sale between Gonzalez and Lynch for the 65% transfer. *See id.* at 108, 109, 123; JX 5; JX 7; JX 8; JX 10; JX 11. According to Lynch, both transfers were pursuant to "verbal" "personal" agreements. *See* Lynch Tr. 107, 11, 112, 123. As will be explained *infra*, Lynch later caused Gonzalez to execute a series of backdated documents in 2009 to create a paper trail corroborating the "sales" that never, in fact, occurred.

Curiously, at the time of these alleged transfers, Gonzalez and Lynch had only known each other for nine months. *See id.* at 112. In addition, Lynch was providing Gonzalez with legal advice at the time, but testified that he did not encourage Gonzalez to seek independent counsel with respect to the purported sale. *See id.* at 121–24. In contrast, for the IMC acquisition, Gonzalez insisted upon counsel and lengthy, contemporaneous documentation. *See* JX 2. Lynch justifies these differences by stating that, in the IMC acquisition, "the buyer did not know the company." Lynch Tr. 124–25. But because he

Rather, I find that, in 2007, Lynch used the final steps of the IMC acquisition as a platform to obtain Gonzalez's signature on a document naming Lynch as Belleville's majority member: Lynch's first step in subverting Televideo's 65% interest in Belleville.[102] That document, which appears at Joint Exhibit ("JX") 7 and JX 8, is a "Certificate of Amendment of Grupo Belleville Holdings, LLC" that Gonzalez executed and Lynch filed with the Delaware Secretary of State on October 18, 2007.[103] It states that Gonzalez owns 5% of Belleville, Televideo owns 30%, and Lynch owns 65%.[104] Lynch presented the document to Gonzalez, who signed it at Lynch's direction, and then Lynch filed the document in Delaware.[105]

---

"knew the company exactly -- very well," Lynch posits that Gonzalez did not insist upon the same protections. *Id.* at 124–25. Nor did Lynch secure written contractual protections for himself until 2009. *See id.* at 109. Lynch did not "see that it was necessary" to document anything until 2009" because he "had different documents issued by Mr. Gonzalez that confirmed [his] ownership of 65 percent." *Id.* at 108. As I will explain, these documents—signed by Gonzalez, and drafted and filed at Lynch's discretion while he served as Belleville's legal representative and Gonzalez's advisor—are riddled with inconsistencies. Lynch's testimony that he purchased 5% and then 60% of Belleville from Televideo in 2007 and 2008 is not credible and not supported by the preponderance of credible evidence.

[102] *See* Lynch Tr. 110 (testifying that a document purportedly corroborating Lynch's timeline for his purportedly genuine 65% purchase was executed under the guise of the final Hadad acquisition).

[103] JX 7; JX 8 at 5; *see also* A. Gonzalez Tr. 475–76. For clarity, I refer to it only as JX 7, even where testimony as to the document was elicited in response to JX 8.

[104] *See* JX 7; *accord* JX 8 at 5.

[105] *See* A. Gonzalez Tr. 475–76.

Lynch acknowledges that he did not actually hold 65% of Belleville at the time JX 7 was signed and filed, and testified that its terms were "wrong."[106] Lynch contends that because Gonzalez signed JX 7 and acknowledged that it was filed with the Delaware Secretary of State, JX 7 is evidence of the supposed agreement to "sell" Lynch 65% of Belleville between September 2007 and January 2008.[107] But the purported "sales" never happened, and the fact that JX 7 was filed months before the purported 60% sale supports that conclusion.[108] Further, Lynch's explanation as to why JX 7 was executed months before the purchase it purportedly documents does not hold together. [109]

---

[106] Lynch Tr. 110.

[107] *See id.* at 19–20, 110.

[108] JX 7 was executed and filed in October 2007 before Gonzalez and Lynch allegedly agreed to transfer the second 60% block of Belleville to Lynch in January 2008. *See* JX 7; JX 8 at 5; Lynch Tr. 19.

[109] When asked whether JX 7 and JX 8 "reflect[ed] your terms and conditions that you agreed with Mr. Gonzalez," Lynch responded, "No. . . . [T]his document reflects that Mr. Gonzalez, in name of Televideo Services, transferred 65 percent of interest in Grupo Belleville to me of Televideo." Lynch Tr. 110. He then agreed that "this document is wrong" because JX 7 was executed before Hadad sold his remaining interest in IMC and before Lynch came to hold Televideo's 65% interest in Belleville. *Id.*

Lynch explained that JX 7 was executed as an incentive or aid for Lynch to squeeze Hadad out. According to Lynch, "this document was previously done so that I could perform the exclusion of Mr. Hadad and that that could generate the transfer of the 65 percent." *Id.* JX 7 was "signed before [Lynch] could exclude Mr. Hadad, which seemed to be in a bit of a rush." *Id.* at 19. Lynch testified that Gonzalez offered Lynch an additional 60% of Belleville if Lynch could successfully acquire Hadad's remaining interest in IMC, and that "Gonzalez made [him] work harder in order to achieve the objective." *Id.* at 19–20. Lynch did not succeed in negotiating for Hadad's remaining interest until December 2007. *See id.* at 20, 111. Lynch paid nothing to Gonzalez or Televideo before JX 7 was

26

The preponderance of credible evidence demonstrates that Lynch drafted and filed JX 7 in the context of the final Hadad acquisition, and presented it to Gonzalez under the guise that it was needed to carry out the final steps of that transaction.[110] Gonzalez trusted Lynch's advice that Gonzalez's signature was required to further that business objective.[111] Gonzalez credibly testified that, aside from signing JX 7 at Lynch's direction, he had no involvement with its preparation or filing.[112] And Morelia testified that she did not receive JX 7 or any other paperwork indicating that there had been a 65% transfer in 2007.[113] She did not see a copy of JX 7 until 2008 or 2009, when Lynch informed her and Gonzalez that they needed to alter Belleville's ownership structure to comply with Argentine law.[114]

---

filed in October 2007, and there was no discussion, by email or in person, of the terms of any purchase for the total 65%, including the price at which Lynch would acquire it. Lynch has offered no credible explanation as to why it would have been necessary or helpful to file this document with the Delaware Secretary of State before the Hadad squeeze-out and transfer of his interests in IMC to Belleville closed.

[110] *See* Lynch Tr. 110; A. Gonzalez Tr. 475–76; M. Gonzalez Tr. 264–66.

[111] *See, e.g.*, Lynch Tr. 110; A. Gonzalez Tr. 459, 463, 464, 466, 467, 468, 471, 472, 478, 480–81, 482, 483, 485, 486, 487, 488, 490, 493, 494, 469, 499, 516; *see also* White Tr. 528.

[112] *See* A. Gonzalez Tr. 475–76.

[113] *See* M. Gonzalez Tr. 264–66.

[114] *See id.* at 265–66.

I find that JX 7 is inaccurate: Lynch did not purchase or otherwise acquire 65% of Belleville at the time Gonzalez executed it and Lynch filed it.[115] Lynch prepared and filed JX 7 with the Delaware Secretary of State for his own benefit, knowing that Gonzalez would sign the document believing it was needed for the Hadad acquisition and remaining ignorant as to the facts.[116] I conclude that JX 7 was Lynch's first test run to determine the extent to which Gonzalez would trust his advice and sign documents at his request.

Lynch did not stop with JX 7. The next step in his paper trail was submitted as JX 10.[117] JX 10 is an affidavit that Lynch signed and filed in his capacity as Belleville's legal representative on November 26, 2007 with the Argentine IGJ.[118] It is not signed by Gonzalez.[119] While Lynch represented that he owned 65% of Belleville when he filed JX 7 in October 2007, one month later, in JX 10, he represented that he owned just 5%.[120] Only Lynch testified about JX 10, and he has

---

[115] These problematic documents support my finding that the September 2007 and January 2008 "verbal agreements" never happened.

[116] *See* Lynch Tr. 110; A. Gonzalez Tr. 475–76; M. Gonzalez Tr. 264–66.

[117] *See* JX 10. This document also appears in JX 3. *See* JX 3 at 24. Lynch points to JX 10 to corroborate the purported September 2007 and January 2008 transfers. However, I find that JX 10 further refutes the authenticity of JX 7 and the alleged verbal agreements between Lynch and Gonzalez.

[118] *See* JX 10; *see also* JX 3 at 24, 25; Lynch Tr. 120–22.

[119] JX 10.

[120] *See* JX 10; Lynch Tr. 20–21, 120–22.

28

offered no testimony credibly explaining this discrepancy.[121]  The preponderance of credible evidence suggests that Lynch prepared and filed JX 10 without Gonzalez's knowledge or approval, using his position as Belleville's legal representative to tinker with the record of Belleville's ownership for his own benefit.[122]  Taken together, JX 10 and JX 7 were the first steps in Lynch's scheme.

### D. Lynch Devises A Strategy To Both Accommodate Argentine Legislation And Pad His File; Gonzalez Agrees To Conditionally Transfer 65% Of Belleville To Lynch In Name Only; And Lynch Prepares A Suite Of Documents To Paper The 65% Transfer.

Before 2009, Argentine law did not limit the ability of an American company to hold an interest in an Argentine media company.[123]  In late 2008, Casaleggio informed Lynch of an upcoming change in Argentine law that would prevent a foreigner from holding more than 30% of an Argentine media company unless the foreign country had a reciprocal agreement with Argentina.[124]  Gonzalez and Televideo did not have the benefit of such an agreement.[125]

---

[121] *See* Lynch Tr. 20–21, 120–22.

[122] *See* JX 10; Lynch Tr. 20–21, 120–22.  Hereafter, Lynch doggedly pursued a paper trail that pegged his interest at 65% or higher.  One reasonable inference is that Lynch was not yet ready to paper his full scheme with Argentine regulators.  That day would quickly arrive.

[123] *See* Lynch Tr. 132.

[124] *See* Casaleggio Tr. 547–48.

[125] *See id.*

Lynch proposed a solution that would allow Gonzalez and Televideo to remain Belleville's actual beneficial owners, while simultaneously complying with Argentine law.[126] Lynch volunteered that, as an Argentine citizen, he take 65% majority membership in Belleville in name only.[127] When Casaleggio doubted whether Gonzalez would approve that plan, Lynch told her that he and Gonzalez would also execute a counterdocument: "a contract . . . established to depict the real situation of the owners" and evidencing that "Gonzalez was still going to be the owner of what he had purchased."[128]

Lynch approached Gonzalez in late 2008 and informed him "[t]hat possibly the law might change where ownership would have to be held by an Argentine citizen at 65 percent of it."[129] At that time, Lynch "had already been taking charge of the legal aspect of the station," and suggested that "[they] needed to change the ownership to be able to apply to the corresponding institutions in Argentina and to agree with what is mandated by the law."[130]

---

[126] *See* A. Gonzalez Tr. 454–55, 463; Casaleggio Tr. 547–48.

[127] *See* A. Gonzalez Tr. 454–55, 463; Casaleggio Tr. 547–48.

[128] Casaleggio Tr. 548; *accord* Lynch Tr. 145.

[129] A. Gonzalez Tr. 453–54.

[130] *Id.* at 454.

30

Aware that Gonzalez would never agree to actually give Lynch 65% of Belleville, Lynch assured Gonzalez that he would prepare a counterdocument acknowledging Televideo would retain actual, beneficial ownership of that interest and that Lynch would return it to Televideo upon request.[131] As Gonzalez testified, "he offered a document and he personally informed me and said not to worry and so that I could be calm, that he will create a counter document."[132]

According to the witnesses, counterdocuments are commonly used for business transactions throughout Latin America.[133] They reflect an understanding between assignor and assignee that, upon the assignor's request, the assignee will return the subject property to the assignor.[134] As Lynch explained it, the counterdocument was "a guarantee that the company being held in someone else's name would go back to Mr. Gonzalez."[135] Gonzalez used counterdocuments for his operations in other countries;[136] in particular, Lynch drafted counterdocuments for

---

[131] *See, e.g.*, *id.* at 453–55, 456, 457, 459, 463, 472, 474; Casaleggio Tr. 457–58; *see also* Lynch Tr. 146–56; JX 24; JX 25.

[132] A. Gonzalez Tr. 455.

[133] *See, e.g.*, Lynch Tr. 82–83, 84, 145, 146; Landaburu Tr. 433; A. Gonzalez 474; Casaleggio Tr. 548.

[134] *See, e.g.*, Lynch Tr. 145; Casaleggio Tr. 548.

[135] Lynch Tr. 145.

[136] *See, e.g.*, *id.* at 82–83, 105, 145, 157; Lambert Tr. 354; JX 98; JX 99; JX 106; JX 107; JX 109; JX 110; JX 113; JX 116; JX 117.

31

Belleville Investments in the Bahamas and Worldwide Features, Inc. in Panama.[137] In those cases, Lynch drafted, executed, and performed under the counterdocuments' terms, ultimately returning the subject interests to Gonzalez as required.[138]

Lynch assured Gonzalez that this solution would ensure compliance with governing law and protect Gonzalez's and Televideo's collective 100% interest in Belleville, just as it had protected Gonzalez's interest in other companies in the past.[139] Trusting Lynch's advice that the transfer was necessary to maintain Belleville's holdings in Argentina, Gonzalez agreed to transfer 65% of Belleville to Lynch in name only.[140]

The parties agreed to the following terms: (1) Gonzalez would transfer 65% of Televideo's interest in Belleville to Lynch, in name only, for the purpose of satisfying Argentine regulations; (2) Lynch would never have or otherwise hold full beneficial ownership of the 65%; (3) Televideo would remain the actual beneficial owner of the interest, and the parties would memorialize that understanding in a counterdocument; (4) the parties would paper this sham transfer, naming Lynch as Belleville's 65% member in public and private documents, for presentation to

---

[137] *See* Lynch Tr. 88, 105, 145, 156–57; Landaburu Tr. 433–34, 436.

[138] *See* Lynch Tr. 88, 105, 145, 156–57, 240–49; Landaburu Tr. 433–34, 436.

[139] *See, e.g.*, A. Gonzalez Tr. 455, 459, 463.

[140] *See, e.g.*, *id.* at 454, 455, 459, 463.

regulators; and (5) Lynch would return the 65% interest to Televideo upon Gonzalez's request.[141]

There was no intent to transfer actual beneficial ownership of the interest to Lynch: "the idea or the spirit was never that [Lynch] was going to be a shareholder. The idea was that in order to be able to comply with the legal needs of Argentina, [documents] would be signed but [Gonzalez and Televideo] would still be the owners."[142] Gonzalez credibly testified that he would not have agreed to the transfer, or to sign any document evidencing it, if he was not protected by the counterdocument memorializing Televideo's true ownership.[143] Despite his plans to the contrary, Lynch told Gonzalez that he agreed to this arrangement.[144]

After Gonzalez agreed to Lynch's plan, Lynch prepared, and Gonzalez and Morelia executed, paperwork to be presented to the Argentine regulator Comite Federal de Radiofusion ("COMFER"), reflecting that Televideo transferred 65% of Belleville to Lynch.[145] JX 37 is a "Certificate of the Secretary of Grupo Belleville

---

[141] *See, e.g.*, *id.* at 454, 455, 459, 463; JX 24; JX 25.

[142] A. Gonzalez Tr. 463.

[143] *Id.* at 459:20–23 ("Q. Would you have signed any of those documents if you did not have the counterdocument? A. No. First of all, we wanted to make sure that the property would still be ours.").

[144] *See, e.g.*, JX 24; M. Gonzalez Tr. 265–66, 279; A. Gonzalez Tr. 455, 463, 485.

[145] *See* M. Gonzalez Tr. 266–67; Casaleggio Tr. 546.

Holdings" filed with COMFER on December 31, 2008, to demonstrate that an Argentine owned a majority stake in Belleville.[146]

The document is signed by Gonzalez and his daughter, Morelia, in her capacity as Belleville's secretary.[147] Morelia certified that Lynch held 65% of Belleville, Televideo held 30%, and Gonzalez held 5%.[148] Morelia signed the document "[b]ecause Lorefice had told [her] to sign it" in his capacity as Belleville's attorney.[149] Likewise, Gonzalez testified that "[n]either Morelia or myself [were] the ones preparing the documents," and that "[a]ll these things Carlos brought over and he asked for our signatures."[150] Gonzalez "was just signing what Lorefice told him to sign."[151] Gonzalez and Morelia executed JX 37 because Lynch informed them that it was needed to comply with Argentine law and assured Gonzalez that

---

[146] *See* JX 37; Lynch Tr. 21–22. During the relevant years, the Argentine government agency responsible for oversight control of broadcasting companies had several names: Comite Federal de Radiodifusion ("COMFER"), Autoridad Federal de Servicios de Comunicación Audiovisual ("AFSCA") and Ente Nacional de Comunicaciones ("ENACOM"). *See* Glossary of Stipulated Terms at 1, 3.

[147] JX 37. There was a dispute as to whether Morelia was, in fact, Belleville's secretary at the time this document was executed and filed, but that dispute has no bearing on my findings. *See* M. Gonzalez Tr. 266–67, 294–96; A. Gonzalez Tr. 498–99, 501–02.

[148] *See* JX 37.

[149] M. Gonzalez Tr. 267.

[150] A. Gonzalez Tr. 499, 501.

[151] M. Gonzalez Tr. 294; *see* A. Gonzalez Tr. 499, 501.

there would be a counterdocument.[152]  In view of the agreement that Lynch would hold the 65% in name only, JX 37's certification that Lynch was the owner of 65% of Belleville Holdings was "correct."[153]  And on the heels of JX 37, the parties further padded their scheme by designating Lynch as Belleville's co-manager, alongside Gonzalez, in January 2009.[154]

Thereafter, the parties created several additional documents in order to present a cohesive and consistent picture to regulators, and to legitimize the hastily executed JX 37 in the event regulators would request the "transfer" documents.[155]  Gonzalez signed each document, believing that each was necessary to further the parties' mutual scheme to facially satisfy Argentine law and that, therefore, each was a sham

---

[152] *See* M. Gonzalez Tr. 267, 294; A. Gonzalez Tr. 454, 498–501.

[153] *See* M. Gonzalez Tr. 295.  Lynch points to JX 37 as evidence of the purported September 2007 and January 2008 verbal agreements.  While JX 37 is consistent with Lynch's preferred timeline of events, as it was signed and filed after the 60% "sale" closed in January 2008, the preponderance of the evidence shows that JX 37 was executed in December 2008 based on the parties' true agreement that the 65% transfer was in name only to satisfy regulations.

[154] *See* PTO ¶ 28; JX 16.  The parties stipulated to this fact, and post-trial, Defendants do not appear to refute Lynch's designation as co-manager.  However, I note my reservations about the accuracy and authenticity of this designation.  JX 16 is dated January 20, 2009, but was signed and notarized on November 9, 2009.  *See* JX 16.  To me, it appears to be one of many documents that Lynch prepared for Gonzalez's signature, supposedly in furtherance of the sham transaction discussed *infra*.  I also note that JX 16 is notarized by Marco Cuono, Gonzalez's son-in-law.  *See* JX 16; M. Gonzalez Tr. 273.  This is one of many documents in the record that Cuono notarized after the fact.  *See, e.g.*, JX 5, JX 11; JX 12.

[155] *See, e.g.*, JX 5; JX 6; JX 11; JX 12; JX 13; JX 14; JX 15; JX 24; JX 25; JX 26; JX 27; JX 28; JX 29; JX 30; JX 31; JX 32; JX 35; JX 64; JX 66; JX 67; JX 68.

document with meaningless, non-binding terms.[156] Lynch would eventually weaponize these documents to claim he actually purchased and held 65% of Belleville.[157]

For example, Belleville's tax returns from 2008 on reflected that Lynch owned 65% of Belleville.[158] Those returns included a Form K-1.[159] In May 2009, Lynch sent his accountant a K-1 for 2008 that identified him as Belleville's 65% owner.[160] He also provided a copy of JX 7 as "proof of [his] ownership" because he "bought the shares without paying for them."[161] He annotated the copy: "NRA" appears beside Lynch's name, and "Class 'B', N/V; Profits interest" appears beside his membership interest.[162] I understand these notes to indicate that Lynch is a "nonresident alien" that holds a "non-voting" interest in Belleville.[163] This is consistent with Gonzalez's testimony that Lynch never had the full rights and

---

[156] The only exception to this belief was the Counterdocument, JX 25, which evidenced the parties' agreement that Televideo remained the beneficial owner of the 65% membership interest, despite papering a sham transaction to satisfy Argentine law.

[157] *See, e.g.*, White Tr. 530–33.

[158] *See* JX 17; Gomez Tr. 440–41.

[159] *See* JX 17; Gomez Tr. 440–41.

[160] *See* JX 17 at 3.

[161] *Id.* at 1, 2.

[162] *See id.* at 4; JX 7. These handwritten notes do not appear on the copy of this document that appears as JX 8. *Compare* JX 7, *and* JX 17 at 4, *with* JX 8.

[163] *See* Lynch Tr. 119–20. Lynch testified that he could not recall the meaning of these notes; I am unpersuaded by his hedging.

benefits of Belleville ownership, and with the actual timeline of events.[164]  At trial,

Lynch testified that he could not recall what these annotations meant, and touted his

65% ownership as genuine.[165]

In view of the new Argentine law, on October 15, 2009, Lynch advised

Gonzalez that they needed to execute additional documents to memorialize the 65%

transfer.[166]  He explained:

> In the year 2009, the media law in Argentina was modified because it
> differed to what was in effect up to 2009.  The regulating entity did not
> only see the American company as an owner of the rights, but it looked
> for the ultimate beneficial owner of this case, who was the final owner,
> not the ultimate beneficial owner but, rather, the final owner, the
> ultimate owner.[167]

---

[164] As discussed *infra*, this 2009 email, the K-1, and the markings on JX 7, are consistent
with Gonzalez's timeline of events.  Gonzalez first agreed to "transfer" 65% to Lynch in
name only in December 2008, so Lynch received a Form K-1 for calendar year 2008 in
connection with Belleville's U.S. tax filings, stating that he was Belleville's 65% owner.
*See* JX 17 at 2.  Lynch provided that document to his personal accountant, and attached JX
7 to document his ownership in view of the absent payment.  *See id.* at 1; Lynch Tr. 21–
22.  Lynch's "purchase" was logged through a series of documents Lynch created in 2009,
2010, and 2016.  *See, e.g.*, JX 5; JX 6; JX 11; JX 12; JX 13; JX 14; JX 15; JX 24; JX 25;
JX 26; JX 27; JX 28; JX 29; JX 30; JX 31; JX 32; JX 35; JX 64; JX 66; JX 67; JX 68.  The
fact that Lynch's ownership was flagged as "N/V" is consistent with the actual terms of
the parties' agreement to create a sham ownership structure.

[165] *See* Lynch Tr. 119–20; JX 17 at 1.

[166] *See* JX 18; A. Gonzalez Tr. 454–55.

[167] Lynch Tr. 107.

37

Lynch also advised that his stake should be increased from 65% to 70% pursuant to a new Argentine law.[168]

Also on October 15, Lynch emailed Marco Cuono, an attorney and Gonzalez's son-in-law, stating they needed to "modify the corporate composition of [Belleville] as follows and on February 2, 2009 (this is so it doesn't contradict with what was reported in January 2008, which was the latest that was presented)."[169] Lynch suggested increasing his holdings in Belleville to 70%, eliminating Gonzalez's personal 5% holding in Belleville but allowing Televideo to remain at 30%.[170] Lynch pushed to backdate the document, stating that "[t]he certification date must be February 2, 2009."[171]

That same day, Lynch also emailed Morelia:

---

[168] *See* JX 18; Lynch Tr. 131–33. He informed Gonzalez that they "need[ed] to perform a new transfer . . . for [Lynch] to acquire a major percentage than the one [he] already had at the time." Lynch Tr. 132. Lynch needed "to acquire a greater percentage in order to complete that 70 percent because, at that time, I did not have 70 percent." *Id.* at 133. Lynch proposed several solutions, including further shuffling shares around in his name. *See* JX 18 at 1–2. He stated that "an important issue to solve would be the price of the shares given the fact that the sale would be carried out by an American resident." *Id.* at 2.

[169] JX 20 at 1. As stated, Cuono was the parties' preferred notary for backdated documents. *See supra* note 154.

[170] *See* JX 20 at 1.

[171] *Id.*

> I spoke with your father today, to whom I explained the situation in Argentina regarding the shareholding structure. Your father told me to take his shareholding in GBH. According to our conversation by phone, in principle it would be taking the 5% that he had personally, leaving my stake in Telearte indirectly as follows . . . .[172]

Lynch informed Morelia that he would be sending documents for Gonzalez to sign in order to further document the 65% transfer and to increase his holdings to 70%.[173] Those documents would reflect "acquisition of 65% of GBH from Televideo (Clarifying that is really to assume the debt with the companies)," "acquisition of 5% of GBH from RAGG," and "acquisition of 5% of [IMC] from GBH."[174] The proposed 5% transfer of Gonzalez's personal Belleville interest never materialized and was never documented.[175]

In order to further document the fake 65% transfer, Lynch prepared a series of eight documents for Gonzalez to execute in Miami.[176] He emailed them to Morelia on October 22, 2009 (the "October 22 Email"); she then conveyed them to Gonzalez.[177] Lynch informed Gonzalez and Morelia that the documents needed to

---

[172] JX 21 at 1–2.

[173] *See id.* at 2.

[174] *Id.*

[175] Lynch Tr. 135–36.

[176] *See, e.g.*, JX 24; JX 25; JX 26; JX 27; JX 28; JX 29; JX 30; JX 31; JX 32.

[177] *See* JX 24; M. Gonzalez Tr. 276–77, 303.

be promptly executed.[178] Lynch said that, once Gonzalez executed the documents, Lynch would take the signed documents back to Buenos Aires for completion.[179]

The October 22 Email attached documents "regarding the operations that made [Lynch] acquire 65% of GBH."[180] As described by Lynch, the attached documents were (1) a purchase agreement for 5% of Belleville, dated September 2007 (the "First Purchase Agreement"); (2) a notification letter to Belleville of the 5% transfer; (3) a purchase agreement for 60% of Belleville, dated January 2008 (the "Second Purchase Agreement"); (4) a notification letter to Belleville of the 60% transfer (together with the 5% notification letter, the "Notices"); (5) a debt assumption agreement for $16 million of Televideo's debt (the "Addenda");[181] (6) a dation-in-payment; and (7) a blank transfer notice.[182] Of particular importance,

---

[178] *See* JX 24 at 2.

[179] *See id.* at 1–2.

[180] *Id.* at 1.

[181] The email reflects that the price was not based on the value of the 65%, but instead on the readily calculable amount of debt. *See id.* at 2; M. Gonzalez Tr. 300–01. Gomez, the accountant for both Gonzalez and Belleville, was involved in reviewing the documentation to ensure that Televideo's debt could properly be removed from its books. *See* M. Gonzalez Tr. 301.

[182] *See* JX 24; JX 26; JX 27; JX 28; JX 29; JX 30; JX 31; JX 32; *see also* JX 5; JX 6; JX 11; JX 12; JX 13; JX 15.

consistent with other transactions Lynch previously devised for Gonzalez, Lynch provided (8) a sworn statement (the "Counterdocument").[183]

Lynch advised Gonzalez that these documents were necessary to comply with Argentine law, and that they documented the transfer for public record purposes only, such that Gonzalez and Televideo would remain the actual and beneficial owners of all membership interests in Belleville.[184] Lynch informed Gonzalez that he "urgently need[ed]" the First and Second Purchase Agreements (together, the "Purchase Agreements") and their accompanying Notices to memorialize Lynch's proposed plan.[185] But Lynch intended those documents to bolster his story that he had purchased the 65% interest in September 2007 and January 2008. Morelia printed each document, and gave them to Gonzalez for his signature. He executed each of them, including the Counterdocument.[186]

The First Purchase Agreement, JX 5, transferred a 5% membership interest in Belleville from Televideo to Lynch.[187] It is backdated to September 7, 2007, but

---

[183] JX 25; *see also* JX 23.

[184] *See, e.g.*, JX 24; Lynch Tr. 132–33; A. Gonzalez Tr. 454, 455, 459, 463, 466–68, 472, 474.

[185] JX 24 at 2.

[186] *See* M. Gonzalez Tr. 276–77, 303.

[187] JX 5; *accord* JX 26.

was signed in October 2009.[188]  The Second Purchase Agreement, JX 11, transferred

a 60% membership interest in Belleville from Televideo to Lynch.[189]  It is backdated

to January 8, 2008, but was signed in October 2009.[190]  The Purchase Agreements

contain similar language.[191]  And both Purchase Agreements were accompanied by

a notice from Televideo to Belleville of the subject transfer.[192]

Because the Purchase Agreements memorialized a sham transaction that no

party intended to perform, the Purchase Agreements' substantive terms were

---

[188] *See* JX 5; JX 24; Lambert Tr. 320; M. Gonzalez Tr. 276–77, 303.

[189] JX 11; *accord* JX 28.

[190] Lynch chose these fictitious dates to bolster his story that he purchased the 65% interest at those times.  *See* Lynch Tr. 130–31; M. Gonzalez Tr. 275–76; *see also* JX 21 (directing Morelia to backdate documents); JX 24 (providing Purchase Agreements backdated to September 2007 and January 2008).  Still, the chosen dates are inconsistent with JX 7, which Lynch filed in October 2007 to identify himself as Belleville's 65% member.

[191] *Compare* JX 5, *with* JX 11.  The First Purchase Agreement states:  "It is [Televideo's] intention to sell, assign and transfer to [Lynch] FIVE PERCENT (5%) of [Belleville's] capital stock, as well as all irrevocable contributions made or pending to be made to [Belleville] on account of the future issue of shares, all ownership rights, and all profits corresponding to said ownership."  JX 5 at 12, ¶ c.  The Second Purchase Agreement contains identical language with respect to the 60% transfer.  *See* JX 11 at 12, ¶ c.

[192] *Compare* JX 6, *with* JX 13.  The 5% Notice states:  "We are writing to you in order to inform that on the date hereof Televideo Services Inc. has transferred to Carlos Eduardo Lorefice Lynch an [interest] equivalent to FIVE PERCENT (5%) in Grupo Belleville Holdings, L.L.C., including the whole voting and economic rights arising from said beneficial ownership."  JX 6 at 5.  The Notice associated with the Second Purchase Agreement states contains identical language with respect to the 60% transfer.  *See* JX 13 at 5.

immaterial. Gonzalez allowed Lynch to arbitrarily set their terms.[193] The Purchase Agreement provided that the total purchase price for 65% of Belleville was $16 million.[194] The Purchase Agreements required Lynch to pay interest annually,[195] but Lynch was not required to pay principal until January 8, 2013.[196] Lynch's principal payments were divided into ten equal installments totaling $16 million.[197] Lynch did not deliver any cash when the parties executed the Purchase Agreements.[198]

Lynch also drafted an Addenda, JX 30, framing the consideration as a debt assumption.[199] Backdated to January 2008, the Addenda provided that Lynch would assume $16 million of Televideo's debt incurred through the IMC acquisition.[200] This artifice was consistent with Lynch's October 22 Email, conjuring up a purchase

---

[193] *See, e.g.*, A. Gonzalez Tr. 471, 485; JX 24 (tethering purchase price to arbitrary debt amounts without mention of any negotiated price term). Lynch claims "negotiations" took place for the transfer. They did not. *See supra* notes 98–101 and accompanying text.

[194] *See, e.g.*, JX 5 § 2.1; JX 11 § 2.1; JX 12 § 1.1.

[195] *See* JX 5 § 2.2; JX 11 § 2.2.

[196] *See* JX 5 §§ 2.1, 2.2; JX 11 §§ 2.1, 2.2.

[197] *See* JX 5 §§ 2.1, 2.2; JX 11 §§ 2.1, 2.2.

[198] *See, e.g.*, Lynch Tr. 95, 107–08, 117.

[199] *See* JX 12; *accord* JX 30. The Addenda did not alter Lynch's payment schedule from the Purchase Agreements. *See* JX 12 § 3. Pursuant the Addenda, the "Parties agree[d] that, as payment for the Membership Interest, [Lynch] undertakes and is obligated to pay liabilities that [Televideo] owes to [Televideo's] Creditors, for up to an amount equivalent to the price agreed in the Purchase Agreements for the transfer of the Membership Interest, that is SIXTEEN MILLION US DOLLARS." *Id.* § 1.1. Televideo's creditors conferred and expressly agreed to release Televideo from $16 million of its debt. *See id.* § 1.2.

[200] *See* JX 30.

price based not on the actual value of the 65% interest, but instead on the readily calculable amount of debt.[201] The Addenda specified that, because Lynch assumed Televideo's debts, Lynch's payments under the Purchase Agreements were to be made to Televideo creditors.[202]

Lynch successfully convinced Gonzalez to execute the suite of Purchase Agreements, Notices, and the Addenda to legitimize the sham transfer, effectuate Lynch's plan to circumvent Argentine holding restrictions, and ultimately seize the opportunity to run off with the Company. And Belleville continued to enshrine Lynch's ownership in its public filings and private documents so as not to tip off Argentine regulators regarding Belleville's actual ownership.[203]

### E. Gonzalez Executed Sham Documents Because Lynch Represented That He Would, And Did, Execute The Counterdocument.

In accordance with their plan, Gonzalez believed, because Lynch indicated, that the Purchase Agreements, Notices, and Addenda facially identified Lynch as holding 65% of Belleville and the associated voting and economic rights, but that

---

[201] *See* JX 24 at 1 (stating that under the Addenda "CLL assumes the debt for US $16M that Televideo Services holds with (Interamericana, Belleville, Prolasa and EFG Worldwide (at this point we have to confirm the amounts and people that would sign for each of the companies)").

[202] *See* JX 30 §§ 1.2, 2; *accord* JX 12 §§ 1.2, 2.

[203] For example, Belleville's tax returns from 2008 through 2017 name Lynch as Belleville's 65% owner. *See* Gomez Tr. 440–47, 448. Gonzalez signed them.

Televideo would remain the interest's true beneficial holder via the Counterdocument.[204]  The Counterdocument reflects the understanding that Lynch held only record title to the 65% interest and that Gonzalez (through Televideo) was its actual, beneficial owner.[205]  It expressly provided that Lynch would return record ownership to Televideo upon request.[206]  And it made clear that Gonzalez would provide all funds used to "acquir[e]" Lynch's holdings.[207]

Gonzalez focused on completing the Counterdocument to reflect the same, with little focus on the sham documents' terms.[208]  At all times, Gonzalez operated under the belief that Lynch would, and did, execute the Counterdocument as promised.[209]  Gonzalez agreed to the 65% transfer in 2008 because Lynch promised to execute a counterdocument, and he signed the suite of documents in 2009 because Lynch's October 22 Email included the Counterdocument and Lynch represented that he would execute it.[210]  Gonzalez would not have executed any other

---

[204] *See, e.g.*, A. Gonzalez Tr. 453–55, 456, 457, 459, 463, 472, 474, 485.

[205] *See, e.g.*, JX 25; Lynch Tr. 145; Casaleggio Tr. 548.

[206] *See* JX 25 ¶ 6.

[207] *Id.* ¶ 2.

[208] *See, e.g.*, A. Gonzalez Tr. 453–55, 456, 457, 459, 463, 472, 474, 485.

[209] *See, e.g.*, *id.* at 455, 456, 459, 463, 472, 474, 483, 485, 494; *see also* M. Gonzalez Tr. 277–78, 279–80, 289–90; White Tr. 451.

[210] *See* A. Gonzalez Tr. 455, 459.

documentation, including the remaining attachments, without it.[211]  Lynch knew this.[212]

Lynch drafted the Counterdocument and sent it to Gonzalez.[213]  He promised Gonzalez that he and his wife would execute the Counterdocument to ensure Gonzalez would sign the other documents papering the 65% transfer.[214]  Lynch suggested a number of ways they could arrange his wife's signature, then "insist[ed] that this [Counterdocument] should be signed tomorrow."[215]

Gonzalez signed the Counterdocument shortly after receiving the October 22 Email.[216]  Lynch then retrieved the Counterdocument from Gonzalez, and took it with him to Argentina under the guise that he needed his wife's signature.[217] Gonzalez always believed that Lynch and his wife signed the Counterdocument

---

[211] *See id.* at 459 ("Q. Now, going back to the counterdocument, you signed a number of documents with Mr. Lorefice concerning GBH; correct?  A. Definitely, yes.  Because he was my employee and my attorney, I completely trusted in him.  Q. Would you have signed any of those documents if you did not have the counterdocument?  A. No.  First of all, we wanted to make sure that the property would still be ours.").

[212] *See* Lynch Tr. 146–153; JX 24; JX 25.

[213] *See* Lynch Tr. 145–54; A. Gonzalez Tr. 455.

[214] *See* Lynch Tr. 145–54; A. Gonzalez Tr. 455.

[215] JX 24 at 2.

[216] *See, e.g.*, Morelia Tr. 303.

[217] *See* JX 24 at 2.

46

provided in the October 22 Email; he never agreed or suggested that Lynch need not

sign it.[218]

---

[218] *See, e.g.*, A. Gonzalez Tr. 456 ("Q. Did you ever agree with Mr. Lynch to get rid of the counterdocument? A. Never."), 463 ("Everything that I signed for, there was always a counterdocument. And he will prepare them. I completely trusted in Mr. Lorefice."); *see also* Lynch Tr. 129–30; Morelia Tr. 303; White Tr. 541.

Lynch testified that while he never intended to sign the Counterdocument, he told Gonzalez he would sign it in order to secure a meeting with Gonzalez to negotiate the terms of the Purchase Agreements. *See* Lynch Tr. 129–30, 148, 152, 153–54. Lynch testified that he hoped that, once the promise of a Counterdocument gave Gonzalez a sense of security, Gonzalez would agree to a meeting with him to further negotiate the terms of his ownership stake. *See, e.g.*, *id.* at 153–54, 251; JX 24.

According to Lynch, soon after sending the October 22 Email, he met with Gonzalez in Miami. *See, e.g.*, Lynch Tr. 26, 251. Lynch testified that he and Gonzalez were the only two people at the meeting. *See id.* at 26; M. Gonzalez Tr. 303. He contends that at that meeting, they signed at least four documents: the two Purchase Agreements and the two purchase notifications. *See id.* at 27–28 (stating Gonzalez signed the Purchase Agreements at the supposed meeting); *but see* M. Gonzalez Tr. 303 (stating Morelia printed the Purchase Agreements and gave them to Gonzalez to sign as directed in the October 22 Email, JX 24).

Lynch further contends that, at that meeting, he told Gonzalez that he would not execute the Counterdocument, dation-in-payment, or blank transfer notice, and that Gonzalez agreed. *See, e.g.*, Lynch Tr. 26–28, 148, 149, 251–53. According to Lynch, they "agreed to replace the reviewed documents as affidavit or sworn statement, the dation of payment, and the transfer for a security interest." *Id.* at 27. Lynch says they then "modified the security interest" and agreed to do away with the Counterdocument because "it's totally excessive. It does not reflect reality. . . . That's why [Lynch] never wanted to sign it, and that's why it was replaced by another document that . . . does reflect a security interest." *Id.* at 152, 153. To support this contention, Lynch points out that none of the witnesses who saw the Counterdocument testified to seeing executed copies of the dation-in-payment or blank transfer notice. *See* D.I. 190 at 6.

I am unpersuaded. Only Lynch's own testimony supports his position that he told Gonzalez he would not sign the Counterdocument, and that Gonzalez agreed. *See, e.g.*, Lynch Tr. 149. I do not find Lynch's testimony credible, and the preponderance of the evidence shows no such in-person meeting or negotiations occurred. No document has been presented reflecting such negotiations. The terms of Lynch's "purchase" or "security interest" were meaningless because, as explained, Lynch never "purchased" any interest in

47

At trial, Lynch testified that he lied when he promised to execute the Counterdocument.[219]   He never intended to sign it.[220]   He testified that the Counterdocument is "a draft I sent and that I never thought of signing" and that "it was never my intention to sign it, nor the intention of having my wife sign it."[221] And consistent therewith, he adamantly testified that he never signed the Counterdocument.[222]   This remarkable admission was the most credible piece of

---

Belleville.  Therefore, as I will explain, the terms of that "purchase" were never performed. The only "security" that serves as a logical counterpart for a sham purchase is a document clarifying no true transfer ever occurred.  Lynch's contention that Gonzalez agreed to eliminate the Counterdocument is unsupported and inconsistent with the record.  If Gonzalez and Lynch met in person, I find they did not negotiate the terms of Lynch's "purchase" or agree to—or even discuss—doing away with the Counterdocument that was so important to Gonzalez.  *See* A. Gonzalez Tr. 456, 462–63.

[219] *See* Lynch Tr. 145–54.

[220] *See, e.g.*, *id.* at 146 (Q. Were you ever going to sign item 1 that you've listed and given to Morelia?  A. No, it was never my intention to sign it, nor the intention of having my wife sign it."), 147 ("[W]hat I was saying was I was going to do something that it wasn't my intention to do.  It could be a lie."), 150 ("[M]y intention was never to sign them."), 155–56 ("What I'm saying is that, to Mr. Gonzalez's understanding, the documents numbered 1, 7, and 8 served as a security interest.  To my point of view, the way I see it, it's totally excessive.  It does not reflect reality. . . . That's why I never wanted to sign it . . . ."), 158 ("It's a draft I sent and that I never thought of signing."), 159 ("It was a draft of a sworn statement that I was not going to sign -- of an affidavit that I was not going to sign. . . . I told the Court that it was never my intention to sign it."), 160 ("A. The whole document is something that I was not willing to sign.  Q. And even though the whole document was something you were not willing to sign, you sent it to Morelia, asking her -- telling her that you were going to sign it and get your wife to sign it; right?  A. Correct. Something that never took place.  Q. So you never signed it; correct?  You never signed the counterdocument?  A. I never signed it.").

[221] *Id.* at 146, 158.

[222] *See, e.g.*, *id.* at 160.

Lynch's testimony over nearly two days. Accordingly, on this point, I take Lynch at his word. Lynch never signed the Counterdocument, and an executed version was never produced.[223]

Still, sometime after taking the Counterdocument to Argentina, Lynch returned the Counterdocument, signed only by Gonzalez, to Belleville's offices in Miami.[224] Both Morelia and Gonzalez saw it.[225] Morelia then placed the original Counterdocument in a safety deposit box in Miami for safekeeping.[226] Eventually, Morelia moved the Counterdocument from one safety deposit box to another, and then to Televideo's offices in Miami.[227] The Counterdocument had to be kept a secret from Argentine regulators in order to be effective, and in order for Lynch's solution to satisfy those regulators.[228] Thereafter, Lynch communicated with Morelia about the Counterdocument, fortifying the belief that he signed it as promised.[229] Just as Lynch had used the Counterdocument to soothe Gonzalez's

---

[223] *See id.*

[224] No witness testified to the specific chain of custody. I make this determination from the preponderance of the evidence presented.

[225] *See* M. Gonzalez Tr. 281; A. Gonzalez Tr. 455.

[226] *See* M. Gonzalez Tr. 281–82.

[227] *Id.*

[228] *See id.* at 278 (stating the Counterdocument "was going to be a private document that was going to modify a previous document"), 282 (stating the Counter document was "a document that we didn't want anyone to read, so we kept it private").

[229] *See id.* at 278–79.

concerns, he "always told [Morelia] that this [counter]document should give [her] peace of mind; that if he would go crazy or something would happen to him, [her] dad's investment would be protected."[230]

Sometime in 2011, a package of documents arrived in Argentina in preparation for completing a regulatory filing before AFSCA.[231] Lynch explained to Curutchet that the paperwork was necessary "in order to comply with the Argentine law," and that "he would create a counterdocument to look after the

---

[230] *Id.* at 279. The parties dispute whether Lynch and his wife ever signed the Counterdocument. Some witness who saw the Counterdocument could not recall whether the Counterdocument was signed when they saw it. *See* Lambert Tr. 371; Curutchet Tr. 519; White Tr. 540; Casaleggio Tr. 557. But Gonzalez testified that he saw the Counterdocument, and it was signed by Lynch and his wife. *See* A. Gonzalez Tr. 455. So did Morelia. *See* M. Gonzalez Tr. 281. She also claims that she put the only executed copy of the Counterdocument in the safe deposit boxes, and did not remove it until 2016. *See id.* at 281–83.

Morelia and Gonzalez's testimony on these points is inconsistent with Lynch's position that he did not sign the Counterdocument. And if Lynch did not sign it, Morelia and Gonzalez presumably would have had the opportunity to discover that fact when they physically saw the Counterdocument when Lynch returned it to Miami. This has gone unquestioned and unexplained, and reasonable minds can differ in explaining this discrepancy.

On this point, I take Lynch at his word that he did not. Lynch prepared the Counterdocument, presented it to Gonzalez, and falsely promised that he would execute it, while never intending to do so or to perform under it. Gonzalez and Morelia genuinely believed that Lynch signed it, and Lynch's conduct continued to fortify that belief. *See, e.g., id.* at 279; A. Gonzalez Tr. 459, 463, 472, 474, 483; JX 141. For those reasons, Gonzalez agreed to document the 65% transfer. Lynch eventually took measures to do away with the Counterdocument, signed or not, and Morelia testified about circumstances that gave Lynch the opportunity to take and destroy any signed Counterdocument. *See infra* Section I.H.

[231] *See* Curutchet Tr. 515–17; Casaleggio Tr. 555–58.

interest of Mr. Angel Gonzalez."[232]  Curutchet received the package and saw a copy of the Counterdocument therein.[233]  In 2014, a copy of the Counterdocument surfaced again when Lynch presented "a complete copy of a docket[,] in his own hands at his office," of AFSCA paperwork.[234]  The witnesses who saw it could not confirm whether it was, in fact, signed by Lynch.[235]

### F.  The Parties Extend The Paper Trail.

The parties did not perform under the Purchase Agreements or Addenda because the 65% transfer was a sham.  Because Lynch did not make the required "payments" for a transaction that supposedly closed in January 2008, the paper record reflected that he was in arrears, threatening the apparent authenticity of the 65% transfer.  So beginning in 2010, Lynch drafted a series of instruments restructuring the debt he purportedly assumed, and advised Gonzalez to execute them.  Lynch did so to identify credible creditors, legitimize the transfer, and erode the significance of the Counterdocument.  He papered the file for his benefit.[236]

---

[232] *See* Curutchet Tr. 516.

[233] *See id.* at 515–17; Casaleggio Tr. 555–58.

[234] Casaleggio Tr. 558.

[235] *See id.* at 557; Curutchet Tr. 519.

[236] *See* JX 12; JX 14; JX 35; JX 66; JX 67; JX 68.

### 1.      The Revised Addenda And Complement

In February 2010, Lynch sent Gonzalez a revised Addenda, JX 12, noting that when they executed the original they "did not know what credits were going to be assigned," that the chosen January 2008 date on the documents "could be modified," and that a number of loose ends remained in the sham.[237] Those revisions identified two particular Televideo creditors to which Lynch was supposed to "pay" the required installments under the Purchase Agreements: Interamerican Services Limited and EFG Worldwide.[238] Aside from identifying those creditors, the revised Addenda was substantively identical to the original, JX 30.[239]

Lynch also directed Lambert to draft a document intended to work alongside the revised Addenda and further legitimize the fake debt assignment.[240] So at the same time he prepared the revised Addenda, Lambert prepared a complement to the

---

[237] JX 33 at 48; Lynch Tr. 32–33, 172. Because he did not provide an updated Counterdocument along with the revised Addenda and Complement, Lynch contends that this email supports his position that the parties agreed to eliminate the Counterdocument. I disagree. The absence of a counterdocument from the February documents supports Gonzalez's position that the Counterdocument was executed as expected and stored for safekeeping.

[238] *See* JX 33 at 48; Lynch Tr. 33, 171–72. The records reflect that the parties refer to "EFG Worldwide" in various ways. For example, Plaintiffs also refer to EFG Worldwide as Worldwide Features, Inc. *See* D.I. 190 at 1. From these references, I deduce that Televideo's creditor, EFG Worldwide, a company in the Belleville family that Lynch held in name only, subject to a counterdocument. *See* Lynch Tr. 88, 105, 145, 156–57.

[239] *Compare* JX 12, *with* JX 30.

[240] *See* JX 14; JX 33.

52

Addenda, JX 14 (the "Complement").[241]  Backdated to January 2008, the Complement provided that "Interamerican Services Limited and EFG Worldwide accept the assignment of Televideo Services Inc.'s credit to CLL."[242]  The Complement securitized the 65% transfer, appointed Televideo as collection agent for Televideo's creditors, and authorized Televideo to negotiate and agree to modifications of Lynch's debt.[243]  The Complement appointed Televideo as collection agent for certain of Televideo's creditors and authorized Televideo to negotiate and agree to modifications of Lynch's debt.[244]

Gonzalez executed the revised Addenda and Complement.[245]  Lynch did not deliver any cash when the parties executed those documents.[246]

---

[241] *See* JX 14; Lambert Tr. 335.  Lambert and Lynch testified they drafted the Complement to document Lynch and Gonzalez's alleged Miami agreement to replace the unexecuted Counterdocument, dation-in-payment, and transfer letter with a traditional security interest. *See* Lynch Tr. 252–53; Lambert Tr. 327–30, 334–36.  This testimony is not credible because there was never such an agreement.

[242] JX 33 at 48; *see also* JX 14 § 3.

[243] JX 14 §§ 1.2, 3.  It provides that "[Lynch] secures to [Televideo's] Creditors the payment of the Price with the Membership Interest, such security is accepted in this act by [Televideo's] Creditors." *Id.* § 1.2.

[244] *See* JX 14 § 3.

[245] *See* JX 12; JX 14.  He did so on behalf of Televideo.  *See* A. Gonzalez Tr. 476, 480.

[246] *See, e.g.*, Lynch Tr. 95, 107–08, 117.

## 2.     The 2010 Restructuring Agreement

Lynch did not pay the interest required by the First Purchase Agreement, Second Purchase Agreement, and Addenda, so Company records reflected that Lynch was in arrears.[247]   Lynch suggested that he and Gonzalez restructure his "debt" to keep up with appearances.[248]       Accordingly, Lynch prepared the 2010 Restructuring Agreement, which he and Gonzalez executed on September 15, 2010.[249] It purported to restructure the debt from the Second Purchase Agreement.[250] Lynch pitched the 2010 Restructuring Agreement as minimizing the amount of funds Gonzalez would have to front to Lynch, so that Lynch could return them as "payment;" Gonzalez believed him.[251]

The 2010 Restructuring Agreement waived Lynch's default upon payment of penalty interest and accelerated Lynch's principal payments.[252]   Other adjustments to Lynch's payment obligations included changing the number of installment payments from ten to twelve, and making the first payment due on November 15,

---

[247] *See id.* at 35–36, 108.

[248] *See id.*

[249] *See* JX 35 at 7.  The 2010 Restructuring Agreement was drafted at Lynch's discretion.

[250] *See id*.

[251] *See* Lynch Tr. 35–37; A. Gonzalez Tr. 480–83, 486.

[252] *See* JX 35 § 2.3.

54

2010 instead of the original January 8, 2013.[253]  Lynch's first payment pursuant to the 2010 Restructuring Agreement was comprised of $800,000 of principal and $119,536.42 of interest.[254]

Lynch paid the first required installment payment by wire transfer in the amount of $919,536.42 on November 12, 2010.[255]  He paid the second installment of $819,549.68 on June 17, 2011.[256]  At the end of October 2011, Argentina imposed a series of currency controls barring the export of US dollars.[257]  Despite the currency controls, Lynch used his US bank account to make an "advance payment" in November 2011.[258]  The payments appeared to come from Lynch, but Gonzalez provided the funding.[259]  After November 2011, Lynch stopped "paying" and again fell into "default."[260]

---

[253] *Compare* JX 5 *and* JX 11, *with* JX 35 § 1.

[254] *See* JX 36 (wire transfer of $919,536.42).

[255] *See id.*; Lynch Tr. 52.

[256] *See* JX 41 (wire transfer of $819,549.68).

[257] *See* Lynch Tr. 37.

[258] *See* JX 42; Lynch Tr. 53.  A new government lifted the currency restrictions at the end of 2015.  *See* JX 64 at 2.

[259] *See, e.g.*, JX 36; JX 41; JX 42; JX 69; JX 74; JX 122; JX 123; JX 124; JX 162; M. Gonzalez Tr. 297, 299; A. Gonzalez Tr. 483, 486.

[260] *See* Lynch Tr. 37; JX 64 ("As a consequence of the exchange restrictions in force in Argentina until early 2016, CLL did not have access to a single and free exchange market to transfer the balance of the due amounts under the sale and purchase agreement.").

### 3. The May 2016 Restructuring Agreements

Lynch's purported debt remained unpaid for years. In 2017, Lynch and Gonzalez agreed that they again needed to address Lynch's default to maintain the transfer's apparent legitimacy.[261] Lynch advised Gonzalez to execute a series of new debt restructuring agreements: the May 2nd Restructuring Agreement, the May 3rd Restructuring Agreement, and the May 4th Restructuring Agreement (collectively, the "May 2016 Restructuring Agreements").[262] Each was drafted at Lynch's direction after September 2016, and backdated to May 2016.[263]

The May 2016 Restructuring Agreements were simply the latest documents that Lynch prepared, or directed to be prepared, and advised Gonzalez to sign in furtherance of their agreed-upon "solution" to satisfy Argentine laws.[264] Nearing

---

[261] *See* JX 64; JX 66; JX 67; JX 68.

[262] *See* JX 64; JX 66; JX 67; JX 68.

[263] *See* JX 64; JX 65; JX 66; JX 68. The Beccar Varela law firm drafted, and Lambert reviewed, the May 2016 Restructuring Agreements at Lynch's direction. *See* Lambert Tr. 359. Lambert testified "those are the dates that Mr. Lynch asked me to put in the documents." *Id.* at 361.

[264] Lynch contends that Gonzalez agreed to relieve Lynch of some of his repayment obligations because Lynch performed four "extraordinary" tasks for Gonzalez after 2011. *See, e.g.*, Lynch Tr. 37–42, 174–82. According to Lynch, he performed these services outside the scope of his normal work responsibilities and "undertook them at substantial personal risk," D.I. 190 at 12, but Gonzalez did not immediately compensate Lynch for his efforts. *See* Lynch Tr. 37, 41. In particular, Lynch claims he (1) assisted Gonzalez in covertly using Company funds to purchase a piece of Florida real estate for Gonzalez's female friend; (2) helped resolve problems Lynch and Gonzalez were having with the Argentine government by identifying and recruiting sympathetic businessmen; (3) smuggled Gonzalez's wife from Italy to Nicaragua, and ultimately Florida, when there was

the end of his paper trail, Lynch also used the May 2016 Restructuring Agreements to record and legitimize the Counterdocument's destruction.

In September or October of 2016, Lynch prepared the May 2nd Restructuring Agreement and backdated it to May 2, 2016.[265] It lowered the purported purchase price of the membership interest and forgave Lynch's past-due principal and interest payments.[266] Specifically, the May 2nd Restructuring Agreement (1) cured Lynch's payment default caused by the Argentine currency export restrictions;[267] (2) waived $272,739.18 of interest that had accrued during the currency export restrictions;[268] and (3) reduced Lynch's principal obligation by 30% from $14,223,714.10 to $9,946,599.87.[269]

---

an Interpol red notice issued for her arrest, based on her alleged interference with the Guatemalan presidential election; and (4) made payments on Gonzalez's behalf that Gonzalez did not want to make directly. *See, e.g.*, *id.* at 37–42, 174–82. But the preponderance of the evidence demonstrates Lynch did not participate in these services to the extent he contends. *See, e.g.*, *id.* at 174–82 (cross examination of Lynch as to his purported "extraordinary" tasks); White Tr. 534–39 (explaining that Lynch had minimal involvement in smuggling Mrs. Gonzalez from Italy). And even if Lynch played a key role, the services were rendered before the May 2016 Restructuring Agreements were prepared and executed in 2017. *See* Lynch Tr. 179, 180, 181, 182; Lambert Tr. 360–61. The May 2016 Restructuring Agreements were not consideration for services rendered.

[265] *See* JX 64; Lynch Tr. 174; Lambert Tr. 360.

[266] *See* JX 64 §§ 2.03, 2.04; Lynch Tr. 36–37.

[267] *See* JX 64 § 2.03.

[268] *See id.* §§ 2.02(b), 2.04(c).

[269] *See id.* §§ 2.02(a), 2.04(b).

The May 2nd Restructuring Agreement required Lynch to make three payments to satisfy his debt. The first payment of $1,000,000 was due by May 17, 2016.[270] The second payment of $500,000.00 was due by September 15, 2016.[271] Lynch supposedly made these payments, but could not have done so on the specified dates because the Agreement was not executed before those dates.[272] The balance of $8,456,599.87 is due on or before December 31, 2021.[273]

After drafting the May 2nd Restructuring Agreement, in 2017, Lynch prepared a second restructuring agreement.[274] The May 3rd Restructuring Agreement restructured the debt addressed in the May 2nd Restructuring Agreement.[275] It provided Lynch's creditors with a payment of $350,000 before December 31, 2017, four years before it had been due under the May 2nd Agreement.[276] It also reduced the interest rate from 5% to 4%,[277] and removed Lynch's pledge to secure his debt.[278] Again, at the time Gonzalez was signing these

---

[270] *See id.* § 2.04(d).

[271] *See id.*

[272] *See* JX 69; JX 74.

[273] *See* JX 64 § 2.04(e).

[274] *See* JX 66; Lambert Tr. 360–61.

[275] *See* JX 66. Lambert drafted the May 3rd Restructuring Agreement at Lynch's direction.

[276] *Compare* JX 64 §§ 2.04(d), (e), *with* JX 66 § 2.04(d).

[277] *Compare* JX 64 § 2.04(j), *with* JX 66 § 2.04(j).

[278] *Compare* JX 64, Article VII, *with* JX 66, Article VI.

Agreements at Lynch's direction, he was indifferent to their written terms because he always understood the 65% "purchase" to be a mutual farce to satisfy Argentine holding restrictions. He signed the agreements Lynch brought to him, taking Lynch's word that they were necessary and therefore taking little to no time to review their terms.

Even with Gonzalez's signatures, Lynch's plan remained encumbered by the Counterdocument. Gonzalez believed the Counterdocument evidenced the parties' actual agreement, and believed it would supersede any of the documents identifying Lynch as Belleville's 65% member. Gonzalez was under the impression that Lynch and his wife had executed it and that it was stored safely in Miami.[279] Lynch was aware that Gonzalez would eventually point to the Counterdocument, and expected Lynch to return the 65% interest to its true owner, Televideo, as he had done on at least two other occasions.[280] The documents executed to date did not do enough to minimize or eliminate this risk.

So, later in 2017, Lynch prepared the May 4th Restructuring Agreement and presented it to Gonzalez for his signature.[281] As with the May 2nd and May 3rd

---

[279] *Cf.* JX 141 (email chain dated October 2018 evidencing Gonzalez's belief that the Counterdocument was signed by Lynch and his wife and safely stored in Miami); Lopez Dep. 57–59 (discussing JX 141).

[280] *See* Lynch Tr. 88, 105, 145, 156–57; Landaburu Tr. 433–34, 436.

[281] *See* JX 67; JX 68.

Restructuring Agreements, the May 4th Restructuring Agreement is backdated to 2016.[282] It is identical to the May 3rd Restructuring Agreement, except for an additional clause that purports to invalidate the Counterdocument:[283]

---

[282] *See* JX 67; JX 68.

[283] *See* Lynch Tr. 47 ("The May 4th agreement has an additional clause, 2.05 . . . such clause provides certain declarations and guarantees on warranties signed by Mr. Gonzalez in representation of Televideo Services in my favor, to my benefit, that will be used to, for example, avoid trials like this."), 203 ("[T]he only thing that is added on to the May 4th agreement is clause 2.05, which is the protection clause that would prevent for us to be in this trial, this lawsuit.").

Section 2.05    Acknowledgement.    Televideo    establishes    and acknowledges:

(a)  The full and legitimate possession of CLL of 65% of Grupo Belleville Holdings L.L.C.

(b)  That any public or private instrument that the Parties or any of the Parties has signed regarding the property of 65% of Grupo Belleville Holdings L.L.C. with any individual other than CLL shall be null and void.

(c)  That any document fully or partially signed by CLL, acknowledging and/or transferring the property of the 65% of Grupo Belleville Holdings L.L.C in favor of Televideo and/or Remigio Ángel González González shall be void and null and shall be destroyed by Televideo and/or Remigio Ángel González González pursuant to which Televideo and Remigio Ángel González González shall be liable before CLL and shall hold him entirely harmless from any damage that the exhibition and/or execution of the aforementioned documents may involve.[284]

Knowing that Gonzalez "did not want to respond to uncomfortable questioning," Lynch presented the May 4th Restructuring Agreement and Section 2.05 to Gonzalez as an escape valve in the event regulators came close to uncovering their scheme: Section 2.05 would falsely evidence that the Counterdocument did not govern Belleville's membership structure.[285]    Because the May 4th Restructuring Agreement referred to the Counterdocument, it was to be a "secret" document between Lynch and Gonzalez "that would not be presented or brought before the

---

[284] JX 67 § 2.05; *accord* JX 68 § 2.05.

[285] *See* Lynch Tr. 48–50, 203–11.

regulators."[286] This was consistent with the Counterdocument's secret nature, as public disclosure or mention of it would reveal Belleville's true owners, and would defeat the scheme to satisfy Argentine regulators.[287] If regulators requested documentation, but were not tipped off about the Counterdocument, Lynch proposed they produce the May 3rd Restructuring Agreement.[288] But in the event regulators began to inquire about the Counterdocument, Lynch suggested they rely on the May 4th Restructuring Agreement and Section 2.05 "in order to avoid any inconvenience or uncomfortable questioning, on behalf of the regulators"[289] and so that "there [would not] be any doubts about" the sham transfer.[290]

---

[286] *See id.* at 48, 49–50, 203–11, 256–58.

[287] *See* D.I. 219 at 69–72, 111, 114; Casaleggio Tr. 553.

[288] *See* Lynch Tr. at 203 ("The May 3rd agreement was for any issue to present before any public organization or, better said, any regulatory body or regulator because clause 2.05 has issues that neither one of the parties would like the regulator to ask about them, although we knew that nothing had been signed.").

[289] *Id.* at 203–04 ("But in order to avoid any inconvenience or uncomfortable questioning, on behalf of the regulators, we asked -- or, rather, we agreed to [the May 4th Restructuring Agreement]. . . . It was an agreement that would not be presented or brought before the regulators.")

[290] *Id.* at 48 (Lynch stating that he included Section 2.05 "[b]ecause, to me, the purchase of 65 percent is an important event, and I don't want there to be any doubts about it").

This elaborate explanation was a ruse. Lynch included Section 2.05 to justify the Counterdocument's eventual destruction and absence, and to protect himself in the event it resurfaced.[291]

### G. Lynch "Pays" For The Belleville Membership Interests.

From the time Lynch was introduced to Belleville in 2007 through 2017, Lynch did not inject any capital into the Company.[292] Between 2007 and 2010, Lynch could not afford to purchase 65% of Belleville.[293] And despite Lynch's contention that he negotiated the purchase of 65% of Belleville as early as 2007, he did not make any payments until 2010.[294]

---

[291] Even though Lynch disputes that he signed the Counterdocument and that he was bound by it, he claims he needed to include Section 2.05 as "protection" for two reasons. I do not find these reasons credible. First, Lynch claimed he needed to be protected from litigation of the sort presented in the instant case. *See, e.g.*, Lynch Tr. 43, 47. Lynch filed this action himself. Second, Lynch claims Gonzalez used forged documents in connection with the wind-down of Gonzalez's brother's estate after his brother passed away unexpectedly, to the detriment of his brother's widow. *See id.* at 257. Lynch was concerned that Gonzalez might attempt the same type of forgery via the Counterdocument to take what Lynch touted as his genuine 65% ownership in the Company. *See id.* This attenuated and speculative rationale yields to the much simpler and more supported explanation that Lynch drafted Section 2.05 to protect himself from the Counterdocument he had promised Gonzalez he would execute.

[292] *See* Gomez Tr. 448.

[293] *See* Casaleggio Tr. 554–55.

[294] *See* JX 36; Lynch Tr. 52, 107–08, 177; Maleplate Dep. 97–98.

Gonzalez would not have waited over two years to be paid for such a valuable asset.[295] Nor would he have agreed to sell full beneficial ownership of 65% of Belleville to Lynch for less than he had just paid for the interest.[296] The diminished purchase price and Lynch's late payments did not matter because Gonzalez funded the sham sale.[297] The Counterdocument provides as much: "all of the funds and money used for the acquisition of the Equity interest were and will be provided to [Lynch] by [Gonzalez]."[298]

---

[295] *See* Lynch Tr. 107–108; A. Gonzalez Tr. 456.

[296] *See* A. Gonzalez Tr. 455, 456, 459, 463.

[297] *See, e.g.*, M. Gonzalez Tr. 280 ("[W]hose money was to be used to purchase the 65 percent interest in GBH? A. My dad's. . . . Q. What is your understanding as to where he got the money to pay for the 65 percent interest of the GBH shares? A. From the TV channel in Argentina."), 290 ("Q. And what are you instructing Ms. Maleplate to do? A. To please give Lorefice the sum of $100,000. Q. And who authorized that transfer to Mr. Lorefice in the amount of $100,000 on the 14th of January 2015? A. My dad. Q. Did Mr. Lorefice have the ability to transfer money on his own? A. No. Q. Who is the one that's in charge of transferring money for all the Albavision entities? A. My dad needs to give the instructions."), 291–92 ("A. Yes. Q. Now, with regards to the email to Ms. Maleplate, what are you instructing her to do? A. To give Lorefice the sum of $300,000. Q. And was this -- who authorized this transfer of $300,000 on the 7th of August 2015. A. My dad."), 292 ("A. It's Lorefice's bonus. Q. Who determined Mr. Lorefice's bonus? A. My dad. Q. And the email, what does it instruct Ms. Maleplate to do? A. To give Lorefice the sum of $300,000. Q. And who authorized that? A. My dad."), 297 ("Q. Are you aware of any transfer from any bank used by your father to Mr. Lynch for the purpose of paying for Mr. Lynch's holdings in Grupo Belleville? A. The only thing I know of, that the money would come from the channel. I don't know how they structured that, how they did that. I don't know the details."); *see also* JX 36; JX 41; JX 42; JX 51; JX 58; JX 60; JX 69; JX 74; JX 123; JX 124; JX 162.

[298] JX 25 ¶ 2.

All funds transferred for the "purchase" of the subject 65% interest came either directly or indirectly from Gonzalez's personal or business accounts, including from the accounts of Belleville and its subsidiaries.[299] Lynch devised a process whereby employees of Belleville or its subsidiaries credited Lynch's account, and created accounting entries for "advanced fees" (supposedly for Lynch's director and legal services) that he did not actually earn; Gonzalez authorized those amounts.[300] He then returned the amounts as purported payments owed for the 65%.[301] Maleplate documented these fees and payments in detailed charts.[302]

Shortly before each of Lynch's purported payments, he received an "advancement" of nearly the exact same amount.[303] In 2010, Lynch received a $1 million "advance payment" from one of Gonzalez's companies, and shortly thereafter, Lynch paid $919,536.42 to Televideo pursuant to the 2010 Restructuring Agreement.[304] In June 2011, Lynch paid $819,548 to Televideo after receiving $817,500 from another of Gonzalez's companies.[305] And in November 2011, Lynch

---

[299] *See* M. Gonzalez Tr. 280, 290, 291–92, 297.

[300] *See id.* at 280, 290, 291–92, 297; A. Gonzalez Tr. 486; Maleplate Dep. 133.

[301] *See, e.g.*, Lynch Tr. 227–28; Maleplate Dep. 55–56, 61–62, 64–68, 72–77, 80, 83–83, 124–26, 128–31, 133–34.

[302] *See, e.g.*, JX 122; JX 162; Lynch Tr. 225, 226–29, 235, 236, 239–40.

[303] *See* JX 122; JX 162.

[304] *See* JX 36; JX 122; JX 162; Lynch Tr. 52.

[305] *See* JX 41; JX 122; JX 162.

65

received a transfer from Gonzalez's company for $209,720; Lynch paid Televideo the exact same dollar amount a few days later.[306]

Even assuming that Interamerican Services Limited and EFG Worldwide were genuine Belleville creditors, nothing in the record suggests that either creditor complained or otherwise objected to Lynch's late payments. This fortifies the conclusion that Lynch's purported assumption of Televideo's debt was just another fabrication.[307] Televideo collected the funds from Lynch "on behalf of [Televideo]'s creditors"[308] because the debt assumption documents were part of a circular scheme of fraudulent "payments" for 65% of Belleville.

### H. Lynch Continues To Misrepresent His Intentions About, And Ultimately Conceals Or Destroys, The Counterdocument.

Lynch obtained the instruments he sought by representing to Gonzalez that an executed Counterdocument existed.[309] Those documents could be used to show a legitimate transfer only in the absence of the Counterdocument. While I have taken Lynch at his word that he did not execute the Counterdocument, a copy signed by

---

[306] *See* JX 41; JX 122; JX 162.

[307] *See* JX 36; JX 41; JX 42; JX 69; JX 74; JX 124; JX 162.

[308] JX 14.

[309] *See, e.g.*, JX 24; JX 141; A. Gonzalez Tr. 455, 456, 459, 463, 472, 474, 483, 485, 494; *see also* M. Gonzalez Tr. 277–78, 279–80, 289–90; White Tr. 451.

Gonzalez existed.  Multiple witnesses verified that they saw it.[310]  So at the end of the paper trail, Lynch built space to destroy the Counterdocument in the May 4th Restructuring Agreement.  He also took measures to ensure it would not physically appear.

In April 2016, Lynch, Landaburu, and Lambert were tasked with preparing an inventory of all sensitive Belleville documents that were maintained in safety deposit boxes and that were not referenced elsewhere in Belleville's files.[311]  The Counterdocument was one such document.  As part of this inventory, the original Counterdocument was removed from the safety deposit box and supposedly delivered to Belleville's office for Lynch and his team to inventory.[312]  The Counterdocument was never seen again, and no signed original or signed copy was produced in this action.[313]  Lynch hid or destroyed the Counterdocument as contemplated by Section 2.05 of the May 4th Restructuring Agreement.[314]

---

[310] *See, e.g.*, M. Gonzalez Tr. 281; A. Gonzalez Tr. 455; Casaleggio Tr. 577; Curutchet Tr. 519.

[311] *See* JX 62; JX 72; M. Gonzalez Tr. 283–90; Lambert Tr. 349–51.

[312] *See* M. Gonzalez Tr. 284.

[313] *See id.* at 283–90; Lambert Tr. 345–47, 349–51.

[314] *See* JX 67 § 2.05; M. Gonzalez Tr. 283–90; Lambert Tr. 348–51.

Thereafter, Lynch continued to propound that the Counterdocument existed, fortifying Gonzalez's belief that Lynch would abide by its terms.[315] Around the time the parties executed the May 2016 Restructuring Agreements, the parties explored a management buyout of Gonzalez's media empire, including Belleville.[316] The parties refer to this transaction as the Magnus Project.[317] Gonzalez retained and paid for Greenberg Traurig, LLP ("Greenberg"), Ernst & Young LLP ("E&Y"), and Bank of America to conduct due diligence and to advise on the deal's potential structure and the best manner in which to market the project to potential suitors.[318] Lynch,

---

[315] *See, e.g.*, A. Gonzalez Tr. 455, 456, 459, 463, 472, 474, 483, 485, 494; *see also* Lynch Tr. 221–23; Lambert Tr. 356–59; JX 117.

[316] *See, e.g.*, Glossary of Stipulated Terms at 2; Lynch Tr. 212–14; Lambert Tr. 341–42. Indeed, the attention on Company affairs due to the buyout attempt may have inspired the May 4th Restructuring Agreement. *See* Lynch. Tr. 51 (noting that the May 4th Restructuring Agreement was signed at the end of 2017, "in the middle of a negotiation with the advice or the consulting from Bank of America and the law firm Greenberg Traurig and Ernst & Young for the possible sale and the management buyout of the totality of the operations"), 211 (noting May 4th Restructuring Agreement was executed as "the Magnus Project falls apart"); Lambert Tr. 345 (noting that Lynch and his confederates removed the Counterdocument form the Magus Project presentations out of fear "[t]hat it may have caused that the project might not be able to be carried out").

[317] *See* Glossary of Stipulated Terms; JX 92; JX 93; JX 94; JX 95; JX 96; JX 97; JX 98; JX 99; JX 100; JX 101; JX 102; JX 103; JX 104; JX 105; JX 106; JX 107; JX 108; JX 109; JX 110; JX 111; JX 112; JX 113; JX 114; JX 115; JX 116; JX 117; JX 118; JX 119; JX 120. The parties also referred to iterations of the Magnus Project as "Project Magnetico." *See, e.g.*, JX 100. The parties did not explicitly rely on or include all of the Magnus Project documents in the Schedule of Evidence. But because the Court learned of the Magnus Project's importance for the first time at trial and because testimony regarding the Magnus Project was limited, the Court relies on the above listed JXs in the record for context.

[318] *See* Lynch Tr. 214; Lambert Tr. 342–43. Lynch did not contribute financially to the Magnus Project. *See* Lynch Tr. 214.

Lambert, and Landaburu assisted by providing the relevant information regarding Belleville's ownership.[319]

A majority of the Magnus Project documents in the record were prepared by third party advisors, including Greenberg and E&Y.[320] Those documents reflect the advisors' understanding that Argentine law forbids foreign individuals and entities from owning more than 30% of media companies, and that Lynch held 65% of Belleville in name only and subject to the Counterdocument.[321] Early iterations of the advisors' decks discuss that the "holding structure considerations" in Argentina include "US Ultimate Beneficial Owners," or "UBOs," a term Lynch used to refer to Gonzalez's actual ownership under other counterdocuments.[322] Second, in discussing Argentina's "contribution plan," the decks show that after Gonzalez and Televideo contributed their respective 5% and 30%, Lynch would "contribute[]" 65% of Belleville, in exchange for "LP interests" in the new entity.[323] Importantly, the final step in the transaction mandated that "CLL sign[] Control Documents with

---

[319] *See, e.g.*, Lynch Tr. 214–15; Lambert Tr. 345–46.

[320] *See* JX 92; JX 93; JX 94; JX 95; JX 96; JX 97; JX 98; JX 100; JX 101; JX 102; JX 103; JX 104; JX 105; JX 107; JX 108; JX 109; JX 110; JX 111; JX 112; JX 113; JX 114; JX 115; JX 116; JX 117; JX 118; JX 119; JX 120.

[321] *See, e.g.*, JX 117.

[322] *See* JX 93 at 23; Lynch Tr. 105, 122, 197.

[323] *E.g.*, JX 95 at 9.

69

respect to those LP interests," meaning a counterdocument.[324] Even without explicit mention of the Belleville Counterdocument, the early drafts promised continuity of Gonzalez's preferred ownership structure, under which Lynch held the membership interest in name only to facially satisfy regulators.[325]

Third, the Magnus Project categorized the transaction's participants into two groups: the "Gonzalez Family" and "Other Shareholders."[326] Lynch is listed among over thirty Other Shareholders, who held interests in Gonzalez's entities subject to a "DDJJ" or counterdocument.[327] The advisors on the Magnus Project also identified subsets of holders: "B Asset Holders," who were "independent owners," and "Strategic Partners" like Lynch, who were not.[328] Lynch was categorized as a Strategic Partner because he held the 65% interest in name only and for Televideo's benefit.[329]

The Magnus Project advisors pressed for information about what control documents governed the ownership structure for each of Gonzalez's companies,

---

[324] *E.g.*, *id.*

[325] *See, e.g.*, JX 95 at 9; JX 96 at 12; JX 97 at 9, 11.

[326] *E.g.*, JX 99 at 13–15.

[327] *Compare* JX 99 at 14–15 (listing Lynch among the "Other Shareholders"), *with* JX 98 (listing Lynch among "individuals with interests in the group entities" that held subject to counterdocuments).

[328] *See* JX 99 at 21; JX 104 at 1–3.

[329] *See, e.g.*, JX 99; JX 104.

including Belleville.[330]   Later iterations of the decks explicitly and repeatedly reflected Belleville's ownership under "current control documents" as follows: "Sworn declaration stating that the true owner of the shares is [Gonzalez]."[331]   The advisors had been told that Gonzalez was the true owner of all Belleville's interests, as memorialized by the Counterdocument.[332]

At one point, based on information provided by Lynch's confederates, the Argentine law firm assisting with the project crossed out the "control documents" content identifying the Counterdocument.[333]   According to Lambert, the firm did so upon reviewing the corporate documentation for Belleville, as they could not locate a Counterdocument.[334]   But the decks consistently referred to Lynch as a Strategic Partner, not an independent owner.[335]   And despite the efforts to cross out reference to the Counterdocument, later versions of the Magnus Project deck rejected that edit and explicitly referenced the Counterdocument.[336]

---

[330] *See, e.g.*, JX 101; JX 104.

[331] *See, e.g.*, JX 98; JX 99; JX 106; JX 107; JX 109; JX 110; JX 113; JX 116; JX 117.

[332] *See, e.g.*, JX 110 at 147; Lambert Tr. 345–46, 356–57.

[333] *See* JX 99 at 23; JX 106 at 23; Lambert Tr. 345–46, 348–49, 356–57.

[334] *See* Lambert Tr. 348–49.

[335] *See* JX 99 at 21; JX 106 at 21.

[336] *See, e.g.*, JX 107; JX 109; JX 110; JX 113; JX 116; JX 117.

Lynch and Lambert unsuccessfully attempted to explain away the Magnus Project's persistent references to the Counterdocument.[337] Even though they tried to cross out the references, Lynch and Lambert contend they purposefully permitted "erroneous[]" references to the Counterdocument to keep up the impression that Gonzalez owned 65% of Belleville, so as to avoid alarm within the Belleville family.[338] And Lynch indicated he lied to protect Gonzalez's reputation, but later planned to disclose (albeit falsely) that he was the actual, beneficial owner of the 65% membership interest.[339] I do not find this explanation credible. The preponderance of the evidence suggests that Lynch, Lambert, and Landaburu tried to remove the Magnus Project's references to the Counterdocument, as part of their

---

[337] *See* Lynch Tr. 221–23; Lambert Tr. 356–59.

[338] *See* Lynch Tr. 221–23; *see also* Lambert Tr. 356–59.

[339] *See* Lynch Tr. 222–23 ("I did it to prevent Mr. Gonzalez from giving explanations or receive complaints from certain people of his realm of his work environment. . . . Q. But when you say that you wanted -that Mr. Gonzalez -- that you did this for Mr. Gonzalez so that if people in his realm found out about this, they would be misled. Correct? A. I don't know if they were going to have access. I did it in the case that they would have access. Q. Mr. Gonzalez didn't ask you to do this. Correct? A. Correct. Q. So you took it out of your own volition to add, in a document in 2017, the fact that you had a sworn declaration in favor of Mr. Gonzalez. Correct? A. I did it on a draft, not in a final document. Q. Well, but were you going to change the final document so that if the other people found out, then all of a sudden now they do know? A. I cannot talk about the future. I don't know what I would have done. We never reached a point of finishing the project.").

72

larger effort to expunge it from Belleville's files and history, but were simply unsuccessful.[340]

The Magnus Project never came to fruition and was ultimately called off at the end of 2017, in part due to complications involving the Foreign Corrupt Practices Act.[341]

## I.    Lynch Holds The 65% Interest For Ransom.

After sufficiently papering the file and eliminating the Counterdocument, Lynch felt secure that his plan had worked. The record indisputably reflected that Lynch owned 65% of Belleville, and Gonzalez was in the dark as to Lynch's true intentions and the Counterdocument's absence. Lynch decided that it was time to make his final move.

In February 2018, Lynch called Gonzalez's trusted advisor, White.[342] Lynch told White to convey the following message to Gonzalez: "[A]s of this date, Argentina will no longer answer to Miami. It's going to be handled as an independent operation, and he [Gonzalez] will be treated as any of the other

---

[340] Lynch, Lambert, and Landaburu had an opportunity to review and comment on earlier versions of this Magnus Project presentation, and admit that they retained the reference to the Counterdocument. *See* Lambert Tr. 345–47.

[341] *See* Lynch Tr. 211, 215; Lambert Tr. 342–43.

[342] *See* White Tr. 528–29.

shareholders."[343] Gonzalez asked White to meet with Lynch in Argentina and request return of 65% of Belleville to Televideo, as he and Lynch agreed.[344] Lynch had previously relinquished record ownership of other companies that he held as Gonzalez's nominee without any exchange of valuable consideration.[345] He did so even when their relationship soured.[346] But Belleville was different because Lynch had already papered his coup and success seemed imminent; the reward from his final stand—65% of a successful media parent company—greatly outweighed the risk.

So at the meeting, Lynch held 65% of Belleville for "ransom."[347] He demanded that Gonzalez do the following before he would agree to return record ownership: (1) transfer between $15 to $25 million to Lynch to cover potential tax liability for the return; (2) provide a golden parachute of approximately $12 million for Lynch's friends and confidants, Lambert, Landaburu, Birencwajg, and Banus; (3) set up a bank account in the United States funded with $10 million that Lynch

---

[343] *Id.* at 529.

[344] *See id.* at 529–30 ("Q. So did you ever meet with Mr. Lorefice Lynch in Argentina? A. Yes, I did so on two occasions. The first one it was during the lunch. He didn't look very good. He had apparently suffered some injuries because he had fell from a horse. It looked like he was in pain.").

[345] *See* Lynch Tr. 88, 105, 145, 156–57, 240–49; Landaburu Tr. 433–34, 436.

[346] *See* Lynch Tr. 88, 105, 122, 145, 156–57, 240–49; Landaburu Tr. 433–34, 436.

[347] White Tr. 532.

could draw upon as a legal defense fund in the event he was sued for any of the transactions he implemented for Gonzalez; and (4) issue a severance payment to Lynch of approximately $20 million.[348] Gonzalez refused Lynch's demands. Lynch went on the offensive.

### J. Lynch And Gonzalez Make Competing Filings That Lead To This Action.

In February 2018, Lynch drafted a new limited liability company agreement for Belleville, naming himself as Belleville's sole manager (the "2018 LLC Agreement").[349] That document is signed solely by Lynch.[350] Then, on March 2, Lynch changed Belleville's registered agent in Delaware through an amendment to Belleville's Certificate of Formation, filed as the "Certificate of Amendment Changing Only the Register Office or Registered Agent of Grupo Belleville Holdings, LLC" with the Delaware Secretary of State.[351]

On April 11, 2019, Gonzalez responded. Unbeknownst to Lynch, he signed a "Certificate of Amendment of Grupo Belleville Holdings, LLC" in which he claimed that Televideo owned 95% of the membership interests in Belleville and

---

[348] *See id.* at 530–32.

[349] *See* JX 132. This is the first LLC agreement for Belleville that appears in the record.

[350] *See id.*

[351] PTO ¶ 29.

Gonzalez owned 5% (the "April 2019 Certificate").[352] The April 2019 Certificate named Alviz as Belleville's President and Manager.[353] Gonzalez caused the April 2019 Certificate to be filed with the Delaware Secretary of State on April 12.[354] Gonzalez also caused Belleville to represent to the Argentine Telecommunications Agency, Ente Nacional de Comunicaciones ("ENACOM"), that Televideo had assumed all of the ownership interest Lynch previously held and that Lynch was no longer a Belleville equity holder.[355]

In addition, Alviz submitted a Certificate of Resolution, dated April 12, to the IGJ and ENACOM on Belleville's behalf (the "Alviz Certificate").[356] The Alviz Certificate purported to revoke Lynch's appointment as Belleville's legal representative in Argentina and appointed Lopez to represent Belleville in his stead.[357] Also on April 12, Alviz granted a special power of attorney for Belleville to Lopez and a group of Argentine lawyers (collectively, the "Argentine

---

[352] *Id.* ¶ 30; JX 143.

[353] PTO ¶ 32; JX 143.

[354] PTO ¶ 31.

[355] *Id.* ¶ 37.

[356] *See* JX 146; JX 147; PTO ¶ 33. The stipulated fact states that Alejandro Massot filed the Alviz Certificate. *See* PTO ¶ 33. But the record clearly demonstrates that Alviz signed and filed the Alviz Certificate. *See* JX 146; JX 147. The stipulated fact contains a scrivener's error.

[357] PTO ¶ 34.

Attorneys").[358] On April 26, Lopez sent Lynch a series of notifications stating that Belleville had removed Lynch as Belleville's legal representative in Argentina and had revoked all powers granted to Lynch.[359] The notifications also stated that Lopez was Belleville's legal representative and was "therefore the only person with enough capacity to represent [Belleville] before the Shareholder Meeting" of IMC and Sebrumax, two of Belleville's Argentine companies.[360]

Lynch retaliated on May 7. First, Lynch filed a "Certificate of Correction of Grupo Belleville Holdings, LLC" with the Delaware Secretary of State, stating Belleville's membership interests were held as follows: 5% by Gonzalez, 30% by Televideo, and 65% by Lynch.[361] It also named Lynch as Belleville's sole manager and legal representative.[362] Second, Lynch reappointed Belleville's former registered agent in Delaware.[363] Third, he executed a "Revocation of Powers of Attorney," pursuant to which he purported to revoke the powers of attorney Alviz purportedly granted to the Argentine Attorneys through the Alviz Certificate.[364] And

---

[358] *Id.* ¶ 35. Those attorneys included Massot, Ignacio Juan Randle, Gastón Arcal, and Marcos Patricio Hermann. *Id.*

[359] *Id.* ¶ 36.

[360] *Id.*

[361] *Id.* ¶ 38.

[362] *Id.* ¶ 39.

[363] *Id.* ¶ 41.

[364] *Id.* ¶ 40.

on May 8, Lynch submitted a filing to the IGJ purporting to restore himself as Belleville's legal representative in Argentina.[365] Lynch did not consult with Gonzalez in taking any of these actions.[366]

Gonzalez responded. On May 9, Gonzalez, on behalf of Televideo, and Alviz, purportedly on behalf of Belleville, signed and filed another "Certificate of Correction of Grupo Belleville Holdings, LLC" with the Delaware Secretary of State.[367] That certificate named Televideo and Gonzalez as Belleville's members.[368] Then, on May 13, Lynch submitted a filing with ENACOM stating that he held a 65% membership interest in Belleville.[369] And in a final blow, on May 14, Lynch filed a "Certificate of Correction of Grupo Belleville Holdings, LLC" with the Delaware Secretary of State stating the same.[370] This action followed.[371]

---

[365] *Id.* ¶ 42.

[366] *See id.* ¶¶ 38–41.

[367] *Id.* ¶ 43; JX 153. The Certificate of Correction stated that Televideo owns 95% of Belleville and Gonzalez owns 5%.

[368] *See* JX 153.

[369] PTO ¶ 44.

[370] *Id.* ¶ 45.

[371] *Cf.* Lynch Tr. 162 ("I filed this lawsuit because Mr. Gonzalez filed before the Secretary of Delaware a certificate of amendment where it was erasing my interest, and he was putting it under the name of Televideo Services."); Lambert Tr. 338 (stating Lynch "was obligated to start a legal lawsuit against Mr. Gonzalez and other people so that he would be recognized as 65 percent owner of Grupo Belleville and the only manager").

## II. ANALYSIS

The parties have the burden of proving their respective claims by a preponderance of the evidence.[372] "Proof by a preponderance of the evidence means proof that something is more likely than not."[373] This "means that certain evidence, when compared to the evidence opposed to it, has the more convincing force and makes you believe that something is more likely true than not. By implication, the preponderance of the evidence standard also means that if the evidence is in equipoise, Plaintiffs lose."[374] For the viable claims in this case, I am satisfied that the greater weight of the evidence rests on Defendants' side of the scale.

### A. Defendants Are Entitled To Declaratory Judgments In Their Favor.

Both Lynch and Gonzalez pled claims under 6 *Del. C.* § 18-110 and 10 *Del. C.* § 6501 seeking declarations regarding Belleville's ownership and control. This Court has the authority under 6 *Del. C.* § 18-110(a) to "hear and determine . . . the

---

[372] *Martin v. Med-Dev Corp.*, 2015 WL 6472597, at *10 (Del. Ch. Oct. 27, 2015); *see also Williams Field Servs. Gp., LLC v. Caiman Energy II, LLC*, 2019 WL 4668350, at *15–16 (Del. Ch. Sept. 25, 2019) (applying preponderance of the evidence standard in context of competing claims for declaratory relief); *In re IAC/InterActive Corp.*, 948 A.2d at 493 ("[T]he plaintiff in the [18-110] Action[] bears the burden of proving by a preponderance of the evidence that it is entitled to relief.").

[373] *Martin*, 2015 WL 6472597, at *10 (quoting *Agilent Techs., Inc. v. Kirkland*, 2010 WL 610725, at *13 (Del. Ch. Feb. 18, 2010)).

[374] *Id.* (internal quotation marks and footnotes omitted) (quoting *Agilent Techs., Inc.*, 2010 WL 610725, at *13, and then quoting *OptimisCorp v. Waite*, 2015 WL 5147038, at *55 (Del. Ch. Aug. 26, 2015)).

right of any person to become or continue to be a manager of a limited liability company."[375] "In determining what claims are cognizable in a [Section 18-110] action, the most important question that must be answered is whether the claims, if meritorious, would help the court decide the proper composition of the [company's] board or management team."[376] Here, the parties' additional claims pursuant to Section 6501,[377] their tort claims, and their affirmative defenses related to ownership and control, assist the Court in deciding which individuals are Belleville's rightful owners, managers, and members.

Lynch seeks to hold Gonzalez to the terms of the documents he signed naming Lynch as Belleville's 65% owner. But doing so requires concluding that Lynch's paper trail represents a series of bargained-for, binding contracts for Lynch's purchase of 65% of Belleville, supported by consideration and the parties' mutual assent. Defendants contend the documents do not evidence any genuine and binding

---

[375] *MPT of Hoboken TRS, LLC v. HUMC Holdco, LLC*, 2014 WL 3611674, at *8 (Del. Ch. July 22, 2014) (quoting 6 *Del. C.* § 18-110).

[376] *Agranoff v. Miller*, 1999 WL 219650, at *17 (Del. Ch. July 28, 1999); *accord Genger v. TR Inv'rs, LLC*, 26 A.3d 180, 199 (Del. 2011).

[377] *See MPT of Hoboken TRS, LLC*, 2014 WL 3611674, at *8. "To exercise its statutory authority to hear a claim seeking a declaratory judgment, the Court must find four elements: (1) [i]t must be a controversy involving the rights or other legal relations of the party seeking declaratory relief; (2) it must be a controversy in which the claim of right or other legal interest is asserted against one who has an interest in contesting the claim; (3) the controversy must be between parties whose interests are real and adverse; (4) the issue involved in the controversy must be ripe for judicial determination." *Id.* The parties do not dispute that these elements are met here.

contract, but rather are the effluence of Gonzalez's agreement to create the appearance that Lynch owned 65% of Belleville to satisfy Argentine regulators, in reliance on Lynch's purported agreement to return the interest upon Gonzalez's demand. Defendants contend Lynch then refused to do what he had promised. Thus, Belleville's rightful ownership and management depend on a threshold issue: whether documents showing Lynch holds 65% of Televideo's interest in Belleville reflect a genuine contract between Lynch and Gonzalez. The preponderance of the credible evidence suggests that they do not.

Under Delaware law, "the formation of a contract requires a bargain in which there is a manifestation of mutual assent to the exchange and a consideration."[378] A valid contract exists only if "the parties have manifested mutual assent to be bound by that bargain."[379] Parties may be bound by an oral or written agreement only where "evidence reveals '[m]anifestations of assent that are in themselves sufficient to conclude a contract.'"[380]

---

[378] *Sarissa Capital Domestic Fund LP v. Innoviva, Inc.*, 2017 WL 6209597, at *21 (Del. Ch. Dec. 8, 2017) (quoting *Wood v. State*, 2003 WL 168455, at *2 (Del. Jan. 23, 2003) (ORDER)).

[379] *Id.* (citing *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1158 (Del. 2010)).

[380] *Id.* (alteration in original) (quoting *Loppert v. WindsorTech, Inc.*, 865 A.2d 1282, 1288 (Del. Ch. 2004)).

"[M]anifestation of mutual assent is an 'external or objective standard for interpreting conduct.'"[381]  A party "manifests an intention [to be bound] if he believes or has reason to believe that the promisee will infer that intention from his words or conduct."[382]  The "relevant inquiry" is

> [w]hether a reasonable negotiator in the position of one asserting the existence of a contract would have concluded, in that setting, that the agreement reached constituted agreement on all of the terms that the parties themselves regarded as essential and thus that agreement concluded the negotiations . . . .[383]

"Where the objective, contemporaneous evidence indicates that the parties have reached an agreement, they are bound by it, regardless of its form or the manner in which it was manifested."[384]

Mutual assent "means the external expression of intention as distinguished from undisclosed intention."[385]  The Court determines whether there has been mutual assent "based upon the[ ] [parties'] expressed words and deeds as manifested at the

---

[381] *Chemours Co. v. DowDuPont Inc.*, 2020 WL 1527783, at *10 n.130 (Del. Ch. Mar. 30, 2020) (quoting Restatement (Second) of Contracts § 2 cmt. b (1981)).

[382] Restatement (Second) of Contracts § 2 cmt. b (1981).

[383] *Innoviva, Inc.*, 2017 WL 6209597, at *21 (quoting *Leeds v. First Allied Conn. Corp.*, 521 A.2d 1095, 1097 (Del. Ch. 1986)).

[384] *Id.* (quoting *Debbs v. Berman*, 1986 WL 1243, at *7 (Del. Ch. Jan. 29, 1986)); *see also* Restatement (Second) of Contracts §§ 18, 19 (noting that party may assent by conduct, rather than words, promise, or performance).

[385] Restatement (Second) of Contracts § 2 cmt. b (1981).

time rather than by their after-the-fact professed subjective intent[.]"[386] A party's subjective intent to eschew the objective terms of the agreement does not prevent formation, but may render the contract voidable.[387]

Further, mutual assent is a question of fact that the Court resolves by considering all credible evidence.[388]

---

[386] *Innoviva, Inc.*, 2017 WL 6209597, at *21 (alterations in original) (quoting *Debbs*, 1986 WL 1243, at *7).

[387] *Compare* Restatement (Second) of Contracts § 164 (1981) ("If a party's manifestation of assent is induced by either a fraudulent or a material misrepresentation by the other party upon which the recipient is justified in relying, the contract is voidable by the recipient."), *with id.* § 163 ("If a misrepresentation as to the character or essential terms of a proposed contract induces conduct that appears to be a manifestation of assent by one who neither knows nor has reasonable opportunity to know of the character or essential terms of the proposed contract, his conduct is not effective as a manifestation of assent), *and id.* cmt. b ("This Section involves an application of that principle where a misrepresentation goes to what is sometimes called the 'factum' or the 'execution' rather than merely the 'inducement.'"); *see* 1 *Voss on Delaware Contract Law*, § 2.05[2][b] (Lexis 2020) (noting that "[o]vert manifestations of assent control over subjective intent" (quoting *IMO John T. Landon J. Estate*, 2017 WL 2492044, at *3 (Del. Ch. June 8, 2017)).

[388] *See Kotler v. Shipman Assocs., LLC*, 2019 WL 4025634, at *17 (Del. Ch. Aug. 21, 2019); *see also Eagle Force Hldgs., LLC v. Campbell*, 187 A.3d 1209, 1230 (Del. 2018) ("[W]here the putative contract is in the form of a signed writing, that document generally offers the most powerful and persuasive evidence of the parties' intent to be bound. However, Delaware courts have also said that, in resolving this issue of fact, the court may consider evidence of the parties' prior or contemporaneous agreements and negotiations in evaluating whether the parties intended to be bound by the agreement." (footnotes omitted)).

At first glance, a wet ink, signed version of a contract looks to be solid evidence of a meeting of minds. But it is not evidence so powerful that it negates all other evidence to the contrary. Put another way, even if a purported agreement is executed by both parties, when the parties' "understandings of [a contractual] prohibition or permission are incompatible," and where the plaintiff "offered no further evidence indicating" a meeting of the minds, "no enforceable agreement [is] created."[389]

And "[w]here all the parties to what would otherwise be a bargain manifest an intention that the transaction is not to be taken seriously, there is no such manifestation of assent to the exchange as is required . . . ."[390] This is especially true where "the setting makes it clear that there is no contract," unless the party rejecting the existence of a sham "has no reason to know of" the sham.[391]

### 1. The Parties Objectively Agreed To A Sham Transfer In Which Lynch Held The 65% In Name Only For Televideo's Benefit; Gonzalez Is Not Bound By The Documents Naming Lynch As Belleville's 65% Owner.

Based on the parties' expressed words and deeds as manifested at the time and viewed objectively from the standpoint of a reasonable negotiator, Lynch and

---

[389] *Kotler*, 2019 WL 4025634, at \*17 (quoting *Prince of Peace Enters., Inc. v. Top Quality Food Mkt., LLC*, 760 F. Supp. 2d 384, 398–99 (S.D.N.Y. 2011)).

[390] Restatement (Second) of Contracts § 18 cmt. c (1981); *see also* E. Allen Farnsworth, *Farnsworth on Contracts* § 3.07, at 3-28 to 3-39 & 3-30 to 3-31 (2019); 1 *Voss on Delaware Contract Law*, §§ 2.05[1][c], 2.07[1][a] (noting that there is no mutual assent where the parties do not intend to be bound).

[391] Restatement (Second) of Contracts § 18 cmt. c (1981).

Gonzalez manifested assent to an agreement under which Lynch would hold Televideo's 65% interest in name only, return it upon Gonzalez's request, memorialize Televideo's beneficial ownership in the Counterdocument, and prepare and execute sham documents to satisfy regulators.[392] Gonzalez credibly testified that these terms governed the parties' agreement and that he intended to adhere to them.[393] And the preponderance of the evidence demonstrates that Gonzalez, in the position of a reasonable negotiator, would have objectively concluded that Lynch agreed these terms were "essential" in furtherance of their common scheme and manifested assent to the same.[394]

The scheme and its component parts were Lynch's idea. Lynch flagged the new Argentine law and proposed these terms, the sham transfer documents, and the Counterdocument as a solution. Lynch presented the terms to Gonzalez, representing that the solution would simultaneously protect Gonzalez's assets and allow Belleville to continue operating in Argentina. Lynch prepared a series of documents naming Lynch as Belleville's 65% member.[395] Gonzalez executed those documents in furtherance of the parties' agreement to satisfy Argentine holding

---

[392] *See, e.g.*, A. Gonzalez Tr. 463; *Innoviva, Inc.*, 2017 WL 6209597, at *21.

[393] *See, e.g.*, A. Gonzalez Tr. 463.

[394] *Innoviva, Inc.*, 2017 WL 6209597, at *21 (quoting *Leeds*, 521 A.2d at 1097).

[395] *See* JX 5; JX 6; JX 7; JX 8; JX 10; JX 11; JX 12; JX 13; JX 14; JX 15; JX 26; JX 27; JX 28; JX 29; JX 30; JX 31; JX 32; JX 35; JX 37; JX 64; JX 66; JX 67; JX 68.

regulations, and, believing they were sham documents, never intended to be bound by their terms. And Lynch suggested, drafted, and presented to Gonzalez the Counterdocument that memorialized and protected Televideo's beneficial ownership and evidenced the parties' private agreement. Lynch assured Gonzalez that he and his wife would execute it and then performed as though he had, including by drafting additional sham language that he told Gonzalez would address the Counterdocument,[396] and by permitting advisors to reference the Counterdocument in business presentations.[397] And Lynch performed under counterdocuments governing interests in other entities.

Gonzalez had no reason to believe that Lynch's objective assent was inconsistent with his subjective intent until Lynch declared he was holding 65% of Belleville for ransom.[398] Lynch never told Gonzalez that he did not execute the Counterdocument and that he did not intend to return the 65% to Televideo. A reasonable negotiator in Gonzalez's position would have objectively believed Lynch assented to the terms of their agreement. Although Lynch never intended to perform under those terms, the preponderance of objective evidence demonstrates that both

---

[396] *See* JX 67 § 2.05; JX 68 § 2.05.

[397] *See, e.g.*, JX 92; JX 93; JX 94; JX 95; JX 96; JX 97; JX 98; JX 100; JX 101; JX 102; JX 103; JX 104; JX 105; JX 107; JX 108; JX 109; JX 110; JX 111; JX 112; JX 113; JX 114; JX 115; JX 116; JX 117; JX 118; JX 119; JX 120.

[398] *See, e.g.*, A. Gonzalez Tr. 485.

Lynch and Gonzalez mutually assented to the terms of the sham transfer, which included their agreement to execute sham documents to create the appearance of a transfer, together with a Counterdocument precluding transfer of any actual beneficial interest.

Lynch and Gonzalez did not manifest mutual assent to any contract, oral or written, pursuant to which Lynch purchased 65% of Televideo's interest in Belleville. Despite Lynch's contention that he and Gonzalez entered into "verbal agreement[s]" for a "purchase" in September 2007 and January 2008, the preponderance of the evidence demonstrates that no such "agreements" occurred.[399] Nor did Lynch and Gonzalez agree to actually transfer Televideo's interest in Belleville to Lynch in December 2008 or thereafter.[400]

More specifically, the parties did not mutually assent to the terms of the sham documents themselves, which the parties objectively intended would have no binding effect.[401] In the context of the parties' objective agreement to paper the sham transaction, a reasonable negotiator in Lynch's position could not have concluded that Gonzalez intended to be bound by the terms of documents they

---

[399] *See supra* notes 98–122 and accompanying text.

[400] *See supra* Section I.B.

[401] *See* Restatement (Second) of Contracts § 18 cmt. c (1981).

created only to facially satisfy Argentine regulators.[402]  The documents Gonzalez and Lynch executed, which named Lynch as Belleville's 65% member, evidence not a binding contract between the parties to transfer Lynch 65% of Belleville, but rather the parties' objective agreement to create documents supporting the appearance of that transfer, and to terms by which Lynch would hold the interest in name only and return it to Televideo upon Gonzalez' request.

Accordingly, the parties never manifested an intent to be bound by any document naming Lynch as Belleville's majority member.[403]  In the absence of an actual agreement to sell Lynch 65% of Belleville, no "expressed words and deeds as manifested at the time" support Lynch's "after-the-fact professed subjective intent" to retain 65% of Belleville for himself.[404]  Gonzalez is not bound by the terms of any document naming Lynch as Belleville's 65% member.[405]

---

[402] *See Innoviva, Inc.*, 2017 WL 6209597, at *21.

[403] *See id.*; Restatement (Second) of Contracts § 18 cmt. c (1981).

[404] *Innoviva, Inc.*, 2017 WL 6209597, at *21 (quoting *Debbs*, 1986 WL 1243, at *7).

[405] Defendants also raise failure of consideration as an affirmative defense.  I need not reach that defense because the purported agreement Lynch seeks to enforce fails for lack of mutual assent.

### 2. If Gonzalez Were Bound By The Sham Documents, Lynch Fraudulently Induced Gonzalez Into Signing Them And Is Estopped; Lynch's Machinations Are Void.

Even if Gonzalez were bound by the terms of the documents naming Lynch as Belleville's majority member, Defendants' affirmative defenses of fraudulent inducement and promissory estoppel would bar Plaintiffs' claims and mandate judgment in Defendants' favor.

> Delaware is a contractarian state. As such, a party who enters into a contract governed by Delaware law will be charged with knowledge of the contents of the instrument and will be deemed to have knowingly agreed to the plain terms of the instrument absent some well-pled reason to infer otherwise. And this same party will face an uphill climb when it seeks to prosecute claims that it relied on promises that are explicitly contradicted by its own clear and unambiguous written contract.[406]

But in the case of fraud or misrepresentation and in the absence of clear anti-reliance language, the Court may look beyond the language of the four corners of the document to determine the parties' intent, and a party cannot escape responsibility for his own fraudulent representations and misstatements made outside of the agreement's four corners.[407] More broadly, in the context of a statutory claim addressing disputed management, this Court has held that the action of a director or

---

[406] *Chapter 7 Tr. Constantino Flores v. Strauss Water Ltd.*, 2016 WL 5243950, at *6 (Del. Ch. Sept. 22, 2016).

[407] *Abry P'rs V, L.P. v. F & W Acq. LLC*, 891 A.2d 1032, 1059 (Del. Ch. 2006).

manager "will be deemed invalid if obtained through trickery or misrepresentation,"[408] even where he had an opportunity to "simply read" the relevant document to discover an alleged misrepresentation.[409] In such cases, the subject transaction is voidable.[410]

---

[408] *Martin*, 2015 WL 6472597, at *12–14 (quoting *Hockessin Cmty. Ctr., Inc.*, 59 A.3d at 458 (comparing ineffective resignations obtained by trickery or misrepresentation to other non-contractual board actions invalidated by such conduct), and citing *Fogel v. U.S. Energy Sys., Inc.*, 2007 WL 4438978, at *3 (Del. Ch. Dec. 13, 2007) ("Where a director is tricked or deceived about the true purpose of a [special] board meeting, and where that director subsequently does not participate in that meeting, any action purportedly taken there is invalid and void."), and then citing *Schroder v. Scotten, Dillon Co.*, 299 A.2d 431, 436 (Del. Ch. 1972) ("A quorum obtained by trickery is invalid and the reasoning which forbids trickery in securing a quorum applies equally well to securing the absence of opposing directors from a meeting by representing that such a meeting will not be held."), and also citing *Naughty Monkey LLC v. MarineMax Ne. LLC*, 2011 WL 4091851, at *3 (Del. Ch. Aug. 31, 2011) ("[A] party may escape a contract which it was induced to enter by the other party's fraudulent or material misrepresentation . . .")).

[409] *Martin*, 2015 WL 6472597, at *13–14 (noting that a director's reliance on misrepresentation may be reasonable under the circumstances, even if he could have discovered the truth by "simply read[ing]" the documents at issue).

[410] *See id.* at *12; *see also* Restatement (Second) of Contracts § 164 (1981).

Looking at this case as both a contract dispute and a control dispute, I turn to Defendants' affirmative defenses of promissory estoppel and fraudulent inducement. Both defenses seek to unwind transactions obtained through a false promise or statement on which the counterparty relied to his detriment. If Gonzalez had been bound to the terms of the sham documents, these defenses would relieve him of those obligations. And working through the elements of these defenses leads to the conclusion that Lynch strove to obtain a 65% interest in Belleville by trickery and misrepresentations, so if the documents reflecting that holding were valid, they would be void.[411]

"If a party's manifestation of assent is induced by either a fraudulent or a material misrepresentation by the other party upon which the recipient is justified in relying, the contract is voidable by the recipient."[412] To prevail on a fraudulent inducement defense, the asserting party must prove, among other things, reasonable reliance on a false representation:

---

[411] *See Martin*, 2015 WL 6472597, at *12–14.

[412] Restatement (Second) of Contracts § 164 (1981).

1) a false representation, usually one of fact, made by the defendant; 2) the defendant's knowledge or belief that the representation was false, or was made with reckless indifference to the truth; 3) an intent to induce the plaintiff to act or to refrain from acting; [and] 4) the plaintiff's action or inaction taken in justifiable reliance upon the representation . . . .[413]

"A misrepresentation is an assertion that is not in accordance with the facts, either because it is false or because even if it is literally true, it creates a false impression as to the true state of affairs."[414] "In addition, fraud does not consist merely of overt misrepresentations, but may also occur through deliberate concealment of material facts, or by silence in the face of a duty to speak."[415] Still, Delaware law finds it "unreasonable to rely on oral representations when they are expressly contradicted by the parties' written agreement."[416] And fraudulent inducement is "not available as a defense when one had the opportunity to read the contract and by doing so could

---

[413] *Standard Gen. L.P. v. Charney*, 2017 WL 6498063, at *12 (Del. Ch. Dec. 19, 2017) (emphasis omitted) (quoting *Lord v. Souder*, 748 A.2d 393, 402 (Del. 2000)), *aff'd*, 195 A.3d 16 (Del. 2018); *see also Martin*, 2015 WL 6472597, at *12.

[414] *Berdel, Inc. v. Berman Real Estate Mgmt., Inc.*, 1997 WL 793088, at *8 (Del. Ch. Dec. 15, 1997).

[415] *Martin*, 2015 WL 6472597, at *12 (internal quotation marks omitted) (quoting *Gaffin v. Teledyne, Inc.*, 611 A.2d 467, 472 (Del. 1992)).

[416] *Carrow v. Arnold*, 2006 WL 3289582, at *11 (Del. Ch. Oct. 31, 2006), *aff'd*, 933 A.2d 1249 (Del. 2007); *accord Charney*, 2017 WL 6498063, at *12; *Strauss Water Ltd.*, 2016 WL 5243950, at *7.

have discovered the misrepresentation."[417]  But "[t]he reasonableness of [a party]'s reliance on [another]'s alleged misrepresentations . . . must be considered in the context of the surrounding circumstances including [their] prior communications."[418]

As for promissory estoppel, it is, "at base, an equitable remedy."[419]  Under the doctrine of promissory estoppel, the asserting party must prove by clear and convincing evidence that "(1) a promise was made; (2) it was the reasonable expectation of the promisor to induce action or forbearance on the part of the promisee; (3) the promisee reasonably relied on the promise and took action to his detriment; and (4) such promise is binding because injustice can be avoided only by enforcement of the promise."[420]  "A promise is a manifestation of intention to act or

---

[417] *Carrow*, 2006 WL 3289582, at *11 (quoting 17A Am. Jur. 2d *Contracts* § 214 (2006)), *aff'd*, 933 A.2d 1249 (Del. 2007); *accord Charney*, 2017 WL 6498063, at *12; *Strauss Water Ltd.*, 2016 WL 5243950, at *7.

[418] *Martin*, 2015 WL 6472597, at *13.

[419] Donald J. Wolfe, Jr. & Michael A. Pittenger, *Corporate and Commercial Practice in the Delaware Court of Chancery* § 15.02[c], at 15-12 (2018) (quoting *Grunstein v. Silva*, 2009 WL 4698541, at *10 (Del. Ch. Dec. 8, 2009)).

[420] *See Grunstein*, 2009 WL 4698541, at *7; *see also* Restatement (Second) of Contracts § 90 (1981) ("A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise."). The clear and convincing standard requires "proof that is highly probable, and free from serious doubt." *PharmA-thene v. SIGA Techs., Inc.*, 2011 WL 4390726, at *13 (Del. Ch. Sept. 22, 2011) (quoting *Utz v. Utz*, 2003 WL 22952579, at *2 n.11 (Del. Ch. Dec. 5, 2003), *rev'd on other grounds*, 67 A.3d 330 (Del. 2013)).

refrain from acting in a specified way, so made as to justify a promisee in understanding that a commitment has been made."[421]

Here, both defenses yield the same result:  Gonzalez is released from the terms of the documents naming Lynch as Belleville's 65% owner.  Lynch made several misrepresentations upon which Gonzalez relied:  (1) that Gonzalez needed to sign JX 7 to facilitate the final steps of the Hadad acquisition, when Lynch subjectively intended that document to lay the foundation for his misappropriation; (2) that Gonzalez had to execute the Purchase Agreements and the other sham documents to comply with Argentine law, when Lynch subjectively intended for Gonzalez to sign those documents to pad the file naming him as Belleville's majority member;[422] (3) that Lynch would hold the 65% in trust for Televideo, when Lynch never subjectively intended to return the interest to its rightful owner; and (4) that Lynch intended to sign and perform under the Counterdocument, when Lynch never

---

[421] Restatement (Second) of Contracts § 2 & cmt. a (1981); *see also* 1 *Voss on Delaware Contract Law*, § 2.65[2][a] (noting that "the alleged [] promise should not be viewed in a vacuum"  (alterations in original) (quoting *Konitzer v. Carpenter*, 1993 WL 562194, at *9 (Del. Super. Ct. Dec. 29, 1993)).

[422] While Lynch's representation that Argentine law required him to hold a majority stake in Belleville was true, it gave Gonzalez a false impression as to the true motivating factor, which Lynch artfully and diligently concealed:  Lynch's plan to strip Televideo of its majority interest. *See Berdel, Inc.*, 1997 WL 793088, at *8.

subjectively intended the same. Items two through four can also be characterized as sufficiently definite false promises.[423]

Plaintiffs contend that Lynch and Gonzalez agreed to transfer 65% of Belleville to Lynch "long before it was required by Argentine law."[424] As explained, they agreed to no such transfer. Lynch obtained Gonzalez's signature on each document naming Lynch as Belleville's 65% member through false pretenses, misrepresentations, and knowing silence; Lynch communicated and acted in accordance with his objective intentions, while subjectively intending to eschew his promises and conceal the truth from Gonzalez.[425] Thus, the first and second elements of fraudulent inducement, as well as the first element of promissory estoppel, are satisfied.[426]

Likewise, the second element of promissory estoppel and the third element of fraudulent inducement—the intention or reasonable expectation of inducing the

---

[423] *See Charney*, 2017 WL 6498063, at *25 (declining to invoke promissory estoppel where "the alleged 'promise' is too amorphous to be enforced"); Restatement (Second) of Contracts § 2 & cmt. a (1981).

[424] D.I. 190 at 38.

[425] *See Martin*, 2015 WL 6472597, at *13–14.

[426] *See Charney*, 2017 WL 6498063, at *12 (requiring "a false representation, usually one of fact, made by the defendant" and "the defendant's knowledge or belief that the representation was false, or was made with reckless indifference to the truth"); *Grunstein*, 2009 WL 4698541, at *7 (requiring that "a promise was made").

counterparty to act—are met.[427]  Lynch knew Gonzalez trusted him and would follow or sign Lynch's proposed means of executing Gonzalez's business objectives. Consistent with Lynch's appointment as Belleville's legal representative in Argentina and attorney for the Company, Gonzalez trusted Lynch's advice regarding Belleville's operations and compliance with Argentine law.  But from the early days of their working relationship, as early as 2007, Lynch planned to strip Televideo of its majority interest.  Lynch adamantly testified that he never intended to execute the Counterdocument or hold the 65% in trust for Televideo as he represented to Gonzalez.[428]  Lynch conjured a seemingly legitimate legal impetus for each document along his paper trail and presented each document to Gonzalez under the guise that it furthered some corporate goal.  Lynch knew his misrepresentations and false promises were essential:  in particular, he knew that without the promised Counterdocument, Gonzalez would not execute the Purchase Agreements, the Notices, or the Addenda.  Lynch intended his false promises and misrepresentations to induce Gonzalez to sign documents Lynch could use to seize Televideo's control over Belleville.

---

[427] *See Charney*, 2017 WL 6498063, at *12 (requiring "an intent to induce the plaintiff to act or to refrain from acting"); *Grunstein*, 2009 WL 4698541, at *7 (requiring that "it was the reasonable expectation of the promisor to induce action or forbearance on the part of the promisee").

[428] *See* Lynch Tr. 146, 147, 150, 155, 158, 159, 160.

The fourth element of fraudulent inducement and the third element of promissory estoppel, based in reliance, are also met. To his detriment, Gonzalez signed each document naming Lynch as Belleville's 65% member in justifiable and reasonable reliance on Lynch's representations and promises. Those included public filings and private "agreements," which Gonzalez executed believing they legitimized the sham transfer and furthered what he believed to be their mutual scheme to facially satisfy Argentine law.[429] Gonzalez did so notwithstanding the documents' meaningless terms, because Lynch told him that each document was necessary for the parties' mutual scheme to continue Belleville's operations. Objectively viewing Lynch's actions in the context of the sham transaction, Gonzalez had no reason to think Lynch would lead him astray.

Lynch contends that Defendants cannot demonstrate justifiable reliance because the "clear and unambiguous terms of the written contracts between the parties" contradict Gonzalez's assertion that Lynch held the 65% interest as a nominee, and that those "written agreements" trump any document to the contrary, like the October 22 Email.[430] The Court must consider the reasonableness of Gonzalez's reliance on Lynch's misrepresentations and false promises in the context

---

[429] *See* JX 5; JX 6; JX 8; JX 11; JX 12; JX 13; JX 14; JX 15; JX 26; JX 27; JX 28; JX 29; JX 30; JX 31; JX 32; JX 35; JX 37; JX 64; JX 66; JX 67; JX 68.

[430] D.I. 190 at 38–37 (quoting *Strauss Water Ltd.*, 2016 WL 5243950, at *1, *7).

of the surrounding circumstances, including his prior communications with Lynch.[431] This context supports Gonzalez's reliance.

The parties objectively agreed to facially name Lynch as Belleville's 65% owner to satisfy Argentine laws, and to protect Televideo's interest with the Counterdocument, the only document intended to be legitimate and have binding effect. In accordance with that agreement, Lynch prepared and executed the sham documents and represented that he and his wife would sign the Counterdocument. Aside from the Counterdocument, Gonzalez did not believe the other documents and their terms mattered; they were only needed to paper the sham transfer. Gonzalez never intended, either subjectively or objectively, to be bound by their terms.[432] By signing those documents in furtherance of their joint scheme, Gonzalez did not choose to "accept the benefits of those agreements" and "disregard" Lynch's false representations and promises; his trickery was undetectable from the meaningless terms of the sham documents.[433] Because the "clear and unambiguous terms of the

---

[431] *See Martin*, 2015 WL 6472597, at *13 (finding that a party's similar argument failed after analyzing reliance "in the context of the surrounding circumstances including [the parties'] prior communications" (citing *Carrow*, 2006 WL 3289582, at *11)).

[432] *See supra* Section I.D.

[433] *See* D.I. 190 at 41 ("Having chosen to execute the restructuring agreements and accept the benefits of those agreements, Gonzalez cannot avoid the consequences of the Purchase Agreements on a fraudulent inducement theory.").

written [documents] between the parties" were arbitrary and intended only as a sham, Plaintiffs' argument fails.

More specifically, Lynch argues that Defendants' affirmative defenses fail because Lynch told Gonzalez he was not going to sign the Counterdocument and because Section 2.05 of the May 4th Restructuring Agreement evidences Gonzalez's agreement to "revoke and destroy" any Counterdocument.[434] Lynch posits that from Section 2.05 alone, Gonzalez could have discovered the truth and, therefore, could not have justifiably relied on Lynch's representations regarding the Counterdocument. These positions are not supported by the record.

Lynch never told Gonzalez, and Gonzalez never agreed, that Lynch would not sign or perform under the Counterdocument as he initially represented.[435] Lynch proceeded as though he had carried out his promise, but covertly destroyed or concealed the Counterdocument. Gonzalez believed that Lynch executed the Counterdocument, that it still existed in Belleville's files, and that Lynch intended to give the interest back upon demand.[436] The parties were careful to conceal the Counterdocument's existence from the public and regulators, as necessary to effectuate the sham transfer.

---

[434] D.I. 190 at 42–43.

[435] *See supra* note 218 and accompanying text.

[436] *See, e.g.*, A. Gonzalez Tr. 456, 463, 485; JX 141.

Lynch presented the May 4th Restructuring Agreement to Gonzalez as another fake document he needed to sign to paper the sham transfer. In particular, he presented it as protecting Belleville in the event regulators found the Counterdocument. But to Lynch, the May 4th Restructuring Agreement was the perfect insurance for his plan: Section 2.05 stated that the Counterdocument could be nullified and destroyed.[437] Gonzalez viewed it as another sham document to further their mutual scheme, and signed. Thereafter, Lynch and his comrades continued to perpetuate the myth of the Counterdocument, including to Belleville's legal and financial advisors, despite knowing Lynch destroyed or concealed it and despite opportunities to disclose the truth.

Clear and convincing evidence demonstrates that Section 2.05 did not alert Gonzalez that Lynch never signed the Counterdocument, or that he concealed or destroyed the copy Gonzalez signed.[438] Lynch presented the May 4th Restructuring Agreement to Gonzalez for his signature under false pretenses.[439] To the extent

---

[437] *See* JX 67 § 2.05; JX 68 § 2.05; Lynch Tr. 48, 49–50, 203–11, 256–58.

[438] *See Martin*, 2015 WL 6472597, at *14 ("Thus, despite Martin's careless failure to compare the terms of the first resignation letter to the second resignation letter, his reliance on Tomasek's material misrepresentation by silence in the face of a duty to speak as to the conditionality of Martin's resignation was reasonable.").

[439] *See id.* at *13–14; *see also Hockessin Cmty. Ctr., Inc.*, 59 A.3d at 458; *Naughty Monkey LLC*, 2011 WL 4091851, at *3; *Fogel*, 2007 WL 4438978, at *3; *Schroder*, 299 A.2d at 436.

Lynch discussed Section 2.05 with Gonzalez, "the evidence shows that he more than likely implied it was a mere formality" in furtherance of their joint scheme.[440] In view of the parties' mutual scheme, it was reasonable for Gonzalez to rely on Lynch's false representations and promises.

Defendants have met each element of fraudulent inducement and promissory estoppel by clear and convincing evidence.[441] Lynch falsely promised to perform under the parties' objective agreement, and misled Gonzalez regarding each document, in order to induce Gonzalez to certify a paper trail naming Lynch as Belleville's 65% member. Gonzalez justifiably relied on Lynch's misrepresentations and false promises and signed various documents, believing that the documents' terms were meaningless, that his signature was necessary to satisfy Argentine regulators, and that Televideo's interest was secured by the Counterdocument. Until Lynch held the Company for ransom, Gonzalez believed that Lynch was loyal to their objective agreement and had signed the

---

[440] *Martin*, 2015 WL 6472597, at *14.

[441] "There is some uncertainty in our law as to whether a party asserting fraud must prove the claim by clear and convincing evidence or whether a preponderance of the evidence will suffice." *Project Boat Hldgs., LLC v. Bass Pro Gp., LLC*, 2019 WL 2295684, at *23 (Del. Ch. May 29, 2019) (*comparing Ross Hldg. & Mgmt. Co. v. Advance Realty Gp., LLC*, 2014 WL 4374201, at *37 (Del. Ch. Sept. 4, 2014) (requiring plaintiffs to prove fraud by clear and convincing evidence), *with Trascent Mgmt. Consulting, LLC v. Bouri*, 2018 Wl 4293359, at *17 (Del. Ch. Sept. 10, 2018) (requiring plaintiff to prove fraudulent inducement by a preponderance of the evidence)). I need not decide the question, however, because Defendants prevail under either standard.

Counterdocument as promised.[442]  Aware of Gonzalez's belief, Lynch "had a duty fully and fairly to disclose" the truth to Gonzalez, and he failed to do so.[443]

Lynch obtained Gonzalez's signatures with misrepresentations and false promises.  Injustice can only be avoided by holding Lynch to the consequences of his actions.[444]  Accordingly, even if Gonzalez were bound to the terms of the documents he signed, his affirmative defenses of fraudulent inducement and promissory estoppel would relieve him of those obligations.

Defendants are entitled to a declaratory judgment under 10 *Del. C.* § 6501 that (1) Gonzalez holds 5% of Belleville, (2) Televideo holds 95% of Belleville, and (3) Lynch holds no interest in Belleville.

### 3.    Gonzalez And Alviz Are Belleville's Managers.

At the outset of this case, Lynch and Gonzalez brought competing claims to Belleville's management pursuant to Section 18-110:  each sought a declaration that

---

[442] *See, e.g.*, A. Gonzalez Tr. 485 ("Mr. Lynch had all of our trust until he notified that he was separating the property of Argentina.  And all the paperwork in order to do that he had created throughout all the years for everything.  There was no problem.  And he was counting on my complete trust.  I cannot answer for what he made me sign.  I know that I signed and I am responsible, but he created everything."); JX 141 (evidencing Gonzalez's continued belief that Lynch executed the Counterdocument).

[443] *Martin*, 2015 WL 6472597, at *14.

[444] *See Chrysler Corp. v. Chaplake Hldgs., Ltd.*, 822 A.2d 1024, 1033–34 (Del. 2003); *Grunstein*, 2009 WL 4698541, at *7; *see also* 1 *Voss on Delaware Contract Law*, §§ 2.64[1], 2.64[4][b].

he is Belleville's sole manager.[445] Throughout this contentious dispute, Plaintiffs represented that their Section 18-110 claim was the driving force behind this litigation.[446] Yet, Plaintiffs did not address Lynch's purported status as Belleville's sole manager in their post-trial briefing; nor did they refute Defendants' claim that Gonzalez is Belleville's sole manager.[447] As a result, Plaintiffs have waived that claim and any argument that Lynch is Belleville's manager pursuant to Section 18-110.[448]

I only consider the Televideo Defendants' Section 18-110 counterclaim, seeking a declaration that Gonzalez is Belleville's sole manager, which Defendants

---

[445] Notably, Defendants do not seek a declaration that either Defendants Lopez or Alviz is a Belleville manager.

[446] *See, e.g.*, Compl. ¶¶ 92–102; D.I. 37.

[447] *See generally* D.I. 190 (only mentioning "manager" in the context of a personal jurisdiction analysis); D.I. 206 (failing to respond to argument in Defendants' opening brief that Gonzalez is Belleville's sole manager).

[448] *See In re IBP, Inc. S'holders Litig.*, 789 A.2d 14, 62 (Del. Ch. 2001) ("In its opening post-trial brief, Tyson did not argue that these issues would in themselves be sufficient . . . . As a result, I consider Tyson to have waived any arguments about these issues."); *see also Barret v. Am. Country Hldgs., Inc.*, 951 A.2d 735, 745 (Del. Ch. 2008) (noting that if a part "pull[s] out" its "argument for the first time in its post-trial answering brief," "it was therefore not fairly presented"); *Franklin Balance Sheet Inv. Fund v. Crowley*, 2006 WL 3095952, at *4 (Del. Ch. Oct. 19, 2006) (explaining that, "under the briefing rules, a party is obliged in its motion and opening brief to set forth all of the grounds, authorities and arguments supporting its motion" and "should not hold matters in reserve for reply briefs"); *In re Asbestos Litig.*, 2007 WL 2410879, at *4 (Del. Super. Aug. 27, 2007) (noting that it is "well-settled in Delaware" that a legal issue not raised in an opening brief is generally deemed waived and "[m]oving parties must provide adequate factual and legal support for their positions in their moving papers in order to put the opposing parties and the court on notice of the issues to be decided.").

briefed post-trial. Under Section 18-110, the Court may "hear and determine . . . the right of any person to become or continue to be a manager of a limited liability company."[449]

> Section 18-109(a) defines the term "manager" as encompassing two categories of persons: first, a person formally named as a manager pursuant to the governing LLC agreement; and second, a person not formally named as a manager pursuant to the governing LLC agreement but who nevertheless "participates materially in the management of the limited liability company.[450]

An individual "participate[d] materially" in the LLC's business where he "acted as president of the Compan[y], ran [its] day-to-day operations, and took binding action on [its] behalf."[451]

The preponderance of the evidence presented demonstrates that both Gonzalez and Alviz are Belleville's managers: Gonzalez by way of material participation in Belleville's business, and Alviz by way of formal designation in the April 2019 Certificate. Although no document in the record initially formalized his role as manager, Gonzalez participated materially in Belleville's management from its inception. He formally served as Belleville's President, solely controlled Belleville's management and business, and made the ultimate decisions for the

---

[449] *MPT of Hoboken TRS, LLC*, 2014 WL 3611674, at *8 (quoting 6 *Del. C.* § 18-110(a)).

[450] *Metro Storage Int'l LLC v. Harron*, 2019 WL 3282613, at *1 (Del. Ch. July 19, 2019) (citing 6 *Del. C.* § 18-109(a)).

[451] *Id.* at *9 (citing *Phillips v. Hove*, 2011 WL 4404034 (Del. Ch. Sept. 22, 2011)).

Company.  Employees of Belleville and its subsidiaries understood that Gonzalez was in charge, even when he delegated tasks to others.  And in January 2009, Gonzalez was formally designated as a Belleville manager.[452]  He removed himself from this formal managerial role in April 2019, when he named Alviz as Belleville's sole manager and president under the April 2019 Certificate.[453]  Still, Gonzalez continued to participate materially in Belleville's management and operations by directing its day-to-day operations and taking binding action on its behalf; this is undisputed.

Although neither the Televideo Defendants or Alviz seek a declaration that Alviz is a Belleville manager, the preponderance of the evidence, namely the representation in the April 2019 Certificate filed with the Delaware Secretary of State, demonstrates that Alviz is Belleville's President and manager.[454]  The record demonstrates that, notwithstanding Alviz's formal designation, Gonzalez retained

---

[452] *See* JX 16.  Again, Defendants do not appear to refute Lynch's designation as co-manager.

[453] *See* PTO ¶ 32; JX 143.

[454] Lynch's only dispute as to the validity of the April 2019 Certificate depends on his flawed position that he, not Televideo, holds 65% of Belleville.  Having resolved that issue in Gonzalez' favor, there appears to be no dispute that he had the authority to issue the April 2019 Certificate as Belleville's manager and as president of Televideo, Belleville's controlling member.  No valid operating agreement for Belleville appears in the record.  I conclude that the April 2019 Certificate nullified and replaced the document naming Lynch as Gonzalez's co-manager in 2009.  I conclude from that act, the language of the April 2019 Certificate, and Lynch's waiver of his Section 18-110 claim, *see supra* Section II.A.3, that the April 2019 Certificate displaced Lynch's 2009 nomination as co-manager.

actual managerial control over Belleville.  Accordingly, Defendants are entitled to a declaratory judgment under 6 *Del. C.* § 18-110 that Gonzalez and Alviz are Belleville's co-managers.

## B.    All Parties' Tort Claims Fail.

The parties assert numerous tort claims.  The Televideo Defendants assert Lynch is liable for fraudulent inducement and fraudulent misrepresentation, or common law fraud, and conversion.[455]  The Televideo Defendants' tortious fraud claims are based on Lynch's scheme to induce Gonzalez to execute a suite of sham documents naming Lynch as Belleville's 65% owner.  Lynch asserts a mirroring conversion claim against the Televideo Defendants, asserting they took his interest in Belleville.[456]

Each of these claims requires proof of damages by the preponderance of the evidence.[457]  "The law does not permit a recovery of damages which is merely

---

[455] Countercl. ¶¶ 92–107, 108–117.

[456] Compl. ¶¶ 128–37.

[457] *See Great Hill Equity P'rs IV, LP v. SIG Growth Equity Fund I, LLLP*, 2020 WL 948513, at *16 (Del. Ch. Feb. 27, 2020); *Martin*, 2015 WL 6472597, at *10 ("Plaintiffs have the burden of proving each element, including damages, of each of their causes of action against each Defendant by a preponderance of the evidence." (quoting *OptimisCorp*, 2015 WL 5147038, at *55)).

On a claim of fraud, the plaintiff must prove (1) a false representation; (2) the defendant's knowledge or belief that the representation was false, or was made with reckless indifference to the truth; (3) an intent to induce the plaintiff to act or to refrain from acting; (4) the plaintiff's action or inaction taken in justifiable reliance upon the representation; and (5) resulting damage to the plaintiff. *See Lorenzetti v. Hodges*, 62 A.3d

106

speculative or conjectural."[458]  "[T]o support a finding of a specific sum as damages there should generally be other evidence than that which merely shows the nature of plaintiff's injuries[.]"[459]  At trial, neither party put on evidence of damages.

The Televideo Defendants seek an order "granting Defendants an award of monetary damages for CLL's fraudulent conduct."[460]  The Televideo Defendants did not put on an expert or otherwise attempt to quantify the amount of damages suffered as a result of Lynch's fraudulent conduct.  For their conversion claim, the Televideo

---

1224 (Del. 2013) (TABLE); *H–M Wexford LLC v. Encorp, Inc.*, 832 A.2d 129, 144 (Del. Ch. 2003); *Gaffin*, 611 A.2d at 472.  Further, the misrepresentation or omission must be material in nature and concern an essential element of the subject transaction.  *See Princeton Ins. Co. v. Vergano*, 883 A.2d 44, 54 (Del. Ch. 2005).

The elements of fraudulent inducement are identical to those of common law fraud, except that the party must demonstrate that the subject representation was intended to induce action and that the party was, in fact, induced.  *See Gloucester Hldg. Corp. v. U.S. Tape & Sticky Prods., LLC*, 832 A.2d 116, 124 (Del. Ch. 2003) ("To establish fraud in the inducement . . . the elements of common law deceit, which include 'misrepresentation of a material fact, made to induce action, and reasonable reliance on the false statement to the detriment of the person relying.").

Under Delaware law, conversion is "any distinct act of dominion wrongfully exerted over the property of another, in denial of [the plaintiff's] right, or inconsistent with it." *Kuroda v. SPJS Hldgs., LLC*, 971 A.2d 872, 889 (Del. Ch. 2009) (citing *Drug, Inc. v. Hunt*, 168 A. 87, 93 (Del. 1933)); *see also* 18 Am. Jur. 2d *Conversion* § 1 (2020).  To prove conversion, the party must show that (1) the plaintiff had a property interest; (2) the plaintiff had a right to possession of the property; (3) the defendant deprived the plaintiff of possession or use of the property; and, (4) the plaintiff sustained damages.  *See Facciolo Constr. Co. v. Bank of Del.*, 514 A.2d 413, 413 (Del. 1986) (TABLE).

[458] *Henne v. Balick*, 146 A.2d 394, 396 (1958) (quotation omitted).

[459] *Id.*

[460] D.I. 189 at 51; *accord* D.I. 204 at 29.

Defendants suggest that they are entitled to the "full value of the property" that Lynch held for ransom and attempted to take via filings with Delawarean and Argentine authorities.[461] But the Televideo Defendants failed to put on any evidence quantifying that value.[462]

On Lynch's part, in support of conversion, he argues that "Telearte expended considerable effort . . . but nonetheless suffered meaningful financial losses through expenditures on professional fees," so "[t]he Court must enter judgment on this claim in favor of Plaintiffs."[463] Putting aside that Telearte is not a plaintiff in this action, Lynch did not present evidence at trial quantifying the "financial losses" or "expenditures" that resulted from Defendants' alleged misconduct. His conversion claim fails. It also fails for another reason: having concluded that Lynch never actually held 65% of Belleville and that interest rightfully belongs to Televideo, Lynch cannot establish that he had a property interest or a right to possess the property in question.[464]

---

[461] D.I. 189 at 38 n.4. The Televideo Defendants also bring the conversion claim against Lynch as an alternative to their claim for declaratory relief with respect to the 65% interest. *See* Countercl. ¶¶ 83-91; D.I. 189 at 37.

[462] In any event, this opinion provides that Lynch never possessed what he purported to take.

[463] D.I. 190 at 45.

[464] *See Facciolo Constr. Co.*, 514 A.2d at 413.

Accordingly, all parties have failed to prove damages by the preponderance of the evidence and cannot prevail on their tort claims.

## C. Plaintiffs Do Not Prevail On Their Affirmative Defenses.

Having concluded that Defendants have prevailed on all viable claims, I now consider Plaintiffs' affirmative defenses that were addressed post-trial: judicial estoppel and unclean hands.[465] I conclude that those defenses do not bar Defendants' entitlement to a judgment declaring that Televideo holds 95% of Belleville's membership interests, and that Lynch does not own any interest in Belleville.

### 1. Estoppel

Plaintiffs' pleadings and opening post-trial brief explicitly pursued judicial estoppel, but not any other estoppel defense.[466] With the benefit of the analysis in Defendants' opening post-trial brief, Plaintiffs backpedaled in their answering brief, contending that "Plaintiffs . . . are not seeking the application of judicial estoppel. Instead, Plaintiffs seek to estop Defendants from taking a position inconsistent with their prior sworn statements that Lynch is the 65 percent owner of GBH."[467] They

---

[465] All other affirmative defenses Plaintiffs pled but failed to brief post-trial are waived.

[466] *See* D.I. 190 at 28–31; D.I. 49 at 28–29.

[467] D.I. 206 at 15.

pointed to the equitable estoppel and quasi-estoppel doctrines as the source of their defense.[468]

Plaintiffs did not raise equitable estoppel or quasi-estoppel as an affirmative defense in their answer to the Televideo Defendants' counterclaim.[469]  Nor did they brief equitable estoppel or quasi-estoppel in their opening brief.[470]  Equitable and quasi-estoppel were not properly raised and are therefore waived.[471]  And Plaintiffs withdrew their judicial estoppel defense, so I need not consider it either.[472]

Even if I were to consider Plaintiffs' judicial estoppel defense, it would fail. "[J]udicial estoppel may prevent a party from assuming a position in a legal proceeding based on prior, contradictory, or inconsistent positions asserted in the same or another proceeding."[473]  The doctrine is "intended fundamentally to preserve the integrity of the courts and prevent miscarriages of justice by focusing in the

---

[468] *See id.* at 15–16.

[469] *See* D.I. 49 at 28–29.

[470] *See generally* D.I. 190.

[471] *See Barret*, 951 A.2d at 745; *Crowley*, 2006 WL 3095952, at *4; *In re Asbestos Litig.*, 2007 WL 2410879, at *4.

[472] D.I. 206 at 15.

[473] Wolfe & Pittenger, *supra* note 419, § 15.02[d], at 15-12 (citing *In re First Interstate Bancorp S'holders Litig.*, 729 A.2d 851, 859 n.8 (Del. Ch. 1998) ("The doctrine of judicial estoppel precludes a party "from asserting in a legal proceeding, a position inconsistent with a position previously taken by him in the same or in an earlier proceeding.")); *see also Motorola Inc. v. Amkor Tech., Inc.*, 958 A.2d 852, 859 (Del. 2008) (holding that judicial estoppel precludes "a party from asserting a position inconsistent with a position previously taken in the same or earlier legal proceeding").

110

relationship of the parties to the judicial system."[474] Accordingly, Delaware's judicial estoppel doctrine is limited to statements made in prior judicial proceedings, and requires that the asserting party establish six elements: (1) the inconsistent position must have been successfully maintained when first asserted; (2) a judgment must have been rendered; (3) the positions must be clearly inconsistent; (4) the parties and issues must be identical; (5) the party claiming estoppel must have been misled and changed his position; and (6) it must appear to the court unjust for one party to permit the other to change its position.[475] The Court will not invoke estoppel where its enforcement would frustrate public policy.[476]

Plaintiffs contended that statements under penalty of perjury are binding, and because "Gonzalez repeatedly made statements under penalty of perjury to both the United States Internal Revenue Service and the State of Florida that Lynch is the 65 percent owner of GBH," judicial estoppel bars Gonzalez's claims for relief.[477] In

---

[474] Wolfe & Pittenger, *supra* note 419, § 15.02[d], at 15-12 (citing *Amaysing Techs. Corp. v. CyberAir Commc'ns*, 2005 WL 578972, at *4 (Del. Ch. Mar. 3, 2005) ("Judicial estoppel is an equitable doctrine designed to protect the integrity of the judicial process. . . .")).

[475] *See id.* (citing *Norman v. Paco Pharm. Servs., Inc.*, 1992 WL 301362, at *3–4 (Del. Ch. Oct. 21, 1992), *aff'd*, 625 A.2d 279 (Del. 1993)).

[476] *See id.* § 15.02[d], at 15-8 (citing *Harmon v. State*, 2011 WL 5966717 (Del. Super. Ct. Nov. 17, 2011) (noting that "the Delaware Supreme Court remarked strongly against the use of estoppel in the government context"), *rev'd on other grounds*, 62 A.3d 1198 (Del. 2013)).

[477] D.I. 190 at 28.

particular, Plaintiffs relied on Belleville's tax returns from 2008 through 2017 that name Lynch as Belleville's 65% owner, which Gonzalez approved and signed under penalty of perjury. They contended that Defendants' position in this proceeding is clearly inconsistent with those filings, and so Defendants are precluded from deviating from their prior certification that Lynch owned 65% of the Company.

Even assuming the statement in Belleville's tax returns is inconsistent with Defendants' position in this action, that statement was not made in a prior proceeding. And Plaintiffs cited no Delaware authority for the proposition that judicial estoppel bars parties from taking a position in a judicial proceeding that is contrary to a position taken on their income tax return. Rather, Plaintiffs ask me to adopt the reasoning of other courts.[478] In view of the narrow contours of Delaware's judicial estoppel doctrine, and Plaintiffs' waiver, I decline to extend the doctrine beyond the scope of judicial proceedings to reach statements made in tax returns.

### 2. Unclean Hands

Both Plaintiffs and Defendants claim the other faction comes to this Court with unclean hands. Having determined that Defendants prevailed on the viable claims and counterclaims in this matter, I must determine whether unclean hands

---

[478] *Id.* at 28–29 ("This Court should follow those well-reasoned decisions." (citing *Mahoney-Buntzman v. Buntzman*, 12 N.Y.3d 415, 422 (2009), and *S & D Envtl. Servs., Inc. v. Rosenberg Rich Baker Berman & Co., P.A.*, 334 N.J. Super. 305, 317 (Law. Div. 1999), and *In re Robb*, 23 F.3d 895, 898–99 (4th Cir. 1994))).

bars Defendants' affirmative claims for relief. In view of the preponderance of the evidence presented, I decline to apply the unclean hands doctrine to bar Defendants' relief. I also conclude the doctrine would bar Plaintiffs' relief, as to award Plaintiffs relief would yield an inequitable result that runs contrary to public policy.

The equitable doctrine of unclean hands "provides that 'a litigant who engages in reprehensible conduct in relation to the matter in controversy . . . forfeits his right to have the court hear his claim.'"[479] "[I]t is designed primarily to protect courts of equity from being misused by a party who has not acted fairly and without fraud or deceit as to the controversy in issue."[480] This principle rings true in equity regardless of whether the "inequitable action" is "legally possible."[481]

"The doctrine should not be seen as a means to aid a party who faces an unscrupulous opponent . . . ."[482] Rather, the operative question is "whether [a party's] conduct is so offensive to the integrity of the court that his claims should be

[479] *Portnoy v. Cryo-Cell Intern., Inc.*, 940 A.2d 43, 80–81 (Del. Ch. 2008) (quoting *Nakahara v. NS 1991 Am. Tr.*, 739 A.2d 770, 791–92 (Del. Ch. 1998)).

[480] *Patel v. Dimple*, 2007 WL 2353155, at *12 (Del. Ch. Aug. 16, 2007); *see also Portnoy*, 940 A.2d at 81 ("'[T]he purpose of the clean hands maxim is to protect the court against misuse by one who, because of his conduct, has forfeited his right to have the court consider his claims . . . .'" (quoting *Skoglund v. Ormand Indus., Inc.*, 372 A.2d 204, 213 (Del. Ch. 1976)).

[481] *Brown v. Kellar*, 2018 WL 6721263, at *6–7 (Del. Ch. Dec. 21, 2018) (holding that actions under 8 *Del. C.* § 225 "permit[] the adjudication of inequitable conduct" (citing *Schnell v. Chris-Craft Indus., Inc.*, 285 A.2d 437, 439 (Del. 1971))).

[482] *Nakahara*, 718 A.2d at 522.

denied, regardless of their merit."[483] "[T]he inequitable conduct must have an 'immediate and necessary' relation to the claims under which relief is sought."[484] But because the doctrine is considered a "'rule of public policy' and 'not a matter of defense to be applied on behalf of a litigant,'" this Court has "latitude to apply the doctrine to avoid becoming complicit in a [party's] fraudulent act."[485] The "greatest limitation on the doctrine is the widely accepted exception that since it is ultimately based on public policy, countervailing public policy which points in the direction of reaching the case on the merits can preclude its operation."[486] "This court has consistently refused to apply the doctrine of unclean hands to bar an otherwise valid claim of relief where the doctrine would work an inequitable result."[487]

In their opening post-trial brief, Defendants contended that Plaintiffs' claims are barred by unclean hands because Lynch's "improper and misleading conduct with respect to the subject purchase agreements and refinancing agreements and

---

[483] *Portnoy*, 940 A.2d at 81 (internal quotations omitted) (quoting *Gallagher v. Holcomb & Salter*, 1991 WL 158969, at *4 (Del. Ch. 1991)).

[484] *Nakahara*, 718 A.2d at 523.

[485] *Morente v. Morente*, 2000 WL 264329, at *3 (Del. Ch. Feb. 29, 2000) (quoting *Nakahara*, 739 A.2d at 522–23); *see also Nakahara*, 718 A.2d at 522 ("[T]he decisional authority is almost universal in its acceptance in that courts of equity have extraordinarily broad discretion in application of the doctrine.").

[486] *Nakahara*, 718 A.2d at 523.

[487] *Portnoy*, 940 A.2d at 81 (internal quotation marks omitted) (quoting *Dittrick v. Chalfant*, 2007 WL 1039548, at *5 n.18 (Del. Ch. Apr. 4, 2007)).

admitted lie with respect to the Counter-document relate directly to the ownership and management dispute this Court must resolve."[488]

Plaintiffs responded in their answering brief, claiming that Defendants misplace their reliance on the doctrine.[489] In that response, Plaintiffs argued for the first time post-trial that the doctrine bars Defendants' claims because "Gonzalez seeks to enforce a purported bargain wherein Lynch would hold Gonzalez's beneficial ownership of GBH as a nominee in order to deceive the Argentine Media Regulator and circumvent Argentine law."[490] Because Lynch's failings were in the context of "an illicit bargain," Plaintiffs contend that this Court cannot enforce the arrangement.[491] Plaintiffs did not raise this argument in their post-trial opening brief.[492] "As a result, I consider [Plaintiffs] to have waived any arguments about

---

[488] D.I. 189 at 47.

[489] *See* D.I. 206 at 19–24.

[490] *Id.* at 16. Lynch raised unclean hands as an affirmative defense in his answer to the Televideo Defendants' Counterclaims. *See* D.I. 49 at 28.

[491] *Id.* at 17 (quoting *Morente*, 2000 WL 264329, at *3).

[492] *See generally* D.I. 190. Plaintiffs' opening brief cites a case that invokes the unclean hands doctrine, but does not explicitly brief an unclean hands defense. *See id.* at 32 ("Assuming arguendo, that Lynch held the Argentine operations as a nominee for Gonzalez (he did not) instead of as record and beneficial owner, Defendants' claims still fail. The Chancery Court has held: 'When parties enter into legal relationships in an effort to mask their illicit arrangements and to deceive regulatory authorities into allowing the parties to carry out their illicit business, they will be left to lie in the bed they have made.' *Patel v. Dimple, Inc.*, 2007 WL 2353155, at *12 (Del. Ch. Aug. 16, 2007).").

these issues."[493]  Still, I address the defense from both sides.[494]  I decline to apply unclean hands to bar Defendants' claims for relief, but find that Lynch came to this Court with unclean hands.

The doctrine's application is made more difficult by the fact that the parties' dispute was born from a mutual scheme to paper an alternate reality for the benefit of Argentine regulators.  As stated in *Patel v. Dimple*, "[w]hen parties enter into legal relationships in an effort to mask their illicit arrangements and to deceive regulatory authorities into allowing the parties to carry out their illicit business, they will be left to lie in the bed they have made."[495]  And in *Morente v. Morente*, this Court refused to "use the power entrusted it by the people of Delaware to compel specific performance of an aspect of an illegal contract."[496]  Indeed, "it is not the task of this court to aid parties in implementing schemes to avoid the law."[497]

---

[493] *In re IBP, Inc. S'holders Litig.*, 789 A.2d at 62; *see also Barret*, 951 A.2d at 745; *Crowley*, 2006 WL 3095952, at *4; *In re Asbestos Litig.*, 2007 WL 2410879, at *4.

[494] *See In re IBP, Inc. S'holders Litig.*, 789 A.2d at 62.

[495] 2007 WL 2353155, at *12.

[496] 2000 WL 264329, at *3.

[497] *Patel*, 2007 WL 2353155, at *12 (citing *Morente*, 2000 WL 264329, at *3); *see also* Restatement (Second) of Contracts § 18 cmt. c (1981) ("Where the parties to a sham transaction intend to deceive third parties, considerations of public policy may sometimes preclude a defense of sham.").

In *Patel*, two former friends challenged the legal ownership of a parcel of land.[498] The plaintiff had record ownership of the land and the defendant was the sole stockholder of a liquor store on that parcel.[499] The *Patel* parties had executed two lease agreements, which evidenced the only legal relationship that existed between the parties. The defendant contended that the leases were a front designed to mislead Delaware authorities, and that the parties intended a 50-50 split of the land and the liquor store.[500] Despite the parties' alleged intention, the defendant sought an order declaring he owned 50% of the land and 100% of the liquor store.[501] Unpersuaded by the defendant's position, then-Vice Chancellor Strine noted:

> [T]here is no equitable basis for the relief [the defendant] seeks. . . . That is, [the defendant] is trying to exploit [the plaintiff's] legal predicament—a predicament [the defendant] was aware of from the beginning—to reap a financial boon from his, how shall I say it, co-conspirator. [The defendant] is trying to use the powers of an equity court to extract an undeserved windfall.[502]

---

[498] *Patel*, 2007 WL 2353155, at *1.

[499] *See id.*

[500] *See id.* at *1–2 ("The reason they set up the arrangement on paper the way they did was because Vinod was not legally allowed to own an interest in the Store . . . [u]nder 4 *Del C.* § 546 . . . .").

[501] *See id.* at *2.

[502] *Id.*

*Morente v. Morente* also invokes this logic.[503] There, the plaintiff sought a judicial determination that he engaged in a "sham" stock transfer to help the defendant, his son, obtain financing for the construction of a home.[504] To "convinc[e] lenders that [the defendant] owned valuable assets,"[505] the plaintiff executed a stock certificate evidencing that the defendant owned fifty shares of the family business, purportedly upon the condition that the son promised to eventually return the stock or "tear up the certificate."[506] The defendant reneged on his alleged promise to return the shares, in view of his parents' impending divorce. The plaintiff—motivated by the family schism—sued, seeking a declaration that the stock transfer was, in fact, a "sham" and that the defendant was, therefore, not the true owner of the shares.[507] The stock certificate was the only document memorializing the agreement, and no evidence was presented to corroborate the plaintiff's story that the transfer was a sham. Refusing to "compel specific performance of an aspect of an illegal contract," the Court concluded that unclean

---

[503] 2000 WL 264329.

[504] *Id.* at *1.

[505] *Id.*

[506] *Id.*

[507] *Id.*

hands barred the plaintiff's claim.[508]  As in *Patel*, the plaintiff was left to bear the consequence of his co-conspirator's betrayal.

A superficial reading of these cases might support leaving Gonzalez to suffer the consequences of entering into an illicit bargain with Lynch.  But I believe these cases teach two deeper principles that direct the opposite result.  First, unclean hands will bar relief to prevent the offending party from "reap[ing] a financial boon from his . . . co-conspirator" or "extract[ing] an undeserved windfall."[509]  Second, under fundamental public policy and equitable principles, the Court must avoid being complicit in an illicit scheme.  Here, Gonzalez and Lynch agreed to identify Lynch as Belleville's 65% member—in both private and public documents—in a mutual scheme to end-run Argentine regulations and deceive Argentine regulators.[510]  But invoking unclean hands to leave Gonzalez to deal with the aftermath of his agreement with Lynch would yield two inequitable and unsound results:  giving

---

[508] *Id.* at *3.

[509] *Patel*, 2007 WL 2353155, at *2.

[510] The parties quibbled over whether their sham arrangement would be considered illegal in Argentina or would otherwise require corrective action by Argentine regulators. Whether this scheme would, in fact, be fraudulent or even criminal under Argentine law has no bearing here, and I make no such determination, as that matter is reserved for the Argentine authorities.  The parties agree that they needed to keep their arrangement a secret from Argentine regulators because the sham ownership structure would not have satisfied Argentine law if the Counterdocument were known.  *See* D.I. 219 at 69–72, 111, 114. Whether this arrangement was legally possible does not foreclose the Court from considering whether it amounts to inequitable conduct, in the form of an illicit agreement, that may trigger unclean hands.  *See Brown*, 2018 WL 6721263, at *6.

119

Lynch an undeserved windfall, and forcing the Court's implicit blessing of a deceptive scheme.

Enforcing Gonzalez's understanding of the 65% transfer would not "reap a financial boon from his . . . co-conspirator" or "extract an undeserved windfall."[511] As evidenced by the Counterdocument and related testimony, the full, beneficial ownership of 65% of Belleville never belonged to Lynch. Televideo was always the rightful owner. By granting Defendants relief and returning Televideo to its position as Belleville's majority member, Televideo does not receive a windfall.

Rather, enforcing Lynch's paper trail and decreeing Lynch as Belleville's 65% owner would facilitate the undeserved windfall that *Patel* warns against. Lynch fraudulently induced Gonzalez to execute a series of documents to strip Televideo of its majority interest, under the guise of purportedly sound legal advice. He assured Gonzalez that he would hold the interest in name only, as reflected in to the Counterdocument. Because the transfer was a sham, Lynch paid no consideration, and Gonzalez funded all payments to maintain the transfer's apparent propriety. Giving Lynch the benefit of his deception—65% of and control over a successful media company—would allow him "to reap a financial boon from" Gonzalez and permit Lynch to "exploit [Gonzalez and Televideo's] legal predicament—a

---

[511] *Patel*, 2007 WL 2353155, at *2.

predicament [Lynch] was aware of from the beginning" because he curated it.[512]  I decline to apply the unclean hands doctrine to yield such an inequitable result.[513]

Finally, I decline to apply unclean hands to bar Defendants' claims because doing so would conflict with public policy.[514]  "[I]t is not the task of this court to aid parties in implementing schemes to avoid the law."[515]  If I were to conclude that unclean hands bars a declaration that Televideo is Belleville's 65% owner, then I would effectively permit Lynch to hold that interest and give significance to the series of sham documents the parties executed, which do not represent Belleville's actual or intended ownership structure because they were intended to deceive Argentine regulators.  This would render this Court complicit in the parties' deceit.  I do not condone the parties' scheme, and accordingly, I do not—and cannot—apply unclean hands to prevent Televideo from reclaiming its 65% interest.

Rather, the equities of this case mandate that Belleville's ownership revert to the status quo ante, before Lynch papered his false 65% ownership, as that represents Belleville's true and intended ownership structure:  Televideo owns 95% of Belleville, and Gonzalez owns 5%.  And as *Patel* and *Morente* advise, the parties

---

[512] *Id.*

[513] *See Portnoy*, 940 A.2d at 81.

[514] *See Nakahara*, 718 A.2d at 523.

[515] *Patel*, 2007 WL 2353155, at *12 (citing *Morente*, 2000 WL 264329, at *3).

must accept the consequences of this conclusion, including any that may arise under Argentine law (which is for the Argentine regulators to decide) and other governing authorities, such as the Delaware Secretary of State and Attorney General.[516]

Turning to the cleanliness of Lynch's hands, I find that Lynch has engaged in reprehensible conduct that threatens the integrity of this Court and "offend[s] the very sense of equity to which he appeals."[517] Declining to apply unclean hands as a bar to Plaintiffs' relief would allow this Court and its equitable power to be "misused by a party who has not acted fairly and without fraud or deceit as to the controversy in issue."[518]

> "When one [who] files a bill of complaint seeking to set the judicial machinery in operation and to obtain some remedy has violated conscience or good faith or other equitable principles in his conduct, then the doors of the court of equity should be shut against him." In such cases, "the court will refuse to interfere on his behalf, to acknowledge his right, or to award him any remedy."[519]

---

[516] *See State v. Parretti*, 1995 WL 269889, at *1 (Del. Super. Apr. 17, 1995) (establishing that the Court may refer litigant misconduct to the attention of the Attorney General in extraordinary cases).

[517] *Metcap Sec. LLC v. Pearl Senior Care, Inc.*, 2009 WL 513756, at *6 (Del. Ch. Feb. 27, 2009) (quoting *Nakahara* 718 A.2d at 522), *aff'd sub nom.*, 977 A.2d 899 (Del. 2009); *see Portnoy*, 940 A.2d at 80–81.

[518] *Patel*, 2007 WL 2353155, at *12; *see also Portnoy*, 940 A.2d at 81 (quoting *Skoglund*, 372 A.2d at 213).

[519] *In re Silver Leaf, L.L.C.*, 2005 WL 2045641, at *11 (Del. Ch. Aug. 18, 2005) (alteration in original) (quoting *Bodley v. Jones*, 59 A.2d 463, 469 (Del. 1947), and then quoting *Keystone Driller Co. v. Gen. Excavator Co.*, 290 U.S. 240, 245 (1933)).

Lynch conjured a scheme that deceived Gonzalez, Argentine regulators, and this State's corporate governance officials, and he attempted to deceive this Court. Since Lynch began working for Gonzalez, he intended to defraud Televideo of its majority membership in Belleville. Building off of a regulatory issue, Lynch proposed the sham transfer and induced Gonzalez to execute documents naming Gonzalez as Belleville's 65% member under the guise that they would be used to facially satisfy Argentine laws, while knowing and intending he would use them to attempt to seize that stake for himself.

Lynch's premeditated plan upends any conclusion that Lynch and Gonzalez entered the sham transaction on equal footing. Rather than starting down the scheme's path together, Lynch used pretextual reasons and false promises to induce Gonzalez to follow him; and unbeknownst to Gonzalez, Lynch was always steps ahead. And when Lynch reached the end of that path, he turned to this Court and its statutory mandate to attempt to finalize his wrongful control over Belleville, based on documents he knew to be false, and offered incredible testimony in support. Lynch has abused this Court and undertaken to make it "complicit in [his] fraudulent act[s]."[520] The doors of equity are shut against him.[521]

---

[520] *Morente*, 2000 WL 264329, at *3 (quoting *Nakahara*, 739 A.2d at 522–23); *see also Nakahara*, 718 A.2d at 522.

[521] *See In re Silver Leaf, L.L.C.*, 2005 WL 2045641, at *11.

## D. Defendants Are Entitled To Costs And Fees.

Defendants contend that that "because the evidence demonstrates that [Lynch] acted egregiously fraudulent and in bad faith, Defendants are also entitled to an award shifting Defendants' attorneys' fees and costs incurred in this litigation as a component of the judgment."[522] "Under the American Rule and Delaware law, litigants are normally responsible for paying their own litigation costs."[523] The Court recognizes an exception to this rule where the Court finds that the litigation was brought in bad faith or that a party has acted with bad faith during the course of litigation.[524]

> The party invoking the bad faith exception bears the stringent evidentiary burden of producing clear evidence of bad-faith conduct by the opposing party. The standard is arduous: situations in which a party acted vexatiously, wantonly, or for oppressive reasons.[525]

---

[522] D.I. 189 at 42.

[523] *Mahani v. Edix Media Gp., Inc.*, 935 A.2d 242, 245 (Del. 2007).

[524] Wolfe & Pittenger, *supra* note 419, § 17.03[e], at 17-13.

[525] *Marra v. Brandywine Sch. Dist.*, 2012 WL 4847083, at *4 (Del. Ch. Sept. 28, 2012) (quotations omitted).

"The bad faith exception is not lightly invoked,"[526] and only "is applied in extraordinary circumstances primarily to deter abusive litigation and protect the integrity of the judicial process."[527]

"There is no single standard of bad faith that justifies an award of attorneys' fees—whether a party's conduct warrants fee shifting under the bad faith exception is a fact-intensive inquiry."[528] "Delaware courts have previously awarded attorneys' fees where (for example) parties have unnecessarily prolonged or delayed litigation, falsified records or knowingly asserted frivolous claims,"[529] and where the party's underlying, pre-litigation and litigation conduct has been fraudulent and where the party's misconduct was intentional.[530] "In all cases, to merit such an award, the applicant must show by clear evidence that the party from who fees are sought has acted in subjective bad faith."[531]

---

[526] *Ravenswood Inv. Co., L.P. v. Winmill & Co.*, 2014 WL 2445776 at *4 (Del. Ch. May 30, 2014).

[527] *Nichols v. Chrysler Gp., LLC*, 2010 WL 5549048, at * 3 (Del. Ch. Dec. 29, 2010).

[528] *Auriga Capital Corp. v. Gatz Props., LLC*, 40 A.3d 839, 880–81 (Del. Ch. 2012).

[529] *Montgomery Cellular Hldg. Co. v. Dobler*, 880 A.2d 206, 227 (Del. 2005) (internal quotation marks omitted) (quoting *Johnston v. Arbitrium (Cayman Is.) Handels AG*, 720 A.2d 542, 546 (Del. 1998)).

[530] *See* Wolfe & Pittenger, *supra* note 419, § 17.03[e], at 17-16.

[531] *Id.* at 17-17.

Defendants have met this onerous burden here. I find that Lynch brought his claims in bad faith and, in litigating those claims, engaged in intentional misconduct. Lynch hatched his scheme to divest Televideo of 65% of Belleville in 2007. In pursuit of that objective, he fraudulently induced Gonzalez to execute multiple sham documents naming Lynch as Belleville's 65% member. After he sufficiently papered the file, Lynch saw two routes to triumph: cash out by holding the Company for ransom, or utilize the Delaware court system to obtain actual ownership of 65% of Belleville. In February 2018, Lynch informed Gonzalez, with dramatic flair, that "Argentina will no longer answer to Miami."[532] On February 2, Lynch engaged Fox Horan & Camerini, LLP—trial counsel in this action—for "advice and services . . . in connection with drafting" the 2018 LLC Agreement.[533] And on February 19, Lynch sent Gonzalez the 2018 LLC Agreement, knowingly misrepresenting that Lynch was Belleville's 65% member and sole manager.[534] Gonzalez did not sign it, and instead set out to reclaim Televideo's rightful property.[535]

---

[532] White Tr. 529.

[533] JX 133. The parties did not include JX 133 in the Schedule of Evidence. However, Defendants cited JX 133 in their post-trial argument demonstratives, and Plaintiffs did not object to the demonstratives on that ground. I consider JX 133 to have been relied on by the parties.

[534] *See* JX 132.

[535] *See id.*

Having failed to use the false documents to extract a ransom, Lynch then turned to the Delaware court system for a declaration ratifying his fraudulent misconduct.[536] Lynch, individually and purportedly speaking for Belleville, initiated this action to complete his grab at Televideo's 65% of Belleville, which he started back in 2007. Casting his complaint under Section 18-110, he ostensibly sought to confirm ownership in Belleville based on documents he knew were false, and never intended to be true, because he had drafted them as part of a sham. Lynch used this Court's statutory mandate as a framework to litigate his position based on lies, false documents intended to end-run regulators, and misrepresentations. And Lynch used the fact that he sought relief under Section 18-110 as an affirmative weapon to fend off Gonzalez's good faith counterclaims and defenses.[537]

---

[536] *Cf.* Lambert Tr. 338 (stating Lynch "was obligated to start a legal lawsuit against Mr. Gonzalez and other people so that he would be recognized as 65 percent owner of Grupo Belleville and the only manager").

[537] *See* D.I. 37 at 16–17 ("I appreciate the fact that we're dealing with some complicated discovery involving foreign parties and that sort of thing. But I would say that, in my experience with these corporate control proceedings, that the concept of having counterclaims and additional claims and lots of different things, ancillary issues popping up in these cases, is usually pretty curtailed by the Court. The Court -- we do have an entity that is sort of without a captain, and the interest of the State of Delaware is making sure that this issue is resolved very quickly to protect the entity. So I've had similar issues where people have wanted to bring in a lot of different issues and then want to try the panoply of claims they think that they have and make sure that every ox that's been gored gets put before the Court. I just don't think that that's appropriate. I think it's a very

When he did not prevail in that effort, Lynch pressed on, continuing to falsely represent that he was Belleville's 65% owner and sole manager based on the sham documents. And at trial, Lynch falsely testified that he was substantively instrumental in the IMC acquisition; that he negotiated for and purchased 65% of Belleville in 2007 and 2008; that he and Gonzalez negotiated security for that purchase and agreed not to execute the Counterdocument; and that he owed Televideo a debt that was restructured in exchange for valuable consideration. He relied on the sham documents in support of this false testimony.

In the final chapter of this litigation, Lynch waived his ostensibly motivating core claim under Section 18-110, as well as his primary affirmative defenses.[538] At bottom, his entire case was an attempt to hold Gonzalez to sham documents he knew presented lies. The Court will not be complicit in an illicit scheme, nor will it stand to be a pawn in one. And while Gonzalez himself was engaged in some duplicity with Argentine regulators, he acted in good faith before this Court to defend what he knew to be the true ownership and management of the Company. Clear evidence supports a finding that Lynch initiated this action, brought his claims, and ultimately

---

limited action to make a determination on who owns it, and that's it. So I don't see this thing turning into tons and tons and tons of discovery on every known issue.").

[538] *See supra* Section II.A.3.

litigated those claims in bad faith. Defendants are entitled to fees and costs under the bad faith exception.

## III. CONCLUSION

Plaintiffs failed on all counts. The Televideo Defendants are entitled to a judgment in their favor with respect to Counts I, II, and III of their counterclaim. The Court will enter a declaratory judgment that (1) Televideo owns 85% of Belleville, (2) Gonzalez owns 5% of Belleville, (3) Gonzalez and Alviz are Belleville co-managers, and (4) Lynch owns 0% of Belleville and is not a Belleville member or manager. The Televideo Defendants' tort claims fail.

Defendants are entitled to reasonable costs and fees incurred in defending this action. Within twenty days, Defendants shall submit an affidavit, with a form of order, stating the amount of attorneys' fees incurred, pursuant to Chancery Court Rule 88. Plaintiffs may respond regarding the reasonableness of such fees. Once the amount of expenses, including attorneys' fees, and costs has been determined, the parties shall submit an implementing final order and judgment.